## Case No. 17,832.

### WILSON v. ROUSSEAU et al

[1 Blatchf. 3.] [1]

Circuit Court, N. D. New York.    Oct. Term, 1845.

PATENTS FOR INVENTIONS—INFRINGEMENT.

In this case the judges of this court were opposed in opinion upon ten several questions, which were certified to the supreme court of the United States. The case in that court is reported in 4 How. [45 U. S.] 646. The arguments of counsel on the case in this court are here given, with a view to a better understanding of the full scope and bearing of the answers of the supreme court to the several questions certified, the same arguments having been presented in both courts and by the same counsel.

This was an action on the case [by James G. Wilson against Louis Rousseau and Charles Easton] to recover damages for the infringement of letters patent. The questions in the case arose on demurrer. The judges of this court were opposed in opinion upon ten several questions which were raised by the demurrers. [Case unreported.] Those questions were certified to the supreme court of the United States for its opinion, and the decision of that court upon them is reported in 4 How. [45 U. S.] 646. The opinion of the court was delivered by Mr. Justice Nelson. It will be seen, by referring to it, that the seventh, eighth, ninth, and tenth questions certified are simply answered, without the assignment of any reasons for the conclusions of the court, and neither the arguments nor the points of the counsel who argued the cause in the supreme court are given by the reporter. It has therefore been thought that it would not be unprofitable to give at some considerable length the positions assumed by the same counsel in this court on the argument of the demurrers, (and the same arguments were presented in the supreme court,) as tending to assist in a better understanding of the full scope and force of the very important decisions made by the supreme court in the case.

The declaration contained two counts. The

first count set forth the issuing of letters patent to William Woodworth, December 27th, 1828, for fourteen years from that day, for "a new and useful improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness, and also for facing and dressing brick, and cutting mouldings on or facing metallic, mineral, or other substances;" the death of William Woodworth, intestate, at New-York, February 9th, 1839; the appointment of William W. Woodworth, his son, as his administrator, February 14th, 1839; the application of William W. Woodworth, as administrator, July 20th, 1842, to the commissioner of patents for an extension of the patent for seven years; the action of the proper board of commissioners, November 16th, 1842, extending the patent for seven years from the 27th of December, 1842; an assignment by William W. Woodworth, as administrator, to the plaintiff, August 12th, 1844, of the exclusive right to make, use, and vend two machines, under the patent as so extended, to be used in the town of Watervliet, Albany county, New-York; and the infringement by the defendants by the use of the patented invention in Watervliet since the assignment to the plaintiff.

To the first count the defendants pleaded the general issue and three special pleas. The first special plea to the first count set forth, that William Woodworth, on the 4th of December, 1828, after the discovery of his improvement, assigned to one James Strong the one half of his interest in it, by an assignment in writing, under seal, which was duly recorded in the patent office; that on the 28th of November, 1829, by an instrument in writing, under seal, Woodworth and Strong assigned to Daniel H. Twogood, Daniel Halstead, and William Tyack, all their right to the patent for certain territory, embracing, among other places, said county of Albany; that said instrument contained an habendum clause as follows: "To have and to hold the rights and privileges hereby granted, to them and their assigns, for and during the term of fourteen years from the date of the patent," and also this further clause: "And the two parties further agree that any improvement in the machinery, or alteration or renewal of either patent, such improvement, alteration, or renewal shall enure to the benefit of the respective parties in interest, and may be applied and used within their respective districts as hereinbefore designated;" and that said instrument was recorded in the patent office, October 9th, 1837.

To this plea the plaintiff demurred, assigning the following special causes of demurrer: First. That the assignment made by Woodworth and Strong to Twogood, Halstead, and Tyack, November 28th, 1829, having been executed before the passage of any law authorizing an extension of the terms of

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

letters patent, did not vest the grantees with any interest in the rights secured by the extension of the patent for seven years. Second. That the plea did not show that the defendants were assignees of Twogood, Halstead, and Tyack, or ever derived any advantage from the assignment to Twogood, Halstead, and Tyack. The defendants joined in demurrer.

The second special plea to the first count set forth, that William Woodworth, prior to the 1st of November, 1836, disposed of his entire interest in the patent; and that at the time of his death on the 9th of February, 1839, he had no interest in the patent.

To this plea the plaintiff demurred, assigning the following special causes of demurrer: First. That the validity and sufficiency of the extension of the patent were not affected by anything alleged in the plea, nor was the plaintiff's right to judgment barred or affected by the matters alleged in the plea. Second. That William W. Woodworth, in his capacity as administrator, had good right, by law, to apply for and obtain an extension of the patent, and that the extension of the patent could, by law, be made on his application, and to him, and not otherwise. The defendants joined in demurrer.

The third special plea to the first count set forth that William Woodworth died on the 9th of February, 1839, and that at the time of his death he had no interest in the patent.

To this plea the plaintiff demurred, assigning two special causes of demurrer, the same as to the second special plea. The defendants joined in demurrer.

The second count of the declaration set forth the issuing of the patent, the death of Woodworth, the appointment of his administrator, and the extension of the patent for seven years, as in the first count; the extension of the patent for seven years from the 27th of December, 1849, by an act of congress passed February 26th, 1845; the surrender of the patent on the 8th of July, 1845, by William W. Woodworth, as administrator, on account of defects in the specification, and its reissue on that day on an amended specification; an assignment in writing, under seal, by William W. Woodworth, as administrator, to the plaintiff, on the 9th of July, 1845, of his right and title to the said re-issued patent of July 8th, 1845, for the residue of said first extension of seven years, so far as regarded, (among other things,) the exclusive right to use two machines in the town of Watervliet, Albany county, New-York; and the infringement by the defendants, by the use of the patented invention in Watervliet, since October 1st, 1845.

To the second count the defendants demurred, assigning the following special causes of demurrer: First. That it did not appear by the second count that the plaintiff was the assignee of an exclusive right to make, use, and vend said improvement within the town of Watervliet, or that he was invested, as to

that territory, with all the rights of the original patentee. Second. That the re-issued patent of the 8th of July, 1845, was void: 1st. For uncertainty in the amended specification; 2d. For ambiguity in the same; 3d. For multiplicity of claim in the same; 4th. Because it appeared that the re-issued patent of the 8th of July, 1845, was not for the same invention for which the patent of December 27th, 1828, was granted. Third. That the decision of the board of commissioners, upon the application for the extension of a patent under the 18th section of the act of congress of July 4th, 1836, commonly known as the patent act, is not conclusive upon the question of their jurisdiction to act in the given case. Fourth. That the commissioner of patents could not lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and during the existence of an extended term of seven years. The plaintiff joined in demurrer.

The questions upon which the judges were opposed in opinion will be severally stated hereafter. They will also be found at length in the report of the case in 4 How. [45 U. S.], together with the certified statement of facts, and copies of the letters patent and specifications, and of various papers referred to in the statement and questions. The first cause of demurrer to the first special plea to the first count raised the second and third questions; and the second cause, the fourth question. The causes of demurrer to the second and third special pleas to the first count raised the first and fifth questions. The first cause of demurrer to the second count raised the sixth question; the first, second, and third subdivisions of the second cause the seventh question, and the fourth subdivision the eighth question; the third cause, the ninth question; and the fourth cause, the tenth question. For the sake of convenience the arguments will be presented in the order of the questions as certified, rather than in their order as raised by the pleadings in this court.

William H. Seward, for plaintiff.

Level, smooth, and impervious wooden floors are among the necessary parts of all our dwellings. They were prepared until 1828 with manual labor, and with very imperfect instruments. A skilful and vigorous mechanic would prepare ten or fifteen planks, equal to one hundred feet, in a day, at a cost of two dollars. William Woodworth invented a machine by which five thousand feet of lumber are prepared for floors in one day, at an expense of ten dollars.

Point I. Whether the 18th section of the patent act of 1836 authorized the extension of a patent on the application of the executor or administrator of a deceased patentee. The laws of the United States regard property in letters patent for inventions as personal prop-

erty in contradistinction to real property. If a patent be granted for fourteen years, and the patentee die during the term, the property in it becomes vested in his personal representatives. The 18th section of the patent act of July 4, 1836 (5 Stat. 124), declares a new and further right in behalf of an inventor who has obtained a patent. This new right is a title to an extension of the original grant for seven years more, if the patentee, at any time before the expiration of his patent, shall show to the proper authority, by a certain form of proof, that such an extension would be "consistent with the public interest," and "just and proper, by reason of his failure," without neglect or fault on his part, "to obtain from the use and sale of his invention, a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same and the introduction thereof into use." The effect of such an extension, when made, is that the original letters patent "have the same effect in law as if they had been originally granted for twenty-one years." By the operation of the 18th section, such a new and additional right as has been described vests at once in every inventor when he obtains his patent; that is to say, a contingent right to an extension for seven years. The consideration of this new and additional right is of the same nature, if not identical, with that of the right to demand the original patent, and belongs as exclusively to the same inventor. That consideration is the unremunerated merit of a discovery useful to the commonwealth. If the original patent had been for twenty-one years, and the inventor had died during that period, the administrator would have taken the benefits of the unexpired term. Why should not the administrator apply for and obtain the extension, on the death of the patentee during the same term? The argument on the other side is that the letter of the statute provides for an application by the patentee, prescribes conditions to be performed by him, and directs a grant to him, without at all alluding to the possibility of his death. But the statute recognizes the application for an extension, not as a petition for a boon, but as a demand, which must be granted whenever certain circumstances exist. The inventor, then, has a right to an extension in certain cases. If it were of such a nature that courts of common law could enforce it by proper remedies, it would be a legal right. But it is a right contingent on the favorable adjudication of the board of commissioners, which is invested with legislative discretion in regard to the application, and it is also an equitable right, because any claim or interest in regard to it which may be created among individuals by contract, can be enforced in courts of equity alone.

But, where not affected by assignment or testamentary direction, choses in action, whether legal or equitable, and whether absolute or contingent, always pass by mere operation of law to the personal representative of a deceased owner, without any words of perpetuity. An administrator, though not named in the obligation, may sue on a bond executed to his intestate. So any personal right, whether arising by express agreement, or by mere implication of law, whether absolute or conditional or contingent, may be asserted with the same effect by an executor, as by the party to whom in life the right belonged. The administrator's right of succession to personal property is absolute and universal. This transmissibility has only one exception. The right to damages for personal torts does not descend. Rights conferred by law, or created by legislation, whether rights of one citizen against another, or of a citizen against the commonwealth, are as truly rights of property, as those created between citizens by contract. In such cases the law is a contract, or creates a contract, as has been well settled. Therefore, such rights are subject to the principle of transmission to personal representatives, like all other rights of personal property. If the state grant the use of a bridge for a term of years, on condition that the grantee shall erect the bridge, and, at the expiration of his term, devote it to the public, is not this a contract, which, if performed by the grantee, will descend to his representatives and carry the franchise to them? Nor is there anything in the intangibility of the right to an extension of a patent, or in the uncertainty of its future establishment, which exempts it from the principle of this law.

An executor or administrator is entitled to all the personal property of the decedent, not only to such as is susceptible of manual possession, but also to things in action, whether in law or in equity; and this includes not only property not in the possession of the deceased at the time of his death, but also interests vested in him by condition, remainder, limitation or election, and such interests equally in equity as in law. 9 Petersd. Abr. 298. The right to an extension of a patent is an interest concerning personal property, in equity, depending on the election of the patentee and on a condition beyond his control. Such an interest must necessarily pass to the administrator, unless the statute, expressly or by implication, limits its duration to the life of the patentee. The statute contains no such express limitation. No limitation is implied by the provision that the patentee shall desire an extension; for the desire here described is an election, which can be made by an administrator. Nor is a limitation implied by the provision that the patentee shall apply; for the application is only a legal proceeding to assert a personal right, and an administrator may institute such a proceeding.

But it is chiefly insisted that a limitation is implied by the provision that proof shall be made by the oath of the patentee concerning his profit and loss resulting from the invention. This direction concerning the oath

of the patentee is merely incidental and a matter of detail, which must give way when necessary to secure effect to the essential portion of the statute. The essential thing is, that it must appear that the inventor has not been adequately rewarded. It must appear also, that the application is for his benefit, as between him and the world at large. But, in view of the policy of the act, he lives in the person of his administrator, and an application by the administrator is virtually an application by the inventor. The law requires the patentee to exhibit his profits and losses. They must be exhibited, even though he be dead. His administrator has his books and accounts, and is therefore presumed to be competent to show what the law requires. If he can do this, the object of the provision concerning proof is attained. If he cannot, the application must fail. It would alike fail, for the same cause, if made by the inventor himself. If, in some cases, an administrator might be unable to satisfy the board, that circumstance would constitute no reason why one who could fully satisfy the board should not apply.

The object of the patent laws is, as defined in the constitution, "to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their writings and discoveries." The 18th section of the act of 1836 implies that, in order to promote the progress of science and the useful arts, it is necessary to extend a patent, when the public interests will permit, if· the inventor have, without fault on his part, failed to obtain a remuneration during the term of fourteen years. The act is, therefore, remedial. But, if the position of the defendants be correct, the law will altogether fail in those numerous cases where a patentee dies without obtaining an extension. Now, since there is no express limitation on the life of the patentee, imposing on us the necessity of adopting so suicidal a construction of the 18th section, and since portions of the statute may seem to conflict with each other, all that can be claimed by our adversaries is that, in this respect, that section is ambiguous. Admitting such ambiguity, only for argument's sake, we humbly submit that our construction is in harmony with the policy of the statute. Again, our construction brings the 18th section into harmony with the other details of the statute. The 6th section provides that any inventor, (without alluding to his possible death,) may apply for and obtain letters patent. The 10th section declares that if the inventor shall die before a patent issue, then the right of applying for and obtaining such patent shall devolve on the executor or administrator of such person, in trust for the heirs at law of the deceased, or of his devisees, in as full and ample a manner, and under the same conditions, limitations, and restrictions, as the same was held or might have been claimed or enjoyed by such person in his life-time; and when ap-

plication shall be made by such legal representative, the necessary oath or affirmation shall be so varied as to be applicable to him. Again, the 13th section provides that, if a patent shall prove void by reason of mistake or accident, the patentee may surrender it, and obtain a renewed patent for the unexpired portion of the original term; and the statute expressly declares that the executor or administrator of a deceased patentee may apply in such a case. Now, the most accomplished casuist would fail to find a reason for a policy in that case, distinguishable from the policy of extension provided for in the 18th section. Again, the statute is beneficent. It is, therefore, to be construed rigorously against the public and beneficently towards inventors. It would be a mockery of national magnanimity and justice to offer the extension of a patent to the unrewarded inventor while in life, and yet plead his death in abatement of an application for an extension on behalf of his children. The construction insisted upon by our adversaries does violence to natural sentiments of justice. The commonwealth has, by the discovery, received a beneficial consideration. It pays an equivalent to the inventor. Would it not be absurd and capricious to say that the equivalent shall be conferred on the inventor if he live fourteen years, but shall be denied him if he do not live so long? Again, the 18th section provides for the transmission of the benefits of the extension to assignees. It would be very strange indeed if an assignee should be remembered with justice and kindness by his country, and the inventor's children be cast out from her favor. The language of the British statute in regard to the extension of patents is to the same effect. Executors and administrators are not expressly named, while in fact they apply for and obtain such extension. St. 5 & 6 Wm. IV. c. 83, § 4; Hind. Pat. 600.

But, it is urged that executors and administrators seem to have been intentionally excluded, because they are not mentioned in the 18th section, while they are expressly named in other sections, such as the 5th, 6th, 10th, and 13th. The remark is founded on the principle that the entire law is the symmetrical production of one mind, and that uniformity of language must therefore be expected, where there is uniformity of purpose. But the reason fails in construing statutes enacted by popular legislatures. It is insisted, moreover, that the powers vested in the board of commissioners are special and administrative, and are, therefore, to be strictly exercised. This is very true. But how strictly? Certainly not so strictly as to defeat the statute. The letter must be preserved, but not if it kill the spirit of the law.

The question thus discussed was necessarily involved in the decision of the board of commissioners, when the extension of 1842 was granted in this case. That board acted judicially and decided the point in our favor. In the case of Van Hook v. Scudder [Case No.

16,853], in the circuit court of the United States for the Southern district of New-York, the late Mr. Justice Thompson, in June, 1843, held that an administrator or executor might make application for the extension of a patent after the death of the patentee, and that the patent might lawfully be extended on such an application. The same view of the statute was adopted by Mr. Justice McKinley in the case of Wilson v. Simpson [Id. 17.834], in equity, in the circuit court of the United States for the Eastern district of Louisiana, and by Judge McCaleb in the same court in the case of Wilson v. Curtius [Id. 17,800]. Mr. Justice McLean considered the same question, on the same extension of this patent, in the case of Brooks v. Bicknell [Id. 1,945], in the circuit court of the United States for the district of Ohio, and decided that the construction of the act in this respect had been rightly settled by the board of commissioners. The question was several times presented to the lamented Mr. Justice Story. At first he adopted the opinion of Judge McLean from courtesy; but afterwards, in the case of Woodworth v. Sherman [Id. 18,019], he said that, on the fullest reflection, he had come to the opinion that Judge McLean was right in his decision that an administrator was competent to apply for and receive this grant, and that to hold otherwise would be going contrary to the whole spirit and policy of the patent laws.

Point II. Whether by force and operation of the 18th section of the act of July 4th, 1836, entitled "An act to promote the progress of the useful arts, &c.," the extension granted to William W. Woodworth, as administrator, on the 16th day of November, 1842, enured to the benefit of assignees under the original patent granted to William Woodworth on the 27th day of December, 1828, or whether said extension enured to the benefit of the administrator only, in his said capacity. The policy of promoting science and the arts by granting letters patent is feebly shadowed forth in the books of common law. It is certain that letters patent had originally no such object. They were chiefly employed to grant to favorites of the crown, estates, honors and franchises at the expense of the public welfare. Certainly, very imperfect notions of the present policy of letters patent existed until near the close of the reign of Elizabeth. That queen granted to a favorite of hers, named Ralph Bowes, a monopoly of the manufacture of playing-cards for twelve years, and afterwards extended the franchise for twenty-one years longer. In the letters patent she did not pretend that he had invented those instruments of amusement, or any process of manufacturing them. This monopoly was tested in the case of Darcy v. Allein, 11 Coke, 84b, and it was declared void, because injurious to the public welfare. A severe examination of all existing monopolies was made in parliament at an early period in the reign of James I. But this was done by royal concession, and not at all under a claim of legislative power. On that occasion a large number of letters patent were condemned and abrogated, and none were saved but such as had short terms, and were granted to inventors, for useful discoveries. At last, the statute of 21 Jac. I. c. 3, was passed. See Hind. Pat. 592. This statute, which constituted the British code of the law of letters patent for two hundred years, originated, as is seen, not in the policy of promoting science and the arts, but merely in a jealousy of royal power. It established that policy not by direct and affirmative enactments, but by way of excepting those patents which could be defended on public considerations. The grounds of these exceptions were: 1st, that the patentee was the inventor; 2d, that the discovery was useful; 3rd, that the monopoly would operate as an encouragement to genius; 4th, that the term of the monopoly did not extend longer than fourteen years.

This was the British law of patents when the American constitution was founded. An obvious necessity dictated that the power to provide for the promotion of the arts and sciences should be vested in the federal government, rather than in the authorities of the respective states. And it is remarkable how distinctly every feature of the policy of the statute of James I. is impressed on the constitution of the United States. Article 1, § 8. Congress shall have power. What power? Power to promote the progress of science and useful arts. How? By securing the exclusive right of property in writings and discoveries. To whom? To authors and inventors. For how long? For limited times. Congress exercised its constitutional power in the act of April 10th, 1790 (1 Stat. 109), and that law was expressed in the very words of the statute of James I. The act was revised in 1793, and amended in 1800, 1819, and 1832. Neither the statute of James I., nor the act of 1793, provided for the case of an improvement of an invention already patented; nor for the conflict of claims between the inventor of the principle and the discoverer of the improvement. Nor did either the British or the American code provide for the re-issue of void letters patent; nor for an extension under any circumstances of the limited term for which letters patent were issued. As early as 1793, however, it was perceived that a controversy might arise between the patentee of a machine, and a person who should discover an improvement of it. Congress, therefore, in that year enacted that any person who should have discovered an improvement in the principle of any machine, or in the process of any composition of matter, which should have been patented, and should have obtained a patent for such improvement, should not be at liberty to make, use, or vend the original discovery, nor should the first inventor be at liberty to use the improvement. 1 Stat. 321. Here we recognize for the first time improvements of patents, in the law regulating the rights of scientific property.

In England, as well as in America, until a very recent period, a defective description of the invention rendered the letters patent void.

An attempt was made by American judges, as early as 1812, to correct this great injustice. It was held by them that letters patent might be valid, although the specification were defective, unless the defect arose from an intention to deceive the public. Whittemore v. Cutter [Case No. 17,600]; Park v. Little [Id. 10,-715]. But this view was abandoned in submission to stringent British decisions on the same subject, and it was thereafter held here, as in England, that a defective specification rendered letters patent absolutely void, no matter how innocent of fraudulent design the inventor, or how beneficent his invention. Morris v. Huntington [Id. 9,831]. The evil could now be corrected only by a proceeding which the letter of the law did not direct or recognize, namely, an amendment of the specification and a re-issue of the letters patent. In a case which came before Mr. Justice Thompson in 1824, he held, that there was no insuperable objection to entering a vacatur of the patent, if it had been taken out inadvertently and by mistake; that all the proceedings in the state department were ex parte, and were conducted ministerially rather than judicially; and that there was no good reason why the patent might not be surrendered and cancelled of record, a new and correct specification be filed, and a second, that is to say, a re-issued patent for the unexpired portion of the fourteen years be issued to the patentee, whereby the inventor and the public would be secured in their rights. The department of state promptly adopted the opinion of Judge Thompson, and the principle was sanctioned by the supreme court of the United States. Grant v. Raymond, 6 Pet. [31 U. S.] 218; Shaw v. Cooper, 7 Pet. [32 U. S.] 292. It was also engrafted by congress upon the patent system of this country in 1832, by a law which declared that whenever any patent should be invalid or inoperative, for the reason that any of the terms or conditions prescribed in the third section of the act of 1793 had not, through inadvertence, accident or mistake, and without any fraudulent or deceptive intention, been complied with on the part of the inventor, it should be lawful for the secretary of state, upon the surrender to him of such patent, to cause a new one to be granted to the inventor, for the same invention, for the residue of the period, then unexpired, for which the original patent was granted, upon his complying with the terms and conditions prescribed in the third section of the act. 4 Stat. 559. The law remained thus until 1836. The security offered to inventors, as authorized by the constitution and granted by congress, consisted of the following provisions, namely: a patent for an invention for the term of fourteen years; a patent for an improvement of an invention already patented; and a right to an altered and renewed or re-issued patent for the same term, in lieu of one which should prove void by reason of a defective specification. The act of 5 & 6 Wm. IV. c. 83, passed in 1835, through the efforts of Lord Brougham, contained a provision for the surrender of letters patent for a defective specification, and for the renewal of them on an amended specification, similar in all respects to our own law of 1832.

There was yet another advance to be made. This was accomplished in 1836. Congress, in that year, revised the entire patent system, and abolished all existing laws. A new code was enacted. 5 Stat. 117. Under the former system an inventor was held, in regard to time, to the strict letter of the contract between himself and the government, as expressed in his letters patent. By that contract, he had agreed to surrender his discovery to the public forever, in consideration of being secured in the exclusive enjoyment of it for the limited time appointed by law. Previously to 1836 the term was inflexibly fixed at fourteen years. If an inventor improved his own invention or that of another, he could obtain a patent for the improvement, but only for the term of fourteen years. If a patent proved defective and void, it could be amended, altered and renewed, and thus be made valid and effectual, but only for so many years or months or days as might remain of the fourteen years originally stipulated. No public authority had power, on any consideration, to extend the duration of a patent. No law existed recognizing a right in the inventor to an extension, and of course no such right existed. If, now and then, a patent was extended for seven or perhaps fourteen years, the act of extension was effected not by any subordinate authority, nor by virtue of any existing law, nor in acknowledgment of any right or claim on the part of the inventor, nor in accordance with any established policy. But, on the contrary, the extension was an exception to the policy of the country, and constituted a gift, conferred by a high and solemn act of legislative power. But a change at length came over the spirit of the age. In England as well as in America, after a long trial of the same absolute limitation of patents to the term of fourteen years, it was found that when an invention was really useful, such numerous and powerful interests were often combined against the inventor, that, with the aid of fraud and litigation, letters patent too often failed to secure to the inventor the enjoyment of his property during the limited time so strictly measured. The English statute of 5 & 6 Wm. IV. c. 83, was passed on the 10th of September, 1835. That statute provides that in certain cases after a full hearing of and enquiry into the whole matter by the judicial committee of the privy council, his majesty, if he shall think fit, may grant new letters patent for an invention already patented, "for a term not exceeding seven years after the expiration of the first term, any law, custom or usage to the contrary in any wise notwithstanding." The principle of that act was adopted by the congress of the United States at the very next session of that body. The provision thus made for extending patents, constitutes the 18th section of the act of July 4th, 1836.

All the difficulties which have arisen in the present case, and all which can be raised in regard to the construction of the 18th section, will vanish when a distinction is simply and plainly taken between the "extension" of letters patent and the "renewal" of letters patent. Legislative bodies may use terms loosely, but courts apply them strictly. A "renewal" renovates a patent which has become void, and restores it to the same condition in which it was when it became void, and for the same period of duration. An "extension" differs altogether from this. It seizes upon the franchise at the expiration of the fourteen years, and extends it seven years more; and it has this effect whether the franchise ran its course of fourteen years by virtue of original letters patent or of renewed letters patent. Hence it follows that the "extension" to be made under the 18th section is a relinquishment by the state to the inventor of a portion of an estate which he had solemnly dedicated to the public use; whereas, what is conceded to him by a renewal is what was granted ineffectually before. The claim of the inventor, recognized by the 18th section, arises, not as in other cases, out of his acknowledged title to his invention, for he has conveyed that to the public, nor yet out of the palpable obligation of the government to render effectual the defective guaranty for which it received so valuable an equivalent. But his claim arises now out of a principle of national magnanimity. The legislature is bound to secure individual rights, and could not justly deny a patent for a new invention, or for an improvement of an invention. Nor could congress, with more justice, refuse a renewed patent, when the first should prove useless, for that would be to seize the inventor's property without allowing him any reward, after pretending to give him a solemn guaranty for its enjoyment. And congress could not declare that the renewed patent should be for the sole use of the patentee to the exclusion of assignees, because that would be unjust, fraudulent, and a palpable violation of the constitution. But when the inventor has renounced his discovery to the public, by a contract fairly made and valid in law, a claim for a modification of that contract and for a further remuneration by a prolongation of the franchise, on the ground of disappointed expectation or effort, however just or reasonable, is at least without precedent. Nevertheless, the 18th section is neither capricious, nor unreasonable, nor impolitic. It does not authorize extensions without just claims and enlightened purposes. Those who maintain that, by virtue of the 18th section, assignees of the original term acquire an interest in the extended term, without any express agreement, seem to overlook the nature, alike, of the occasion provided for by that section, of the action prescribed, of the claims of the party procuring that action, and of the policy of the law. For it is on the desire, not of an assignee, but of the patentee, that an extension may be granted in proper cases. The patent to be extended must belong not to an assignee but to the patentee. And the patentee must not merely desire an extension. He cannot be passive. He must act. He must make application in writing and set forth the grounds thereof. Those grounds are to be exhibited, not by any stranger, or even by an assignee or privy in interest, but by the patentee. The 18th section acknowledges that however the patentee may have leased or sold his franchise, in whole or in part, for the term of fourteen years, an equity in remainder belongs to him, and that the right to a prolongation of the term, if it exist in any body, exists in him. It is unimportant to enquire whether the right in the thing patented, after the fourteen years, has reverted to the inventor, or whether he be deemed never to have parted with it. The law expressly declares it his, in saying—"if the patentee shall desire an extension of his patent."

Again, the act directs the commissioner of patents to demand forty dollars in advance, as a condition of receiving an application for an extension, and he shall exact that sum, not from an assignee or a stranger, but from the applicant, who, it has been shown, can be no other than the patentee. Congress distinctly say that this money is to be paid by him as in the case of an original application for a patent. These directions are given for a public transaction, in the nature of a suit to the government for a right. This suit is, in form, a judicial proceeding, a prosecution to obtain a grant or franchise beneficial to the applicant, and, possibly, injurious to the public. After the inventor has instituted his prosecution by an application in writing showing the grounds thereof, and after he has paid the legal fee in advance, he is next required to summon the parties interested to appear before the court. Not only is the government there, for its administrative agents constitute the court, but notice must be given to all the world, and care must be taken to bring the notice home to those persons who are most interested adversely to an extension. The duty of thus calling adverse parties before the court is devolved, with all its burthensome expense, not on any public officer or agent, nor on any assignee or person subordinately interested in the property, but on the patentee. A board is constituted, which is a court, for it "receives" an application, "considers" it, "hears the patentee and any person appearing to show cause in opposition," and, with the latitude of judicial discretion, "decides" upon "evidence produced," at a time and place previously given to the parties, and "certifies its judgment and opinion," that the same may become a public record. This view of the judicial character and functions of the board is sustained by the opinion of Mr. Justice McLean, in the case of Brooks v. Bicknell [Case No. 1,945].

Thus far the patentee is the actor or prose-

cutor. Nor does his action stop here. Besides all other evidence, the court appeals to his conscience, by requiring a statement, on oath, of the ascertained value of the invention. Of its ascertained value to whom? To the public? No. To assignees and grantees? No. To the patentee and his assignees together? No. But of its ascertained value to the patentee. For that value is to be ascertained by an account of his receipts and expenditures, and of those alone. And the receipts and expenditures thus stated must show a true and faithful account of profit and loss, not by assignees and grantees, but of profit and loss in any manner accruing to him, the patentee, from and by reason of the said invention. Why this elaborate, perplexing and expensive exhibition of the accounts of the patentee exclusively, embracing every item of profit and of loss, arising from whatever cause or in whatever manner? The object is explained in the next clause of the section, to wit: that it may appear "to the full and entire satisfaction of the board, whether it is just and proper, that the term of the patent should be extended, because the patentee has, without neglect or fault on his part, failed- to obtain from the use and sale of his invention, a reasonable remuneration for the time, ingenuity and expense bestowed by him upon the same, and the introduction thereof into use."

Who can fail to see that as the inventor alone is invited into court to prefer an application, and is charged with all the responsibilities, expenses and burthens of a public suitor, so the claim investigated is his own, exclusively, and founded upon his own merits, services and sacrifices for the public good? If it be shown that he was not the inventor, his application fails. If it be shown that he has received an adequate recompense, his suit is of course denied. It encounters the same fate, if the failure to obtain such recompense resulted from his own fault or neglect. On the other hand, if he be the inventor, if the discovery be useful, and if he have failed to receive remuneration without such fault or neglect, then, so far as individual interests are concerned, it is just and proper that his application should prevail. And the result must be the same, whether he has used his improvement more or less, whether he has licensed one person or one hundred thousand persons to use his invention, whether he retains the entire property in his franchise or has sold it for every hamlet, town, county and state in the Union. Nor will the case be varied, although assignees have enjoyed the franchise, with or without interruption, whether they have become enriched or impoverished, with or without merit or neglect of their own. Their transactions, their profits and losses, find no place in the "true and faithful account" which the patentee must exhibit. If the board be fully and entirely satisfied of the justice of the claim of the patentee, and

not otherwise, and upon that consideration alone, (but not without due regard to the public interests,) they certify their judgment to that effect to the commissioner of patents. The commissioner is required thereupon to extend the patent for the term of seven years from the expiration of the first term.

The patent thus extended "shall have the same effect in law as though it had been originally granted for the term of twenty-one years." What is thus made to continue twenty-one years, instead of fourteen, its original limitation? The franchise secured by the letters patent. What is that franchise? If we consult the 5th section, we find it is a grant to the inventor for himself, his heirs, executors, administrators or assigns, of the full and exclusive right and liberty of making, using and vending the invention. It is a grant which excludes all men from participating in the enjoyment of the property described. It is a grant to the inventor in praesenti, on the day of the extension. It leaps backward, over all intervening time, to the date of the first patent, and gives that grant the same effect, from that time, as if it had been originally made for twenty-one years. And it looks forward to the possible death of the inventor, or his future assignment of the whole or portions of this new and additional franchise, and includes the patentee and, contingently, his future heirs, executors, administrators and assigns. The heirs, executors, administrators and assigns thus provided for are not the persons who would have been such, had he died or assigned without that extension, but those who shall in fact, and by operation of law, or of his own grant, be his heirs, executors, administrators or assigns, in the event of his future death or assignment. The original patent is not continued from its expiration, with all the accidents, incidents and accessions attached to and gathered round it during its course, but the extension relates back to the commencement of the patent, overleaps all assignments, incidents and accessions, and leaves them as they were, because they are not prolonged or extended, nor is it declared that they are to have the same effect as if the patent had been originally granted for twenty-one years. If the patent were not extended, all assignments and licenses would of course expire with the patent. They must equally expire although the patent is prolonged, for they are not prolonged.

Again, the portions of the 18th section which have been considered manifest a designed neglect and disregard of assignees and licensees. No matter how much any one assignee, or all the assignees, may desire the extension of a patent—no matter though the whole of the original franchise may have been assigned to one person, and he may desire an extension—no matter though assignees of a part, or even of the

whole, make application in writing, and set forth the grounds thereof—no matter what grounds they set forth—no matter though, among such grounds, they show that they have furnished all the capital which has been used in perfecting the discovery and bringing it into use—no matter though they prove, by indisputable evidence, that they have been not merely just, but even generous to the inventor, and liberal to the public, and have been impoverished by their generosity, while the inventor has become opulent, and the country has grown in wealth and prosperity by the expenditure of their capital in bringing the invention into use—no matter though they show all this, and show besides, that the patentee, although indemnified by them, refuses to apply on their behalf and to set forth his accounts on oath, yet the assignees must be dismissed without a hearing. It thus appears, that not only is the patentee a necessary agent in obtaining the extension, but that the policy of the law is to encourage genius by furnishing additional stimulants to inventors, not to assignees, or even to patrons of inventors, and that the law can have effect only at the solicitation of the inventor, in consideration of his exclusive merits and for his benefit and his benefit alone. Why this careful consideration of the inventor? And why this studied neglect of the assignee? Simply because the constitution disclaims all care of assignees, while it positively enjoins the protection of inventors.

But it is insisted by the defendants, that this manifest effect of the 18th section is overcome and defeated by the qualifying sentence at the close of the section, to wit: "And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein; provided, however, that no extension of a patent shall be granted after the expiration of the term for which it was originally issued." Before examining particularly this portion of the section, it must be remarked that congress have constitutional power to promote science and the arts by securing rights of property in writings and inventions to authors and inventors only. A construction, therefore, of the 18th section which shall give it effect to secure such a right, primarily, to a mere assignee, without equivalent paid by him to the author or inventor, would certainly be unconstitutional. It is only by the special authority granted in the constitution that congress can interpose. And they can interpose only for the purpose of promoting science, and only by securing the discovery to the inventor. The British government is not restricted by a written constitution. Hence the king there grants letters patents to introducers and to assignees, and he may even deny letters patent to inventors, or refuse to extend them, and may compensate the discoverer of a useful invention by a sum of money, as was done in Arkwright's case, or oblige an assignee to secure an annuity to the inventor, as in Whitehouse's case. But here congress can do nothing but secure the discovery, and must secure that to the inventor alone.

Again, it must be apparent that neither the entire 18th section, nor the much disputed provision quoted from it, was framed exclusively, or even chiefly, or at all directly, with reference to rights in patented property existing at the time of the passage of the law. The 18th section is merely a part of a broad and comprehensive general system, in many respects new, established by congress for the purpose of regulating, in all cases whatever, for all time to come, the exercise of the constitutional power of the government to secure adequate rewards to authors and inventors. The disputed clause of the 18th section, therefore, as well as the whole section, and the entire statute, must be regarded as directly and chiefly prospective, and providing for future, rather than present patents, patentees, assignments and assignees. Although the proviso, the section, and the act, embrace rights and parties existing at the date of the enactment, their operation in that respect is merely incidental. If there be a conflict between the retrospective application of the provisions and their prospective application, the former must of course give way. Under the pressure of a temporary inconvenience, resulting from what may seem a rigorous application of the law to existing cases, we must carefully avoid fixing upon any part a permanent construction inconsistent with its just and enlightened purposes.

Having thus ascertained the spirit of the provision let us enquire into its possible prospective operation. The 6th section of the statute, following the previous policy of the government, provides for issuing patents in future for a term of fourteen years, as was done before. The 11th section, having reference to patents to be granted under the 6th, declares that they shall be assignable. This provision must be construed as simply declaratory of the assignability of patents to be thereafter granted in pursuance of the law. It may, indeed, be held to recognize the assignability of patents already existing, but, manifestly, it was designed to be chiefly prospective in its operation. So, the 18th section provides, that in certain cases, patents may be extended for seven years, and the disputed clause of that section, following the policy of the 11th section, provides that such extended patents shall be assignable and defines the rights to be acquired by assignees. Let it be remembered that a patent does not imply an irrevocable contract with the government that, at the expiration of the period, the invention shall become public property. The legislature has the power to revive or extend the grant. Evans v. Eaton [Case No. 4,559]. Now the 18th section is pertinent and effectual, if it be held that the assignees intended are such as shall become so after the passage of the law, and who.

would clearly take their interests subject to the law. Adopting this construction, the 18th section disturbs no contracts, nor does it interfere with any present interest, except for enlightened purposes; while it suffers existing patentees, without injustice to any person, to profit by the provision made chiefly for those who were afterwards to come upon the public stage. It would be a great violence to the law to divert its application unnecessarily, so as to alter the force, form or effect of any existing contract of assignment; it would be absurd to do so, when such diversion would defeat the very policy of the whole enactment, and criminal, if it would conflict with the constitution. The 18th section may further be admitted to have in view assignees of patents existing at the date of the law, and which might afterwards be extended, and, in regard to them, the section excludes the possible inference that, by granting a new term, congress were disturbing the interests existing under the old. All this may be allowed, without conceding that congress intended, by the 18th section, to give to assignees of the original term, without merit or consideration on their part, the benefits of the new one. But the defendants ask—why then did congress insert the provision at all, since they must have known that they could not disturb rights already vested, and since, if the patent, which was assignable, should be extended, it would follow that the extended patent would also be assignable? Legislative caution against misconstruction is neither unusual nor unreasonable, and it might well be doubted whether extended patents would be assignable, unless expressly declared so by law. The statute of 27 Hen. VIII. c. 11, solemnly declared that a patent lawfully issued to one person should not be invalidated by a subsequent patent granting the same thing to another. This was only an affirmation and application of a fixed principle of the common law.

Let us now imagine a case of the prospective application of the 18th section. The case shall be supposed to come before this court in 1855. The letters patent were issued in 1840. The patentee will have obtained an extension in 1854 for seven years. He will have assigned all his interest in that extended term to an assignee, who shall bring an action against the patentee himself for exercising the franchise. The court will of course sustain the title of the assignee. This is one sensible and effectual application of the 18th section. I submit another. A patent was issued before 1836 and assigned, with an express agreement by the patentee, that if congress should pass a law authorizing the extension of the patent for seven years, then the assignee should, for a sufficient consideration, have all the benefit of that extension. This is a sensible and pertinent prospective application of the 18th section, in regard to letters patent existing when the act of 1836 was passed. If these explanations of the provision in regard to assignees be sensible, and sufficient to allow it fair and

practical effect in harmony with the spirit of the act and of the constitution, it ought not to receive another explanation which would be unreasonable, or inconsistent with the palpable object of the legislature.

But the defendants insist that inasmuch as the law of 1836, and especially the 18th section, operates upon existing patents and contemplates their extension, therefore the provision in relation to assignees equally contemplates a prolongation of their terms of assignment. If, indeed, when a patent shall be extended under the 18th section, (whether a patent existing in 1836, or one granted afterwards,) there shall then be in force a valid assignment of the patent, or of any interest in it, for the extended term, the assignee will, in that case, as has been shown, have the benefit of the extension; for the benefit of the extension enures to assignees, to the extent of their interest in the thing patented. In the case supposed the assignee would have an interest in the thing patented, reaching into the additional term of extension. But it must be remembered that the act by no means declares that the benefit of the extension shall enure to assignees beyond the extent of their interest in the thing patented.

The spirit of the constitution forbids congress to pass a law impairing the force of a contract. To abridge the term of fourteen years would be to impair the contract. To add seven years to it would equally be to impair it. Is the question affected by the circumstance that the party injured would be the patentee? Not at all. That circumstance strengthens the argument; for the patentee is the only person known to the government by merit or claim. If I convey an estate for life in lands, can the legislature enact that my grantee shall also have the remainder? Would not such a law impair my contract? If a patentee leases a machine for the fourteen years, reserving an annual rent, and congress declares that the lessee shall have it seven years longer without rent, or even on paying the same rent, would not that impair the contract contained in the lease?

Before the act of 1836, the extent of interest which an assignee could take in any thing patented, was a term of fourteen years and no longer. For assuredly, a man could take an interest in a thing for no longer time than the thing itself could endure. Ex vi termini, any assignment made before the act of 1836, ceased with the expiration of the first term, and when a patentee, whose patent was granted before the passage of the law, obtains an extension by virtue of the law, he takes the extended franchise, as he did the original grant, absolutely, and in entire exclusion of all persons to whom he may have assigned or granted an interest in the thing patented, for that interest was bounded by the duration of the original franchise. Now, to construe the act so as to confer the benefits of the extension on a previous assignee whose estate was limited to fourteen years, would involve the absurdi-

ty of altering a solemn contract, not merely without a motive, but in opposition to the motives of the legislature; an enlargement, by mere implication, of the assignee's interest in the thing patented, beyond its fixed bounds; and, in brief, a grant to a stranger, without equivalent, without consideration, without merit, of a portion of that property which once belonged wholly to the inventor, which he had unluckily surrendered to the assignee and to the public without adequate consideration, and which congress designed to restore wholly to the inventor for seven years, in consideration of so great a misfortune. And the grant thus supposed to be made is wrested from the meritorious inventor, and given to the assignee, although he not only never stipulated for it, but never contemplated the possibility of an extension of the patent.

Suppose a patentee to have assigned the entire franchise during the first term. In that case, according to the defendants' construction, the extension would enure to the exclusive benefit of the assignee. Can we suppose any thing more absurd than an application in such case by the patentee, in his own name, at his own expense, in his own person, on an exhibition of his own profits and losses, on the ground of his own merits and misfortunes, fortified by his own oath, for an extension of the patent for seven years for his own benefit, when all the benefits of the extension must pass instantly and irrevocably to his assignee? If this seem unreasonable, add to the statement the possible circumstance, that the patentee has been impoverished by the expense of his invention, while the assignee has become opulent by speculation in the fruits of the inventor's genius. Now, even if such unequal rewards were the result of fair and lawful trade, the lot of the inventor would be hard. But if the assignee have purchased the whole invention, and, by becoming bankrupt, or otherwise, have defrauded the inventor of a just compensation, yet even this circumstance would not at all prevent the entire benefit from enuring to the fraudulent assignee. This argument is believed to have always brought those who sustain the defendants' construction, to the very unstatesmanlike and unlawyerlike conclusion, that no extension of a patent can be granted, when the entire franchise has been assigned for the term of fourteen years. And yet the fact, that the assignee has defrauded the patentee of the whole invention for the whole term, would manifestly be the most conclusive evidence which the inventor could submit to the board in support of his claim to an extension. If however, it shall now be insisted that an extension can be granted in such a case, I respectfully ask—how can the assignee compel the patentee to apply for and receive an extension, and why were assigned interests, so important and meritorious, left by congress at the caprice of a patentee?

Why may not the assignee apply for an extension? Let us pursue this idea. The law and the letters patent expressly authorize the patentee to grant and assign his original franchise. Nay more. According to the 18th section, he must have used all possible diligence, and granted and assigned all he profitably could, even the whole of the franchise, if in his power, or else he cannot obtain an extension. But just in proportion to the extent of his compliance with the law are the advantages of the extension reduced. And if he has been diligent enough and successful enough to sell the entire franchise, then all the benefits of the extension shall enure to strangers. Do the congress of the United States promulgate their laws by riddles? Is the statute book a volume of paradoxes?

It is urged, moreover, by the defendants, that the law clearly intended that assignees should share in the benefit conferred on the patentee, and have some advantage from the extension of the patent for seven years, for it provides, in express terms, that the benefit of the renewal shall enure to them, thus using a word which shows that it was not the intention of the legislature merely to protect interests which previously existed in assignees and grantees, but to give them a share in the benefit conferred on the patentee by the renewal of the patent. Now, I submit most humbly that it is by no means clear that it was the intention of the legislature to give gratuitously to assignees what is thus supposed. The supposed assignees were either assignees of interests in the extended term, by express contract, or they were not. If they were, their interests are saved. If they were not, then they can take no share in the benefits granted, unless they are created such assignees by operation of law, that is, by force of the 18th section. But that would be a violation of the contract, and, therefore, void. Congress are not to be supposed to intend what is unreasonable, unconstitutional or impossible. With the utmost deference I must insist, that if the law intended what is thus supposed, it intended to confer an unconstitutional boon. Admitting that previously existing interests are protected, certainly they are protected only to the extent in which they exist. The right of an assignee to share in the benefit of an extension depends on his having an interest, by virtue of his assignment, in the thing patented. And the right is co-extensive with the interest. If it reach into the new term for a county or a state, then the assignee has the benefit of the extension for that territory. If it reach into the new term one year or five or seven years, then the assignee has the benefit of the extension for that period.

But again, the words of the 18th section are as follows:—"And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein." Had the clause stopped at the word "patented," the privileges of assignees and gran-

tees under the first term, independently of the language of their respective grants or assignments, without regard to the intention of the parties at the time of making them, and with or without consideration, as the case might be, would have been prolonged by the mere force of the act of congress, in the event of an extension. But the words "to the extent of their respective interest therein" are added to the clause, and the question now is as to their meaning and effect. Our opponents say that they refer to the fractional parts into which a patent-right may be divided, and extend the rights of the assignees of such parts, as well as those of assignees of the entire interest, as the case may be, during the extended term. On the other hand we contend that fractional assignments are protected without these words, and that consequently for this purpose they are, at best but surplusage. Suppose a patent-right divided among as many grantees as there are states in the Union, and suppose the clause ran: "and the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented," and there stopped—could it be doubted that in the event of an extension, it would enure to the assignees within their respective states, and no further? Could it be pretended that words of limitation were necessary to prevent the assignee for Maryland from invading the territory of the assignee for Pennsylvania? Courts under such circumstances could have no hesitation in deciding that the clause, without the words of limitation, prolonged the duration without widening the sphere of the grant or assignment. The clause being perfect, then, for the protection of assignees of the whole interest, or of fractional interests, without the words particularly referred to, we must look for some office for them to perform other than that insisted on by our adversaries.

We contend that they are words of limitation, added to the clause which gives the benefit of extension to assignees and grantees, for the very purpose of narrowing the broad construction that could be put upon it without them, had it stopped at the word "patented." The words are placed where we find them to prevent the benefit of extension from enuring to assignees and grantees independently of the language of their respective grants or assignments, without regard to the intention of the parties at the time of making them, and with or without consideration, as the case might be. Their office is to limit the benefit of the extension to those who have acquired an interest therein, by the language of their grant, according to the intention of the parties, and for a consideration. The words in question fully accomplish this purpose, just and proper in itself, and perfectly consistent with and indeed necessary to the policy of the law. They accomplish, as we have seen, no other object.

Another objection urged against our claim is, that assignees may suffer serious injustice by the grant of a new and further term to the patentee, unless they are also embraced in it, for, relying on the assurance given by the law, that the monopoly would be thrown open to the public at the expiration of fourteen years, they may have erected costly machinery, and encountered extraordinary expenses, in which case the law of 1836 would enable the patentee to deal with them most severely and oppressively, and to exact from them a heavier sum for the extended term of seven years, than they would have been willing to give for the original term of fourteen. What is the effect of any extension of a patent? Nay, what is its object? Does it not concede a monopoly, a designed monopoly? Could such a monopoly exist at all, unless it excluded participation? Is it not the very nature of a monopoly, that the patentee may, if he will, deal severely, nay oppressively, with every body? And why is an assignee, who has participated in the profits of the first monopoly, entitled, without paying any consideration, to exemption from the severity and oppression which congress deem it just to allow the patentee to practise towards all other citizens of the commonwealth? The whole force of the argument rests then in the assumption that the assignee may have incurred expense in erecting, during the first term, machinery which would be useful after its expiration, if the monopoly should be opened, as was anticipated when he took his assignment. Upon the point thus presented I offer the following remarks:

First. The act has reference chiefly to prospective cases. In all such cases the assignee takes his assignment without relying, or being at all entitled to rely, on the expectation that the monopoly will be thrown open at the expiration of the first term. On the contrary, he acquires his interest with full knowledge, that if the patentee shall fail to obtain remuneration, he will be entitled to an extension for seven years. All these chances enter into his bargain, and are considered in fixing the price he pays for his assignment. This injustice, against which congress are supposed to have guarded, could by no means happen, except in the very few cases in which patents existing in 1836 should be renewed; while the provision designed to guard against this temporary and inconsiderable inconvenience is one which would defeat the benign operation of the statute in a large class of cases. Certainly, the argument of the defendants is one against the policy of the law, and not merely against its right construction.

Secondly. Not every invention requires the erection of costly machinery or an encounter with great expense. An invention for combining colors would require no machinery and no expense. Yet the assignee of such a patent would participate with the patentee in the benefits of an extension, without paying any equivalent, and without the apology of

fancied injustice. Such partiality to the assignee would be injustice, not only to the inventor but to the public.

Thirdly. When the first term of a patent is about to expire, any citizen may gather capital, erect costly structures and provide water or steam power with machinery, to use the invention for profit, and thus be ready to operate as soon as the fourteen years shall have ended. Nevertheless, the patent may be extended and the citizen, thus ready, be disappointed, and perhaps ruined. Why should not congress consider his case as favorably as that of an assignee, reimbursed, at least in part, by former profits, for similar expenditures?

Fourthly. Neither the patentee, nor his assignee, before the act of 1836, contemplated an extension, because it was not legally possible. When the assignee stipulated for his franchise for the first term, he could stipulate for no more than the patentee had, namely, a term limited to fourteen years. He paid the patentee for no more. If his intention to be ready with machinery, to prosecute the same operations when the patent should expire, constituted a part of his motive to the purchase, it was a contemplated advantage over his fellow-citizens. The extension disappoints his expectation. But it is a disappointment by the intervention of the government; such as all citizens must endure without complaint, when the law is changed for the general good.

Fifthly. The same argument of supposed injustice lies against the grant of the original patent. My neighbor invents a machine and omits to obtain a patent for it. Obtaining a knowledge of it, and deeming it useful, I encounter expense and erect costly machinery, and actually put the machine in operation. The inventor obtains a patent and arrests my wheels by injunction. He may deal severely and oppressively with me. Has congress furnished me any security against such oppression?

Sixthly. The same argument would apply in case of a renewal of a patent void for a defective specification. My neighbor obtains letters patent which the courts pronounce void. I have erected costly machinery and used the invention. He surrenders his void patent and obtains a valid one. Can I complain?

Again. Every patent must be extended before the expiration of the original term. If a patent be extended six months before its close, and if the assignee, having the whole right for the first term, have also a right to sell, may he not make and sell machines enough before the first term shall expire, to supply the entire market for the new term of seven years, and thus defeat the benign purpose of the legislature, and deprive the patentee of all benefit from the extension?

Once more. If, indeed, the benefit of the extension enure not to the patentee but to the assignee, and if the former be merely a trustee for the latter, then, when there has been an assignment of the whole term, the patentee, being authorized by the 18th section, may obtain an extension, and sell franchises, and when the sales are made, the assignee, having laid dormant during all the proceedings, may prosecute the patentee and strip him of the bounty of his country. This is the condition in which William W. Woodworth, the administrator, now is, if he be not entitled to the benefit of this extension for the children and heirs at law of the inventor. If this be the true construction of the law, well might the inventor shrink from his country's justice, for, like Roman gratitude, it would crush the recipient with its weight.

It is urged, also, that the enhanced value of an invention is often produced by the industry and expenditure of an assignee, in bringing it into public use and more general notice. And yet it is forgotten that the board of patents disregard entirely all industry and all expenditure, save only those of the inventor. The rigorous construction of the laws in relation to the conduct of inventors before obtaining letters patent, seemed to oblige them to mature their discoveries unaided and even in secrecy. Congress, seeking to meliorate this evil, enacted by the 7th section of the law of March 3d, 1839 (5 Stat. 354), that the inventor might sue out a patent, although he might previously have sold to other persons a right to use his machine, provided the sale was made not more than two years before his application, and provided also he had not abandoned or dedicated his invention to the public. This law secured to such a purchaser the right so bought by him to use a specific machine. The supreme court decided, in the case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, that the right acquired by such a purchaser was not confined to the particular machine actually constructed or manufactured before the application for the patent, and that the purchaser might construct and use one after the patent was obtained. And it is insisted here, that there is an analogy between the rights of the assignees in the present case, and the rights of purchasers under the 7th section of this act of 1839, as thus expounded by the supreme court.

Now a sufficient answer to this position will be found in the language of the law of 1839. These are the words:—"Every person or corporation who has, or shall have, purchased or constructed any newly invented machine, manufacture, or composition of matter, prior to the application by the inventor or discoverer for a patent, shall be held to possess the right to use, and vend to others to be used, the specific machine, manufacture, or composition of matter so made or purchased, without liability therefor to the inventor, or any other person interested in such invention." Now this law defines the right of a person who, before even an application for a patent, has purchased from the inventor a specific machine, not the right to

make and vend such machines to others. The law speaks of the purchase of a machine, not of letters patent, or of a franchise. An inventor owns his discovery absolutely and forever. He may rely on this title alone, unprotected by law, or he may compromise with the state, and surrender all after fourteen years, to secure the public protection during that time. Having at first chosen the former way, he sells a specific machine, of course with an implied license to use it, to a person acting in good faith and paying an ample equivalent. Afterwards the inventor finds his error and applies for a patent. Congress grant the application so tardily made, but stipulate that the patentee shall not defraud the purchaser to whom he has sold a specific machine with a license to use it. Nothing could be more just. Nor does the case of McClurg v. Kingsland [supra] give a wider scope to the 7th section of the act of 1839. There a workman, with capital and facilities furnished by his employer, discovered and perfected an improved mode of making iron rolls, and it was, with his consent, used by the employer, without letters patent, in consideration of the benefits thus received. Afterwards the workman changed his service, obtained letters patent, assigned them, and the assignee brought an action against the employer. It was held that the employer had not only a right to use the specific machine, but to sell the rolls that he made with it. But it was not adjudged that he had a right to vend to others to manufacture and sell. In other words, his implied or constructive license was protected, but it was not enlarged.

· Now, it is argued, that if the rule is just in one case, it is just in another; and that if it be said in McClurg v. Kingsland, that the purchaser might not know that the inventor would ever apply for a patent, and had no reason to suppose that any obstacle would afterwards be interposed to the free and undisturbed use of the right he had purchased, the same must be said in the case now before the court, because the purchaser could not know that the inventor would ever apply for a renewed term, and, when he purchased the right for the whole term of the existing monopoly, had no reason to suppose that any new obstacle would afterwards be interposed to prevent the free, undisturbed, and continued use of the right; and that it would make the legislation of congress in these two laws contradictory in principle, and inconsistent with justice, in cases like the present, if the construction contended for by the plaintiff is given to the act of 1836. But there is no analogy whatever between the cases. Here the assignees bought in 1829, after the patent to Woodworth. They bought under the patent, and were limited to the term thereby granted. What right of the assignee, then, is that which he is entitled to enjoy, without any new obstacle being interposed by the inventor? The right for fourteen years. Certainly the law, according to our construction, does not invade, but expressly secures that right. The inventor, then, raises no new

obstacle to oppose the enjoyment of it in the most absolute manner. It is manifest, however, that the argument on the part of the defendants assumes a supposed further right of the assignee to use the invention freely and without disturbance after the expiration of the fourteen years. He might doubtless have indulged such an expectation when he bought the fourteen years; but every other citizen had just such an expectation without buying any right at all. In regard to the future beyond the fourteen years, the assignee had bought, if any thing, only what the law had already given to him in common with every other citizen. The new obstacle is raised against the enjoyment of that right and of that right alone—against a right held by the assignee in common with every other member of the state—against a right created and existing independently of the assignment. The obstacle, therefore, is created by law, and not interposed by the inventor. It is assumed, moreover, that the assignee has invested some money, or otherwise incurred expense during the first term, in view of a prospective continuance after the monopoly shall have ceased, and the conclusion is, that if the monopoly be renewed he ought to be favored. Is not then the entire argument perfectly answered when we say, that the just and practical inference in regard to patents is, that competition after the monopoly shall expire will render the use of the invention unprofitable to the inventor as well as to his assignee? The prospective continuance supposed to have been contracted for was, therefore, a prospective continuance by him, not as assignee under an extended monopoly, but as one manufacturer in competition with everybody.

Another argument urged is, that it is unjust in congress to take up the franchise again and prolong it after it has expired, because individuals, when they bought specific products or machines, expected to use them without disturbance after the expiration of the patent. This is true, but the argument, if it have any force, invalidates the interposition of congress altogether. Again, the argument confounds things entirely distinct, under a rule not applicable to all. When a party sells a machine, and the right to use it, he necessarily gives a license to use the products. That license cannot be revoked. If there be a patent for a composition of paint, the paint compounded cannot, when spread upon a house, be reached by the inventor, although the patent be extended. But certainly he would have a just and lawful right in such case to claim that no more paint should be compounded by the use of his invention.

It is also insisted, that the defendants' construction of the 18th section in regard to assignees, is in conformity with previous legislation of congress on the same subject, and reference is made, in support of this position, to an act passed in January, 1808, entitled "An act for the relief of Oliver Evans,"

whereby a new patent was granted to him after the expiration of his original one, and in which act there was an express provision, that no person who had before paid him for a license to use his improvement should be obliged to renew it, or be subject to damages for not renewing it. This argument, like most others founded on analogies, would, at best, be very inconclusive. The law referred to is almost a solecism; while many congressional precedents will be found on the other side of the question. Oliver Evans obtained a patent on the 18th of December, 1790, for a discovery in the art of manufacturing flour and meal. Three years and eleven months after the expiration of the first letters patent they were renewed and extended by an act passed January 26, 1808. In consideration, it is presumed, of the lapse of time, (which cannot occur under the act of 1836,) a provision was made for assignees under the first term, as has been stated; but it will be remarked that no saving was made for those who had built machines after the expiration of the patent and before its renewal. And now it is my duty to vindicate the distinction I have taken between the renewal and the extension of letters patent. That cannot properly be called an extension which does not take place until the franchise to be affected has ceased. The act of granting a new term in such a case must be a renewal or revival as well as an extension. In this law of 1808, however, the legislature avoid using words expressing either the idea of a renewal or that of an extension. On the other hand, A patent was granted to Amos Whittemore, on the 5th of June, 1797, for manufacturing cotton and woolen cards. It was extended by an act of congress passed March 3d, 1809, two years before the expiration of the first term. This law contains no restriction in favor of assignees of the original term. Congress declare that the letters patent are extended. No such words as renewed or renewal are found in the statute. The same Oliver Evans obtained from congress an extension of a patent for an improvement in the steam-engine. The law was on the 7th of February, 1815, before the expiration of the first term. The act does not protect assignees, although the patentee is prohibited from receiving more for the use of his invention under the extended term than was paid by assignees under the first term. No such inaccurate expression as renewed or renewal is found in this statute. The letters patent are extended. A patent to Samuel Parker, for improvements in currying leather, was extended for 14 years by an act passed March 3d, 1821, within the first term. The statute lays no restriction on the patentee, and confers no benefit on assignees. Here too the legislature employ the word extend. On the 2d of March, 1831, congress renewed and extended a patent which had been granted to John Adamson, for a floating dry-dock. Although the patent was renewed after the original term had expired, and although the erection of proper machin-

ery for the use of the invention was vastly expensive, the grant is, nevertheless, without restriction, and saves no interest of assignees. And here, as in the act concerning Oliver Evans in 1808, under precisely similar circumstances, the legislature avoid using words conveying the idea of either renewal or extension. A patent to Samuel Browning, for separating iron ore by magnets, was renewed in 1831, almost three years after the end of the first term, without restriction and without benefit to assignees. Jethro Wood's patent for improvements in the plough was extended for 14 years, on the 19th of May, 1832. All the rights as well of assignees as of the patentee were expressly extended during the second term, and he was forbidden to charge for the use of his invention during the new term more than he received during the first term. This was an exception to the general policy of such statutes, and so notoriously has it failed in any degree to reward the inventor, that his son and heir has been imprisoned for costs incurred in a fruitless endeavor to protect his rights. Robert Eastman and Josiah Jaqueth, in March, 1835, obtained an extension by congress of their patent for a machine for sawing clapboards. The rights of assignees were not extended by that act.

Finally, the patent in question, which was granted to William Woodworth in 1828, and extended by the board of patents in 1842, by virtue of the act of 1836, was still further extended by an act of congress passed on the 26th of February, 1845, to take effect after the 27th of December, 1849, without any reservation in favor of assignees under either the first or the second term. These statutes embrace all or nearly all the instances in which the national legislature has put forth its power directly to extend patents, and they manifest a spirit of beneficence towards patentees and of neglect of assignees, entirely in harmony with the construction of the 18th section insisted upon by the plaintiff. Again, in every instance where letters patent have been extended before the expiration of the first term, which is the effect of the 18th section, the legislature have used the terms "extension" and "extended" and "prolongation" and "prolonged," and have never applied to the act of extension the word "renewal," which, on the contrary, has been invariably applied to the substitution of new letters patent on the surrender of those which were void by reason of a defective specification. It is also an extraordinary fact that in the British statutes, text books and reports, the same discrimination between "renewals" and "extensions" is maintained. (The counsel here read from the British statutes and from Webster on Patents to show that the terms "renewal" and "extension" were invariably used as he had applied them, and also referred to the orders of the privy council to show the same application of the terms in all cases.)

The public documents of the board of patents and of the congress of 1845 show the grounds on which the extensions of the patent

in question were made. They are fully exhibited in the memorial of the administrator of William Woodworth, submitted to congress. The invention of William Woodworth consisted in an entirely new organization of instruments and processes by which boards and plank, and even mineral substances, could be planed, tongued and grooved and cut into mouldings, at a single operation, with a power easily attainable, and with great dispatch. While engaged in perfecting his discovery he procured indispensable pecuniary assistance from James Strong, but not without a sacrifice of one-half of his right in the invention. After the patent was obtained, Woodworth and Strong incurred ruinous expenses in bringing their machine to public notice and favor. At this critical period, when they were greatly embarrassed, they were prevented from making sales by an advertisement published by Uri Emmons, who claimed to be the true inventor of the machine patented by Woodworth and denounced prosecution against all who should use the invention. This pretension of Emmons' was fraudulent and false. He was not the inventor. Henry Gifford of Syracuse applied to Emmons, in 1824, to devise a machine to straighten and joint the edges of planks to be used in building vats required in manufacturing salt by solar evaporation. Emmons built a machine for this purpose, which was found useless and was abandoned and destroyed. Although it resembled Woodworth's in some particulars, it was essentially different as an organized machine. Emmons never built any other machine, or reduced his ideas to form, or applied for letters patent, until after letters were granted to Woodworth. Emmons found Twogood, Halstead, and Tyack negotiating with Woodworth for purchases under him, informed them that he was the inventor of Woodworth's machine, and, for the sum of one thousand dollars paid by them, proceeded to Washington, sued out letters patent for a machine like Woodworth's in many respects, and assigned it to Twogood, Halstead, and Tyack. Embarrassed by opposition of builders, especially of joiners, as well as by debts and heavy losses by incendiary fires, and threatened with litigation, Woodworth and Strong consented, from necessity, to assign to Twogood, Halstead, and Tyack exclusive rights under their patent for the Southern parts of the United States, for no other equivalent than an assignment of exclusive rights under Emmons' fraudulent patent for the Northern states. Woodworth and Strong encountered great difficulties in selling their franchise after this ruinous compromise. They received only an inconsiderable sum and the inventor died in the city of New York in the month of February, 1839, poverty bearing its usual testimony to his character as an inventor and vindicating his merits as a public benefactor. The administrator, after setting forth these facts, stated the exten-

sion of the patent under the 18th section of the act of 1836, and a failure thus far to realize the benefits of it, for causes not necessary to be specified here, and prayed an extension by congress to himself, as administrator, exclusive of assignees under the original patent. The act of 1845, further extending the patent, was passed in compliance with this memorial, and is not merely in harmony with previous legislation, but is entitled to be regarded as a legislative construction of the act of 1836.

It is also claimed that, in England, letters patent are extended on the application of assignees and to assignees, and that, since the language of the British statute and that of our own agree, the same construction ought to be given to the one as to the other. But it has been shown that the British legislature are not rigorously held to secure scientific property to the inventor, as congress are, by a constitution. Patent-rights pass in England by involuntary assignment, that is, by decree in bankruptcy and sale on execution. And the decree in bankruptcy carries all the estate of the inventor, and, of course, the possible remainder of the scientific property after the expiration of the term of fourteen years, as much as the right to the property before the granting of a patent. Therefore, Lord Brougham declared that the statute requires that the letters of extension shall issue to the person owning the possible remainder, whether he be patentee or assignee. Case of Southworth's Patent (in privy council, 1837) Webst. Pat. Cas. 487. And it was declared by the same eminent jurist that the British government seek to benefit the patentee, mediately, through his assignee. Extensions of Bate's and Macintosh's Patents, Webst. Pat. Cas. 739. So, in England, letters patent of extension are granted to the legal assignee, and he is sometimes obliged to secure an annuity to the inventor, as in Whitehouse's Case; while sometimes an extension is denied, but compensation is made in money, as in Arkwright's Case.

But even in England no person is entitled to an extension or to any benefit from an extension, as assignee or grantee, merely because he had a license or grant under the first term, but he must be an assignee of the future estate after the first term. So, licensees there take no right whatever under the new term, not even a right to use specific machines. This is clearly shown from the case of the extension of Southworth's patent, Webst. Pat. Cas. 486. In that case the assignee applied. There were twenty-two licensees, and they had all stipulated to pay during the extended term at the same rates at which they had paid under the first term. A review of the cases of extensions of letters patent adjudicated in the privy council, will clearly illustrate these two propositions: First. That the patentee only, or his assignee, for an adequate consideration, of the contingent extension, and not merely of the fran-

chise for the term of fourteen years, must apply for and obtain the extension. Secondly. That no shadow of benefit from the extension is reserved to grantees or licensees of the first term.

Thus far, the effect of the 18th section has been considered with reference to interests of assignees created by an assignment executed before the act of 1836 was passed, and expressly limited in its provisions to the original term of fourteen years, and our object has been to show that that act does not operate to enlarge or extend or alter or affect the rights of assignees in such cases, but that the renewal of a patent under the 18th section enures to the benefit of the administrator, exclusive of all such assignees.

Point III. Whether the extension specified in the foregoing second point enured to the benefit of the administrator to whom the same was granted, and to him in that capacity exclusively; or whether, as to the territory specified in the contract of assignment made by William Woodworth and James Strong to Twogood, Halstead and Tyack, on the 28th day of November, 1829, and set forth in the first special plea to the first count of the declaration, and by legal operation of the covenants contained in said contract, the said extension enured to the benefit of the said Twogood, Halstead, and Tyack, or their assigns. In the first place, the incidental retrospective operation of the 18th section on patents and assignments existing when the law was passed, (to which class the present case belongs,) must be distinguished from the prospective effect of the statute upon patents granted after its enactment. Since the act of 1836 extensions of patents are legally possible. An inventor has not only a legal property in his discovery, but a legal right to obtain letters patent for fourteen years, together with a legal contingent right to apply during that term for an extension for seven years more. This contingent right is undoubtedly as really the subject of assignment or release as the right to an original patent. Contracts concerning it would be upheld, at least in a court of equity. But in such a case the contract, to pass to the assignee the benefit of the extension for a future term, must be express, or must arise by unquestionable legal implication; that is to say, the intention of the parties to that effect must be plain and unequivocal.

Again, it is not to be denied that, before the act of 1836, an inventor, having a patent for the term of fourteen years, might have contemplated the possibility of the abolition of the whole patent system of the country and the establishment of a new one in its stead, and of a new feature in the new system, under which meritorious and unfortunate inventors might obtain extensions of their letters patent. It is also true that an inventor thus speculating on the distant and uncertain, if not improbable action of the government, might lawfully contract with an assignee, or with any other per-

son, concerning the speculative extension of his patent by a future commissioner of. patents, under the contemplated law of congress, and that a court of equity might oblige the patentee to perform such an agreement. But such an agreement could not be inferred from any general or ambiguous terms. For, in all legal transactions some measure of certainty is necessarily required, and, in contracts, certainty in an absolute degree. Now what certainty is there in the present case? It can only be conjectured that the parties, when making this agreement in 1829, contemplated things so strange and extraordinary, as that the whole patent system of the United States should be changed in 1836, and provision be made for extending letters patent, and the greater contingency of William Woodworth's ability to obtain such an extension. And these conjectures are repugnant to all probability. But it is not enough that we can imagine such conjectures to have been entertained by the parties. We must have them written in the contract, in terms so plain, strong, and unequivocal, as not to mislead. This would be necessary to indicate with certainty what the contingency was and whether it has happened. The knowledge, speculations, and intentions of the parties must have been fully expressed in every such instrument, so that it may be certainly known, when the supposed contingency shall happen, whether it be the same which was the subject of the contract. The contract of assignment by Woodworth and Strong to Twogood, Halstead, and Tyack, made in 1829, expresses no such anticipation or speculation concerning the future action of congress. The contract looks to possible improvements of the invention, and to possible alterations and renewals of the letters patent. But it is totally silent concerning not merely the passage of a future law authorizing an extension of this patent, or extensions of patents generally, but concerning any possible extension of the patent in any manner whatever. Who can say, then, that the parties intended that extension which has taken place?

Again, no matter what the parties may be supposed to have stipulated for, and even though a right to an extension might have passed under the general words, yet these words are controlled by the habendum, and restricted to fourteen years. The assignee can take nothing but what must expire within the fourteen years. It is argued that the whole of the 18th section must have effect, and that the agreement between Woodworth and Strong must have effect. Granted; but the whole agreement must have effect. No part of it must fail. At least, if any part must fail, it must be that which is vague and uncertain, not that which is absolute. Now that part of the agreement which is most absolute and unequivocal is the declaration that Twogood, Halstead, and Tyack shall have and hold the rights and privileges thereby granted for and during the term of fourteen years from the date of the patent, and no longer.

Mr. Stevens: The deed does not say "and no longer."

No; the words "and no longer" are not there. But they are affixed by conclusion of law as absolutely as if they were written in capitals. The construction insisted upon by our adversaries, sacrifices this limitation which is certain, to carry out an inference from the contract as uncertain as any human speculation. Who will say, then, that when the patentee expressly limited his grant to the term of fourteen years, it nevertheless conveyed the same franchise for twenty-one years, seven years of which could only be created by the future legislation of congress? When this agreement was made, the former patent laws were in force. The act of 1836 had not yet come into being. The contract must be expounded with reference to laws and facts which then existed. There was, in 1829, a definite legal meaning of the term "improvement in machinery," and an equally definite legal significance in the words "alteration of a patent," and an equally definite legal application of the expression "renewal of a patent," and each and every one of these terms expressed a well known legal and feasible transaction, different altogether from an extension of letters patent, which was then a legal impossibility. It results, therefore, that the improvements, alterations, and renewals stipulated for, were those which were thus well known, legal, and feasible; not an extension, which was then impracticable. The difficulty in the case arises altogether from confounding the word "renewal" with the word "extension."

Again. a contract can by no possibility be extended so as to bind either party to any thing, which was not mutually understood when it was made. This contract means now just what it meant before the 18th section of the act of 1836 came into the statute book. As the effect of the 18th section is to be ascertained by reasoning a priori, so the meaning of the contract is to be obtained by abstractly examining its provisions, excluding altogether the law passed so long after the agreement was made. Had William Woodworth proposed, after it was made, to apply to congress for an extension of his patent, and had he consulted counsel as to the extent of the assignment to Twogood, Halstead, and Tyack, would not any lawyer have advised him that the assignment related merely to the term of fourteen years, and to renewals of the patent, as then recognized by law, during that term? We are told, however, that when this assignment was made, the parties knew that congress did sometimes extend patents, and may therefore be deemed to have foreseen and provided for an extension. But the difficulty is not that the parties might have foreseen and provided for an extension. but that, foreseeing such an extension, they did not provide for it. They provided only for a renewal within fourteen years, not for an extension for seven years longer. The covenant as to renewal, is satisfied by such renewals as the law then provided for, and the limitation of the whole benefit of the grant to fourteen years, shows that such renewals, and not extensions, were then contemplated. Once more, it is reasonable to suppose that the parties covenanted for what was necessary. Here were two patents for the same discovery, Woodworth's and Emmons'. The parties compromised their conflicting pretensions by a mutual deed, each taking an equal interest in the other's patent. One or the other patent must be void, and must therefore be amended or renewed. None but the patentee, however, could obtain a renewal. Hence the mutual covenant that all renewals should enure to the benefit of the assignee within his district.

It remains to be observed that the 18th section leaves that contract of assignment as it found it. It does not diminish by a hair's breadth the rights of the assignees; nor does it enlarge them. The saving clause provides that "the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented," but only "to the extent of their respective interest therein." Twogood, Halstead, and Tyack had a right to use the thing patented, but only for fourteen years, only during the original patent, not for any portion of the extension; and of course their interest remains the same, if not enlarged by the statute. The 18th section presupposes sales of the whole, or of a great part, at least, of the patent, during the first term, calls for an account, and makes the profits and losses of the sales the basis of a right to an extension. To say, then, that the act meant to enlarge the contract of the assignees, and prolong the term assigned, and thus defeat the objects of the extension, is to impeach the wisdom of the legislature. But if we admit, for argument's sake, that the assignment by Woodworth and Strong contemplated such an extension of the patent as has been made, still it was invalid as an assignment, and constitutes no bar to the plaintiffs' suit. It was at most a mere executory agreement, concerning an impossible contingency, if such an expression may be allowed. An assignment or grant at law cannot be of a chose in action, bare right or naked possibility, much less of a legal impossibility. There was not only no such term of seven years, and no such extension of the fourteen years in being when the agreement was made, but it was not legally possible there ever should be.

But grant that the interest was a legal possibility, yet it was contingent and absolutely uncertain. It relates to a thing not in esse, and which never might be. When, however, such a thing comes in esse, chancery may seize the agreement and award a specific performance, which will convert the merely equitable possible interest into a legal right. Since, then, the interest is a merely equitable one, requiring protection in equity, because of the absence of any legal right, it follows that the assignment in question cannot, with or without aid from the 18th section, carry any legal title to the benefits of the extension; and it is only of legal titles that we have here to inquire. This question was considered by Mr. Justice Story in the case of Woodworth v. Sherman [Case No. 18,019]. He there held that the doctrine for

which I have been contending was expressly applicable to licenses and assignments under the patent act of 1836, and a fortiori applicable, because the whole design of the 18th section was, in terms, exclusively confined to the original inventor, and for his sole benefit, and not for the benefit of his licensee or assignee; and therefore that section was to receive a correspondent construction in favor of the inventor alone, unless the qualifying clause of the section, by natural or necessary implication, conferred the right upon the licensee or assignee. And in regard to the effect of the qualifying clause, the learned judge said: "The clause does not mean to enlarge the right of the assignees or grantees to use the thing patented, beyond the extent of the interest originally granted to them. If that interest was, from its nature or character, or just interpretation, limited to the original term for which the inventor held the patent, then the assignees and grantees were to have no benefit ultra in the renewed patent."

One word further. If the contract carry to Twogood, Halstead and Tyack the first extension, that made by the board in 1842, why does it not equally carry to them the second extension, that of 1845? Is there to be no end to their estate of fourteen years? May they forever remain passive and indifferent, and yet, at each successive effort by congress to reward the genius of the inventor, shall the very shadows of their names defeat the national magnanimity, and convert into mockery the munificence of a grateful people; or, worse than this, can the assignees now wrest from the children of the inventor all they have realized from the extension?

Patented rights pass by all the forms of legal and involuntary assignment, that is by assignments in bankruptcy, as well as by voluntary grant, and may either be sold on execution, or a bill in chancery will reach them to satisfy a judgment. Phil. Pat. 354; Hesse v. Stevenson, 3 Bos. & P. 565. Now, the bankruptcy of the patentee is the consequence of his failure to obtain a remuneration by the use and sale of his invention. It was the design of congress to relieve him. Can it be supposed for an instant that when a bankrupt patentee has made a compulsory assignment of all his rights for the benefit of his creditors, those creditors may seize the new estate and swell their dividends, while he sinks into poverty and despair? The constitution provides not for payment of debts, but for the promotion of science and the arts, and directs this to be done by securing to authors and inventors the fruits of their labors, not by pampering creditors who have already eaten out the substance of public benefactors.

The argument is advanced that the word "renewal" used in the contract, is broad enough to embrace, not only renewals then authorized by law, but renewals that might afterwards be provided for; and that this construction of the word conforms to the scope and spirit of the agreement, and carries into effect the intention and design of the parties, at the time they made it, and is the only construction which will do equal justice to both parties. The word "renewal" is, indeed, broad enough. But the question is not whether it is broad enough to include extensions, but whether it is narrow enough, precise enough, accurate enough. If the word "renewal" had, when the contract was made, a definite and well understood legal application to renewals for the original term in cases where the patent was void, and the act of extending letters patent was at that time known in law by the term "extension" as contradistinguished from "renewal," then the word "renewal" is not accurate enough to embrace an extension. The word "renewal," in this contract, cannot, by any reasoning, or on any principle of law or of logic, mean anything which did not exist, or anything which, though it might happen thereafter, was probably not contemplated by the parties when the agreement was made. For, when the contract was made, the act of 1836 had not passed, and I understand it to be conceded on the part of the defendants, that probably the parties to the contract did not contemplate the passage of such a law. Now, not only is a party forbidden by equity and good conscience from using an unforeseen advantage to defeat his contract, but by no rule of legal reasoning can an agreement be so construed, either in letter or spirit, as to make its terms embrace an object not contemplated by the parties. An executory agreement is an agreement concerning what the parties contemplate, and nothing else. It cannot hold either party concerning things not contemplated. We may infer, therefore, a concession that the extension of the patent is not provided for by the letter of the contract.

The argument for the defendants is further stated thus: "Whether the word 'renewal' did or did not look to the extension of time given by the act of 1836, it is evident upon the words of the covenant that whatever additional value either inventor (Woodworth or Emmons) might afterwards be able to obtain for his invention, it should enure to the benefit of the assignee within the district aforesaid. The parties were not only bound, forever afterwards, to offer no obstruction to one another in their particular districts, but to give to each other the full benefit of their respective exertions to increase the value of their inventions; and if they then looked only to a renewal to be procured by surrendering the existing patent, if it should be found to be defective, and by taking out a new one according to the act of July, 1832, yet it is very clear that both parties intended that every benefit of any kind, that might be obtained for the respective inventors should belong to the assignees in the respective districts. They were in that re-

spect to have a common interest in their inventions, and they have used the broadest words to accomplish that object—words which unquestionably embrace every mode by which the value of the patents could be increased. If by a subsequent act of congress advantages were given to the patentee which he did not at that time possess, and which were not, therefore, in the contemplation of the parties, yet, according to the spirit and meaning of the covenant, the assignee had a right to stand in the place of the patentee in his district, in respect to the new privileges as well as to the old, and it would be against equity and good conscience to allow him to use a privilege afterwards unexpectedly gained, in order to defeat his own contract."

I reply to this very forcible argument: First. The effect of the extension is diminished by describing it as a mere extension of time. An extension is a resumption of the franchise, and a new grant thereof for a term of seven years. Secondly. How does it appear that any benefit of any kind, not stipulated, should pass to the assignees respectively? Thirdly. The contract here was expressly limited to fourteen years. The habendum is: "To have and to hold for fourteen years." An extension of the patent after that time for the benefit of the patentee did not "defeat," could not "defeat" the contract during the fourteen years stipulated. "Whatever additional value" the patent should receive, should pass to the assignee for fourteen years, but for no longer. Fourthly. If the extension were obtained unexpectedly, as is supposed, then manifestly it was not foreseen, when the contract was made. Unless the contract show such foresight, either by express words or by unerring legal implication, then the contract cannot be enlarged so as to make it transfer to the assignee the unexpected estate granted to the inventor. Fifthly. The force of the argument founded on the well understood meaning of the terms "improvements," "alterations," and "renewals" of the patent, employed in the assignment, is parried, by calling up a supposed "spirit of the contract." This spirit is thus defined, viz: that "whatever additional value either inventor might afterwards be able to obtain for his invention, should enure to the benefit of the assignee." And we are assured that the parties here used the broadest words to designate this generous spirit. If this be so, how does it happen, then, that the letter of the contract is not sufficient, without invoking its spirit? Where are any words which imply anything concerning an additional value to the invention, except an "improvement" of the machine, or anything concerning a better security for the franchise, except the words "alteration and renewal" of the patent? All those words are well and fully satisfied by transactions then legal and foreseen, without enlarging their application

to things unexpected and legally impossible. But if this reasoning be thus far sound, the spirit of the agreement must, after all, be ascertained from a general survey of its entire contents. The limitation of fourteen years is absolute and inflexible. You must kill so much of the letter before you can call the supposed spirit to life. Thus, then, while we grant that the inventor could not within the fourteen years avail himself of any advantage, foreseen or unexpected, to defeat the contract he had made for that time, he is left at entire liberty afterwards to avail himself of the magnanimity of his country, not only because it was not foreseen, and clearly, therefore, not bargained away, but because all that was bargained away ceased at the expiration of fourteen years.

But, besides these views of the operation of the 18th section in regard to the rights of assignees, I will refer the court to some authorities on the question. In the case of Van Hook v. Wood [Case No. 16,854], in the circuit court for the Southern district of New-York, in equity, on a motion for an injunction, in October, 1844, Betts, district judge, declared that he considered it settled in the construction of Woodworth's patent, at least so far as to control that incidental motion, "that the extension of the patent to the administrator, vested a legal and valid title in him, and that this right did not enure to the benefit of assignees of the original patent, their interest being limited to the period of that patent." Mr. Justice McKinley took the same view of the subject in the case of Wilson v. Simpson [Id. 17,834], in the circuit court for the district of Louisiana. The question was elaborately examined in the same court by McCaleb, district judge, in the case of Wilson v. Curtius [Id. 17,800]. He held that the parties to the contract contracted without reference to any right which it is pretended is secured to assignees under the act of 1836; that the object of the renewal authorized by the 18th section of that act was not to benefit assignees, but the original inventor or his heirs; that the contract contained no stipulation securing an extension of the right, upon any reasonable or legal interpretation of that instrument; that the law should be construed liberally for the inventor and strictly for the assignee; that when the assignment was made, the parties knew well their rights, and a consideration was paid by the assignees for the exclusive right for fourteen years; that the assignment might have contained a clear, positive, unambiguous stipulation for the benefit of an extension, should one be obtained at the expiration of the fourteen years; but that the want of such a stipulation could not be supplied by the court, and was fatal to the claim of the assignee. In the case before cited, of Woodworth v. Sherman [supra], Mr. Justice Story reviewed the 18th section of the act of 1836, and came to the conclusion that the assignor, before an extension of the patent, could legally grant and convey no more than the

first term; that the 18th section did not extend the rights of assignees; and that assignees could not, by virtue of that act, take any interest in the extended term, unless the assignor had, "by express words, or necessary implication, shown a broader intention," an intention to grant not merely what he then possessed, but also the possibilities which he might thereafter acquire. He declared that this construction made the whole structure of the 18th section harmonious with its professed objects, while any other would render it contradictory and subversive of the object of its enactment, would take from the inventor what he never intended to part with, and might "deprive him, in part, or in the whole, according to circumstances, of the reward, which the section seemed so studiously to hold out to encourage his genius and skill, and to reimburse his expenditures." Mr. Justice McLean also examined these questions in the case of Brooks v. Bicknell [Case No. 1,946], and came to the same conclusions.

Point IV. Whether the plaintiff, claiming title under the extension, from the administrator, can maintain an action for an infringement of the patent-right, within the territory specified in the contract of assignment to Twogood, Halstead and Tyack, against any person not claiming under said assignment, or whether the said assignment be of itself a perfect bar to the plaintiff's suit. If the second and third questions, or the third only, be decided in favor of the plaintiff, the decision will be conclusive in his favor on this fourth proposition.

First. It has been shown that, at most, the interest assigned by Woodworth and Strong to Twogood, Halstead, and Tyack was a mere contingent claim in equity, not assignable at common law. Now, the utmost effect of the qualifying provision at the close of the 18th section is to secure that interest just as it was; and if it were an interest in the extended term, the law must recognize it during that term. But it does not therefore convert the mere equity into a legal property, or interest, or title. Such a mere equity cannot deprive the plaintiff of his title. As long as the patentee, though he has agreed to make an assignment, has not made it, he may bring an action in his own name for an infringement of the patent, notwithstanding such agreement, since the assignee is not put in the place of the patentee, as to right and responsibility, until the assignment is executed. Park v. Little [Case No. 10,715].

Secondly. This is not an action for trespass on land, nor are the interests with which we are concerned real estate, or even real chattels. Nor are the legal instruments with which we are engaged deeds or grants. This is an action of trespass on the case for violating rights in personal property. Whatever may be the rights of Twogood, Halstead, and Tyack, or of their assignees if they have any, the defendants appear here without title. They neither derive nor pretend any title. The plaintiff, by title from the administrator, who had a right to assign, is enjoying the franchise. The defendants are mere trespassers, and their defence amounts to this:—"Because you made an agreement in 1829 with Twogood, Halstead, and Tyack, that if you should obtain an extension for this term of seven years, you would assign the extension to them, therefore we are at liberty to pirate the property during that time, even though Twogood, Halstead and Tyack do not demand the performance of your agreement, or though you may be their trustee." At all events, the legal title is in the plaintiff. Only the patentee or his administrator can apply and obtain the extended patent. It is extended to him. The assignees cannot apply and cannot obtain the extension. If they be entitled to all they claim, it is only an equity in what the law has vested in the patentee or his administrator. The defendants cannot be held to account by the cestui que trust. It would be a good plea in bar, that they had answered in damages to the plaintiff, who is in possession, as the legal assignee of the legal title created by the extension and by force of the 18th section of the act.

No principle is plainer than that trespass for injuries concerning personal property may be brought by any person having any degree of interest in possession—even by a bailee. If the 18th section confers no rights on assignees of the first term, then the question now under consideration does not arise. If the section does confer any such benefit on assignees, it does so through a trust which it creates in their behalf, to be executed by the patentee; and this action may, for aught that is known, be for the benefit of the assignees. The declaration avers continued possession by the patentee, by the administrator, and by the plaintiff, successively. It does not appear that any possession or right ever followed the supposed assignment to Twogood, Halstead and Tyack. The new patent, by virtue of the 18th section, carried the possession, as well as the legal right, to the administrator, and it followed his assignment to the plaintiff. The defendants' plea cannot be good, unless it show that the plaintiff has no legal title or possession, general or special. Certainly this does not appear.

The principles of the common law, as well as of the statute law, have arisen out of commerce in tangible property, real and personal. Nothing is more difficult than to apply them to scientific property. But we venture another exposition. Possession and use are material circumstances in considering the validity of a transfer of a patent-right, as well as of one of other personal property. Phil. Pat. 343. A patentee having mortgaged the patent-right, continued in the notorious use of it, until he became bankrupt. Lord Eldon was inclined to the opinion that the patent-right passed to his assignee in bankruptcy, that is, that the mortgage was not good against the assignee, and ordered a feigned issue to try the question. Ex parte Granger, Evans' 4 St., p. 67, note, cit-

ed in Phil. Pat. 344. The statute of frauds, though not enacted by congress, is adopted by the federal courts, or, at least, such parts of it as are derived from the common law; and of this sort is that in relation to the sale of chattels. Applying this principle, it is submitted that the judgment of this court should sustain the plaintiff's action. When he claims by an assignment of the extended patent, ought a party to be heard who shows no title whatever, and only sets up an agreement to assign the first term, made sixteen years ago, unattended by possession? Suppose this contract of assignment to Twogood, Halstead, and Tyack to have been procured by fraud, could not that fraud be proved by the plaintiff, and would it not vitiate the contract, assignment and covenant? Unquestionably. But will the court allow a stranger, a trespasser, a wrong-doer, to set up the assignment and oblige the plaintiff to prove the fraud in this collateral action? This argument is conclusive of the question.

Point V. Whether the extension of 1842 could be applied for and obtained by William W. Woodworth, as administrator of William Woodworth, deceased, if the said William Woodworth, the original patentee, had, in his life-time, disposed of all his interest in the then existing patent, having, at the time of his death, no right or title to or interest in the said original patent—or whether such sale carried with it nothing beyond the term of said original patent; and if it did not, whether any contingent rights remained in the patentee or his representatives.

My argument on the first and second points demands an affirmative answer to the leading question in this point. Scarcely anything can be said in support of it without repetition. The question will be rendered more simple if we suppose William Woodworth, the patentee, to have survived and obtained the renewal, although he had previously assigned all his interest in the patent. Those who maintain the right of partial assignees of the first term to share the benefit of the assignment with the patentee, are obliged to claim, also, the entire benefit of the extension for an assignee of the whole of the franchise for the first term. This position is so palpably in conflict with the 18th section, (which, as we have shown, recognizes only the patentee, and requires the application to be made by him only, at his expense and cost and on his own merits,) that those who have been led into such an absurdity, seek escape by asserting that in such a case there can be no extension whatever. But the 18th section affords them no such refuge. "Whenever any patentee shall desire an extension," he may apply in all cases, at all times, within the first term of fourteen years. Certainly a patentee may desire an extension when he has sold all the franchise, as well as when he has sold a part; and the more he has sold unprofitably, the more eagerly will he desire an extension. His application must be heard whenever it is made. And on what ground must a judgment be rendered in favor of extending the patent to the patentee? Upon the supposed ground that he has not sold all his interest in the first term? No! But on the ground that whether he has sold the whole, or only a part, he has not been adequately remunerated by the sale. Again, in certain cases, the board of patents must render judgment against the extension. And in what cases? The supposed case where the patentee has sold all his interest? No! The only cases in which the application can be denied are, first, where an extension would conflict with the public interest, and secondly, where, by sales, the inventor has been adequately remunerated. And let it be especially remarked that the judgment must pass against the inventor in such case, equally whether he has sold a part of his original invention, or the whole.

Point VI. Whether the plaintiff, if he be an assignee of an exclusive right to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to maintain an action for an infringement of the patent within said town; or whether, to maintain such action, the plaintiff must be possessed, as to that territory, of all the rights of the original patentee. The 11th section of the act of 1836 declares that "every patent shall be assignable in law, either as to the whole interest, or any undivided part thereof, by any instrument in writing; which assignment, as also every grant and conveyance of the exclusive right under any patent, to make and use the thing patented, within and throughout any specified part or portion of the United States, shall be recorded in the patent office within three months." The 14th section of the same act provides that damages for infringement may be recovered in an action on the case to be brought in the name or names of the person or persons interested, whether as patentees, assignees, or grantees of the exclusive right within and throughout a specified part of the United States.

It was understood in England that a party merely licensed for a particular district might maintain an action for infringement. Our patent law of 1793 was construed so as to deny to the assignee for a particular district, a right to maintain an action; as such an assignment was considered to be a mere license, and not an assignment under the 4th section of that act. Phil. Pat. 383. Confessedly the 10th and 14th sections of the act of 1836, were designed to overrule this construction. A plain man would give them, as we think, the sensible and just effect, that a patentee might assign his whole interest or any undivided part of it, great or small, defining the quantity by the measure of use, or by the number or quantity of the thing patented, to be made, used or vended, or made,

used and vended, and for any territory, great or small, and that any such grantee or assignee who should be injured by piracy might have his action in his own name, for certainly such grantee or assignee is "interested." The words "exclusive right" in the 14th section, supply one part of the description of grantees, and are not, as some suppose, words of limitation to the character of all plaintiffs. Thus, to maintain an action, the plaintiff must show either that he is a patentee or that he is an assignee, (not of an exclusive right within and throughout a specified part of the United States,) but of the whole or some undivided interest in the patent, or that he has a grant and conveyance of the exclusive right to make and use and grant to others to make and use within a specified part of the United States.

If the plaintiff be an assignee of an exclusive right to use two of the patented machines within the town of Watervliet, certainly it is true either that he is an assignee of an undivided part of the whole interest, and may maintain a suit on this ground, or he is grantee of an exclusive right to use within certain territory, and may maintain an action in that capacity. My proposition is, that the act of 1836 was, in this respect, remedial and designed to relieve the law of patents from the technical difficulties which existed in regard to the parties who might maintain actions; and that the act goes the full length of declaring that an injured assignee may maintain a suit alone, whether any other party have an interest in the same patent, in the same territory, or not. Bold as the proposition may seem, it is in harmony with other laws, which do not deprive one tenant in common of legal remedies, because his co-tenants will not join. I invite the court to consider this broad construction of the law, since, if it be adopted, it will bring our statute into harmony with the patent system of England. If the patentee do not wish to part wholly with his patent, he may grant licenses to persons to use it, and it would appear that in the event of an infringement of the patent right, all who have licenses may maintain actions for damages. 13 Petersd. Abr. 236. It has been held that if the patent has been assigned, the assignee may sue alone, or he may join with the patentee in the action. Id. 238. This principle is eminently just, since the patentee of scientific property may refuse to join, and the assignee ought not to be exposed to the caprice of a patentee in regard to a remedy. But if this opinion should not prevail, then I submit that the plaintiff's exclusive right to use two of the patented machines within the town of Watervliet is sufficient to enable him to maintain this action. What is an exclusive right to use two machines in the town of Watervliet? It must be admitted to be an exclusive right to use two machines "within and throughout" the town of Watervliet.

Again, it is either exclusive of the rights of all other persons to use the improvement in that town, or it is not an exclusive right to use. For, if any other party can lawfully use the same machine, then the plaintiff has not an exclusive right to use. Now, if he has such an exclusive right, he is within the letter of the law, since the patent may be divided so that one may have an undivided interest in it to make, another to sell, and another to use, and yet all these remain an undivided whole. The words of the 11th section show that there may be a valid assignment of the right to make and use, and to grant to others a right to make and use, without including the power to grant to others to vend. The question was very elaborately considered by Mr. Justice Story in the case of Washburn v. Gould [Case No. 17,214]. In that case the words of the assignment were, that "the party of the first part hath agreed to license and empower the parties of the second part to construct and use, and to license others to construct and use fifty of the said patented machines;" and the patentee covenanted to bring suits and pay over the damages recovered to the assignee, deducting expenses. Judge Story decided: First. That the words "license and empower," as there used, were equivalent to words of grant or assignment. Secondly. That the effect of the assignment was to give the exclusive right, for the purpose of profit, to construct and use the patented machines, and with them the exclusive right to the patent itself, as an appropriate incident, within the prescribed territorial limits. Thirdly. That if it were necessary to maintain the plaintiff's action in that case, he should decide that the patent might be construed distributively, so as to permit a grant of the exclusive right to construct to one person, to use to another, and to vend to another. Fourthly. That the words conveyed an exclusive right to the patent within and throughout the territory, although the number to be used was limited to fifty, that is to say, that the limitation of the number did not qualify the exclusiveness of the grant. The reasoning of the learned judge in that case seems to lead so clearly to the conclusion at which he arrived, that I very cheerfully leave the question to rest upon his authority.

Point VII. Whether the letters patent of renewal, issued to William W. Woodworth, as administrator, on the 8th day of July, 1845, upon the amended specification and explanatory drawings then filed, be good and valid in law; or whether the same be void for uncertainty, ambiguity, or multiplicity of claim, or any other cause. The question is general. The affirmative can be maintained only by controverting the objections against the validity of the patent, which may be raised by the counsel for the defendants. The question, however, supposes an objection that the specification is uncertain or ambiguous, or at

least that it is bad by reason of multiplicity of claim. I suppose this has allusion to the fact that the machine is capable of planing a plank, of tonguing it, and of grooving it, all at one operation; while, by detaching certain instruments, the same machine might be made to plane alone, to tongue alone, or to groove alone, or to perform any two of these operations together. Hence, it has often been said that the invention was divisible, and ought to have been patented as three separate machines. Words could hardly be more explicit than those used to define the claim:— "What is claimed, is the employment of rotating planes, in combination with rollers, or any analogous device, to prevent the board from being drawn up by the planes when cutting upwards; and also the combination of the rotating planes with the cutter-wheels for tonguing and grooving, for the purpose of planing, tonguing, and grooving boards at one operation; and also the combination of the tonguing and grooving cutter-wheels for tonguing and grooving boards at one operation; and finally, the combination of either the tonguing or the grooving cutter-wheel, for tonguing or grooving boards, with the pressure-rollers." It is apparent that here is described a perfect, organized, unique machine, capable of making three different impressions on different parts of the same material. The human mind might have contrived, first one, then another, and then a third of these operations, successively. But the invention is not vitiated because the whole three were invented in combination for one practical and useful purpose.

We find ourselves engaged with the most subtle of all legal questions when we examine whether the patent is multiplex. The objection of multiplicity is not likely to be received with very great favor, since every inquirer will fail to find a satisfactory reason for the objection in any case. But what is the rule? As explained in Phil. Pat. 219, the rule is, that an application which embraces more than one principal subject or invention, will be rejected; that is, whatever is accessory and auxiliary to the principal subject, may be joined in the same patent, but nothing more. Floors are essential in every structure for human habitation, and they must be smooth and impervious. The mechanic who, if it were possible, should make a machine, which, at one operation, would prepare the entire floor for an apartment, large or small, might combine many instruments, many methods of operation, but surely he would produce but one principal subject or invention. Even the nailing the floor upon the joists would only be auxiliary and accessory, and therefore the addition of a hammer to drive the nail, with power to move it, and perhaps of a forge to make the nail, might not be a violation of the rule. Whatever might be thought of so extreme a case, we have in Woodworth's patent one principal subject, which is no more than the preparation of a board, to be adjusted with others, so as to produce a smooth and impervious face. All the operations of planing, tonguing and grooving, are performed simultaneously, by the use of one power, and upon the same piece of the same material, leaving upon that piece their varied impression. It is one purpose, accomplished upon the same subject matter, by one operation, at one instant of time. Complex as this operation is, the board is single afterwards, as it was before. It was a rough, unshapen plank; it is still no more than a plank, though fitted for a definite use.

But there is another and conclusive answer to the objection of multiplicity. Although the rotating grooving wheels and knives, or the rotating planing knives might be removed, and one or two of the other operations be nevertheless carried on effectively, yet there is one part of the improvement essential to each several operation, which is, of itself, altogether useless, but which, combined with one or more of the other powers and processes, is effective. That is, the rollers and the superior cylinder, which keep the plank or board fastened down on its bed, while it is subjected to one or more of the three operations of planing, tonguing and grooving. Here then is a complex yet unique machine. It is difficult to define its peculiar nature or character. It is a combination or aggregate, for it is made up of many parts and of several operations. But certainly, it is not, as has been supposed, a mere combination. It is an unique machine, for one great and important purpose. And its combination does not consist in uniting three several and separable perfect machines, but in employing certain powers and processes never before applied to effect either object, but now made to operate so as to produce at the same time, on the same substance, three effects, each equally necessary to one single and distinct purpose. The objection of multiplicity of claim results from misapprehension. There may be a lawful patent for a new combination of existing machines, applied to produce one principal purpose or effect. Moody v. Fiske [Case No. 9,745]. So, also, there may be a patent for a machine which combines several auxiliary operations to produce one purpose or effect. And such a patent is not a grant of an abstract principle, nor is it a grant of the different parts of any machine, but it is an improvement applied to a practical use, and effected by a combination of various mechanical powers to obtain one new result. Gray v. James [Id. 5,718]. This last definition describes Woodworth's patent. The new result is the complete preparation of the board, by giving it a smooth surface, and by the adaptation of a tongue and a groove. It is effected by combining no known machinery or machines, but by uniting various known mechanical powers in a new and practical application. The defendants' argument must be, that a compound machine cannot be pat-

ented. But a machine loses neither any of its intrinsic proportions, nor its uses, by being composed of various parts, producing various effects, all of which terminate in one chief object or purpose.

The object of the patent law was to encourage inventions which will reduce labor. In the old way, planing a board was one operation, cutting a tongue along one edge was another, and cutting a groove in the other edge was a third. So, making a nail was once three operations, the forging, the shaping and the heading. Now, since a man of genius has invented a machine for simplifying the manufacture of nails, and reducing all three operations to one, what would be thought of a legislative policy which should forbid the combination, and keep the three operations separate, as when manually performed? In regard to Woodworth's invention, as described in the first specification, one court decided that the machine was multiplex, and that three patents ought to have been issued. The administrator thereupon applied to the commissioner of patents, who decided that the machine was not multiplex, and that three patents could not issue.

In view of the argument on this seventh point, I respectfully ask the court to decide that, according to the specification, Woodworth's patent is not for a mere aggregate of separate machines, nor yet a grant of the different parts of a new machine, as several, but is an improvement applied to a practical use, effected by a combination of various mechanical powers to obtain one new result at one operation. The importance of fixing the character or legal description of this machine, will appear from considering that it will control the question whether the patentee shall be protected from every encroachment on his invention, or whether it shall be free to any person to pirate its parts severally.

Point VIII. Whether the court can determine, as matter of law, upon an inspection of the said two patents and their respective specifications, that the new patent of the 8th of July, 1845, is not for the same invention for which the said patent of 1828 was granted.

The question seems to admit of a brief answer. Certainly the old specification and the new one are unlike. If the new one describes the machine rightly, and the old one was defective in this respect, then the old one, in one sense, does not describe the invention at all. In order to decide that the specifications are for different machines the court must assume the first specification to be a good description of a machine. But it is confessedly bad, because it has been surrendered and cancelled as such. I cannot present a clearer argument on this subject than to quote the late Mr. Justice Story's opinion on the same question:—"Upon the face of it, the new patent purports to be for the same invention and none other, than is contained in the old patent. The avowed difference be-

tween the new and the old is, that the specification in the old is defective, and that the defect is intended to be remedied by the new patent. It is upon this very ground that the old patent was surrendered and the new patent was granted. The claim in the new patent is not of any new invention; but of the old invention more perfectly described and ascertained. It is manifest that, in the first instance, the commissioner was the proper judge whether the invention was the same or not, and whether there was any defect in the specification or not, by inadvertence, accident, or mistake; and consequently, he must have decided that the combination of machinery claimed in the old patent was, in substance, the same combination and invention claimed and described in the new. My impression is, that at the former trial of the old patent before me, I held the claim, substantially (although obscurely worded) to be a claim for the invention of a particular combination of machinery for planing, tonguing, and grooving, and dressing boards, &c.; or, in other words, that it was the claim of an invention of a planing machine or planing apparatus such as he had described in his specification. It appears to me, therefore, that prima facie, and, at all events, in this stage of the cause, it must be taken to be true, that the new patent is for the same invention as the old patent; and that the only difference is not in the invention itself, but in the specification of it. In the old, it was defectively described and claimed. In the new, the defects are intended to be remedied. Whether they are effectually remedied is a point not now properly before the court. But as the commissioner of patents has granted the new patent as for the same invention as the old, it does not appear to me, that this court is now at liberty to revise his judgment, or to say that he has been guilty of an excess of authority, at least, (as has been already suggested,) not in this stage of the cause; for that would be for the court, of itself, to assume to decide many matters of fact, as to the specification and the combination of machinery in both patents, without any adequate means of knowledge or of guarding itself from gross error." Woodworth v. Stone [Case No. 18,021]. I add only, that the argument that the entertaining the question by the court would involve an assumption of facts without proof seems incontrovertible, and that this consideration is as conclusive upon this court, in this cause, at this stage, as it was upon the court in Massachusetts in that cause, on a motion for an injunction. A similar question arose incidentally in the case of Carver v. Braintree Manuf'g Co. [Id. 2,485]. It was held, in that case, that the 13th section of the act of 1836, and the 8th section of the act of 1837, authorizing the re-issue of a patent, because of a defective or redundant specification or description without fraud, or for the purpose of adding thereto an improvement, did not require a patentee

to claim, in his renewed patent, all things which were claimed in his original patent, but gave him the privilege of retaining what he deemed proper; and that the question whether the original and the renewed patent were not for the same invention, involved matters of fact, and therefore was for the jury to decide upon evidence.

Point IX. Whether the decision of the board of commissioners who are to determine upon the application for the extension of a patent under the 18th section of the act of 1836, is conclusive upon the question of their jurisdiction to act in a given case. My argument on the various points relating to the extension under the 18th section, has proceeded on the ground that the decision of the board of commissioners, even on a question of jurisdiction, was subject to review by the courts of the United States. Yet the law has created a board with discretionary and judicial power. Great public interests are involved in their decision, and, in this respect, the board act as a board of executive administration. It may well be supposed, that if congress designed that their decision on any question should be reviewed judicially, the law would have directed the time, manner and circumstances of an appeal, and would have designated the appellate tribunal.

Point X. Whether the commissioner of patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and pending the existence of an extended term of seven years, or whether such surrender and renewal may be made at any time during such extended term. First. The language of the law is comprehensive and unlimited. It does not limit the power to renew to the first fourteen years. But, in the same statute which provides, by the much discussed 18th section, for an extension for seven years, we find the 13th section declaring that "whenever any patent which has heretofore been granted, or which shall hereafter be granted, shall be inoperative and invalid, by reason of a defective or insufficient description or specification, it shall be lawful for the commissioner, &c." Now, here is a patent which was issued in 1828, before the act of 1836 was passed. It is thus far expressly within the letter, as well as within the spirit of the statute. But the statute was, of course, designed to apply to living franchises. Every patent granted before 1836, might, at any time within the term for which it was issued, be surrendered and cancelled. What was the condition of the patent, then, on the 8th day of July, 1845, when it was renewed? The original term of fourteen years had expired. But the new act of 1836 authorises a certain public functionary to certify an extension of it for seven years, and declares that when he shall have so certified, the certificate shall have such effect upon the original letters patent, that they shall, to all intents and purposes, be regarded as if they had issued for twenty-one years. The commissioner has thus certified, and so these letters patent have now living force and effect, which will last until the 27th day of December, 1849. Thus they are brought within the letter and the spirit of the enactment contained in the 13th section. Secondly. The law has long been well settled, that when a patent has been extended, it is prolonged during the additional term, subject to all the legal incidents of the first term. The rights and remedies, the risks and dangers, the privileges and rules of law which appertain to the patent, are prolonged with it. Although it was contended that the special act of congress for the relief of Oliver Evans, passed in 1808, was conclusive of the originality of the invention it was held that the rights of the patentee remained unchanged in all respects, except the limited time. Evans v. Eaton, 1 Pet. [26 U. S.] 322. Thirdly. The power and duty of the commissioner to cancel patents void by reason of a defective specification, exist independently of the 13th section of the act—that is to say, they exist independently of any words of express enactment. As has been seen, such a proceeding was had under the law of 1793, which contained no express provision on that subject, and was affirmed by the supreme court of the United States. Morris v. Huntington [Case No. 9,831], and other cases, before cited, in that connection. If, then, a new patent could be issued as an act of ministerial duty, even without the authority of the 13th section, certainly it can be in all cases where the spirit of the contract between the patentee and the commonwealth requires it. The American continent, from its icy boundaries on the north, to undefined latitudes within the tropics, seems to be rapidly falling under the political sway of our confederacy. The habitations of an hundred millions of people, and of how many more I dare not conjecture, are to be erected by our artisans. The machine in question reduces in the proportion of nine-tenths, the labor and expense of a necessary part of every structure, whether it be raised for use or ornament. If my argument seem to have been too long, I hope the offence may find an apology in the importance of securing to the children of the inventor the reward allotted by his country for so distinguished a benefaction.

Samuel Stevens, for defendants.

This case presents ten questions for solution, each of which calls for the interpretation of different parts of the patent act of 1836; but none of them can by possibility involve the consideration, or require, or even justify, a discussion, as to the policy of that law. This court have nothing to do with the policy of an act of congress. The question upon the construction of any statute is, what have the legislature done, not what it ought,

or ought not to have done. I shall therefore abstain from even an attempt to answer all that part of the argument of the counsel for the plaintiff, (and which is much the greater portion of it,) in which he has attempted to demonstrate the extensive obligation resting upon the government "to foster genius or reward merit," and especially the peculiar genius and exclusive merit of authors and inventors. That argument might have been very properly addressed to the law-making power, to induce the enactment of a statute, with such provisions as the learned counsel supposes congress, from his idea of its duties, should have inserted; but how it is to aid in the humbler task of expounding the statute which has been enacted, is not so easily perceived. Nor have the merits or demerits of the invention for which Woodworth obtained his patent, the most remote bearing upon any of the questions to be discussed or decided in this case. Whether the invention is of the utmost public, as well as private utility, or whether the least possible degree of usefulness that will sustain a patent, is all that can be attributed to it, can make no possible difference in the construction of this statute. The statute must receive the same construction in the one case as in the other. Nor has the history of William Woodworth the least possible connection, directly or remotely, with any of the topics or questions which can legitimately occupy the attention of the court in this cause—whether he died in poverty or in affluence—whether he was a benefactor or a beneficiary of the public, the court have no means of knowing; and if it had, whether he was one or the other, most certainly could not alter or affect the rules by which this statute is to be expounded. The consideration of those topics, therefore, will constitute no part of the argument which I propose to submit.

I. The first question presented is: Whether the 18th section of the patent act of 1836 authorized the extension of a patent on the application of the executor or administrator of a deceased patentee.

To maintain the negative of this question, I shall endeavor to establish the following propositions or points:

1. No property in, or right to, the renewed or extended term, is, by the act, vested in the patentee until such renewal or extension is actually obtained. Therefore upon the death of the patentee, before obtaining such extension or renewal of his patent, no property in, or right to, such renewal or extension, can vest in his heirs or personal representatives.

2. The 18th section of this statute does not, in terms, authorize the renewal or extension of a patent on the application of the executor or administrator of the patentee.

3. It cannot be legitimately inferred from the language of the statute, that the lawmakers intended to authorize the renewal or extension of a patent in favor, or upon the application, of the executor or administrator of a deceased patentee; or to give any latitude of discretion, whatever, to the commissioner of patents, or to the board which is to determine upon the application, as to the person upon whose application such renewal or extension might be granted.

1st. The executors or administrators of the patentee seem to have been intentionally excluded from the 18th section. This is manifest from the fact, that in other parts of the statute, where any right, or privilege, is intended to be given to executors and administrators, it is given to them in express terms. Vide sections 5, 6, 10 and 13.

2d. An administrator or executor of a deceased patentee, cannot perform, or comply with, the terms and conditions required of the patentee by the 18th section, to entitle him to a renewal of his patent; nor could any executor or administrator comply with the conditions required by, the 6th section, to authorize the issuing of a patent originally, and therefore, those terms were varied by the 10th section, so as to enable an executor or administrator to comply with them. But there is no such provision in regard to the 18th section.

3d. The power granted to the commissioner of patents and to the board, by the 18th section, is a special and limited power, and must be strictly pursued.

4th. The provision for the renewal of a patent, contained in the 18th section, if it applies to patents issued before the passage of the act, is, as to those patents, a gratuity to the patentee, in derogation of the rights to which every other citizen would be entitled upon the expiration of the first patent. The law bestowing this gratuity, will not be extended, by construction, to persons not named in it, and who cannot comply with the conditions upon which it is to be granted.

1. As to the first position: The question is not whether the inventor has any or what right to, or property in, his invention, independent of any legislative provision; but whether the 18th section of the act vests in the patentee such a right to a renewed or extended term of his patent, which may or may not thereafter be granted to him under the provisions of that section, as can be regarded as property. After the extension of a patent is duly obtained under that section, I concede that the prolongation of the exclusive right thus secured is property, as much so as the exclusive right granted by the original patent; but I deny that the patentee, before obtaining such renewal or extension of his patent, has any such right to demand or have such renewal granted to him, as will, either in law or equity, constitute property, which will descend to heirs, or vest in personal representatives. Of what description of property is it? Clearly, it is not a chattel, real or personal, in possession. Is it a chose in action? This species of property is defined to be "a personal right not reduced to possession, but recoverable by an action at law." 2 Kent, Comm. (2d

Ed.) 351; 2 Bl. Comm. 396. It depends entirely upon contract. Mr. Justice Blackstone says (2 Bl. Comm. 397) that all property in action depends entirely upon contract, express or implied. Has a patentee such a claim upon the government for a renewal or extension of his patent under the 18th section, as would entitle him to enforce it by an action at law, or suit in equity, if the government were liable to be sued? If a similar right or claim existed against an individual, could it be enforced by any proceeding in law or equity? No obligation is imposed upon the government, by this act, to grant an extension of a patent. It simply authorizes it to be done, provided it shall be deemed by the proper department consistent with the interests of the public. If an individual were placed precisely in the position of the government, it would be entirely at his own option whether such renewal or extension should be granted or not.

The duty and the power of deciding upon an application for the renewal of a patent under this section, is vested in certain designated officers of the government. If those, or any other officers of the government, refuse to perform a duty imposed upon them by statute, and which an individual has a right to require them to perform, to the injury of such individual, this court can, by mandamus, compel the performance of such duty. Kendall v. U. S., 12 Pet. [37 U. S.] 524. Now, suppose the board designated to decide upon these applications, should refuse to renew a patent, in a case where the patentee had complied, on his part, with all the requisitions of that section, could this court compel the board, by mandamus, to renew the patent? Most clearly not. The decision of the board that, in its opinion, a renewal of such patent could not be granted, with a due regard to the public interest, would be conclusive upon the subject. A right of any description in one person to claim the performance of any act by another, necessarily implies an obligation on that other person to perform such act, and an obligation too, which can be enforced at law or in equity; and where no such obligation exists, no such right exists. A patentee has no more right to demand, or require, the renewal of his patent under the 18th section, than he has to demand such renewal of congress. Before the act of 1836 was passed, congress renewed patents upon the application of the patentee, requiring, however, of the patentee, proof of the same facts required to be proved by him, under the 18th section of that act. Act July 3, 1832, § 2 (4 Stat. 559). Notwithstanding the act of 1836, congress have still the right and power to renew a patent if they should deem proper to do so. But neither congress, nor the board of commissioners are bound, or under any obligation, to grant such renewal. There is, therefore, no more right, in the patentee, to demand, or have, an extension of his patent, under the 18th section, than he would have, if that statute had never been enacted.

It was contended by the counsel for the plaintiff, that the property in this assumed right of renewal, was similar to the property in a franchise; and he illustrated this argument by this simile: "If," said he, "the state grant the use of a bridge, for a term of years, on condition that the grantee shall erect the bridge, and at the expiration of his term, devote it to the public, is not this a contract which, if performed by the grantee, will descend to his representatives, and carry the franchise to them? Now," (continued the learned counsel) "is there any thing in the intangibility of the right to an extension of a patent, or in the uncertainty of its future establishment which exempts it from the principle of this law?" No one will be disposed to deny or doubt the correctness of the simile or case put by the learned counsel, but no one can fail to see the inappositeness of the case supposed, to the one at bar. Nor, does it require any legal or logical acumen, to perceive that the conclusion which the learned gentleman drew from his hypothesis, by no means follows from it. A patent or grant of any exclusive right after it has been duly obtained, is a franchise (Webst. Pat. p. 1), a privilege of royalty, or of the supreme power, in the hands of a subject or citizen. 2 Bl. Comm. 37; 4 Kent, Comm. (2d Ed.) 458. Such a grant or franchise, no one doubts, is property. In the description of the various kinds of property given in the books, such a property is designated an incorporeal hereditament. 2 Bl. Comm. 21; 3 Kent, Comm. (2d Ed.) 403. And it is called an hereditament, because it is heritable property, that is, it is property which descends to the heir, and does not go to the personal representatives of the decedent.

But a franchise of any description has no existence before it is granted. The possibility that a franchise may be granted to a person if he apply for it, is not property of any description. If the relation between the decedent and the sovereign power were such, that the sovereign power were under such an obligation to grant the franchise to the decedent and his heirs, as would, in the case of a private person, constitute a legal obligation, which might be enforced at law or in equity, there might be some propriety in classing it with that species of property known as choses or things in action. But where no such obligation exists, to hold the mere capacity to apply for such a grant, and the possibility or even probability that the application would be successful, when it is entirely in the discretion of the power to which the application is made to grant it or not, to be a right, amounting to property, to a chose in action, would most certainly be entirely new. It would be creating a species of things in action hitherto unknown to the law. It might just as well be said, that the right, or rather the privilege, of asking alms, was a chose in action, which would vest in the executor or administrator of a decedent. I will not say that the law-making authority could not, in the plenitude of its creative powers, exalt such a mere possibility, to a right

which should be regarded as property; but I do say, that it has not done it, and it is not within the constitutional powers of this court to do it.

Another argument has been urged by the counsel for the plaintiff, which certainly is entitled to attention for its boldness in setting at defiance well established principles, if for no other cause. It was contended by the learned gentleman, that, independent of any statutory provision, an inventor has a perpetual, absolute and exclusive right to his discovery; that the disclosure of his invention upon obtaining a patent for it from the government, raises an equitable claim upon the government to renew the patent, provided the patentee has not, during the original term for which the patent was granted, been reasonably compensated for the invention; that this equity is a property, vested in the patentee, which, upon his death, vests in his personal representatives; and that the 18th section of the act should be so construed, as to extend to and embrace this equity. To maintain this proposition it was asserted, (I say asserted, because it certainly was not proved,) that the state, in its organic law, (the constitution,) admits that the inventor has a perpetual, absolute and exclusive right to his discovery; that the state admits also, that so strong is the conflict between this private right and the public interest, that the private right is unsafe, and that in view of these facts, the state compromises with inventors, and encourages them, by securing to them an exclusive enjoyment of their rights for a limited term. To me, it is not only a strange, but a startling doctrine, and I think it must be so to this court, and to every other person living under a government of laws, relying upon those laws for the security of life, liberty and property, that there is any kind or species of property, to which a citizen has a just and legal title, that cannot be protected by those laws, and would be unsafe under the guardianship and protecting power of those laws. If an inventor has a perpetual, absolute, and exclusive right to his discovery, independent of any statutory provision, is the law, indeed, so feeble that that right is unsafe? And is a right granted by government, any more sacred or secure, or more easily protected by the laws of this land, than any natural or inherent right? Is property of any description, acquired by any lawful means, less secure or more difficult to protect, than the property in a monopoly granted by government?

But the whole and every part of this position of the learned counsel, is in direct hostility to the decision of the supreme court in the case of Wheaton v. Peters, 8 Pet. [33 U. S.] 591. In that case the court held that an author or inventor has no exclusive right of property in his works or discoveries, after he has published them to the world, and that such right never existed at common law; and, as it regards inventors, the court said that it

never had been pretended that they could hold, by the common law, any property in their inventions after they shall have sold them publicly, and that, in the United States, authors and inventors have no exclusive right or property in their works and inventions, except such as is secured to them by the acts of congress. And in regard to the eighth section of the first article of the constitution, the court held that it does not provide for the protection of acknowledged existing rights, and that the acts of congress, under that clause of the constitution, instead of sanctioning an existing right, created the right which is secured by those acts for a limited period; that a man is entitled to the fruits of his own labors, but can enjoy them only by statutory provisions, and under the rules of property which regulate society, and which define the rights of things in general.

Were it necessary to sustain this judgment by the most clear and undoubted common law authority, the task would be by no means difficult; but I forbear fortifying, by authority, a decision which is of itself the best authority. Starting, then, with the proposition that an inventor has no exclusive right whatever to his invention, except what is created and protected by the acts of congress, an inventor has no claim of any description upon the government, equitable or otherwise, beyond the express provisions of the acts of congress; and, therefore, no equity exists in favor of a patentee against the government, to which the 18th section of the patent act can be extended by construction, even should the court be of opinion that it could, under the name of expounding a statute, extend it to cases and persons clearly not embraced in its language.

Will any one pretend that the claim of a patentee to have a patent extended under the 18th section of the act, is any greater, or approaches any nearer to a right, or to a property, than the claim of an inventor to a patent, before it is issued? By the 5th section of the act, the patent, when issued, secures the exclusive right to the patentee, his heirs, executors, administrators and assigns. By the 6th section, the first and original inventor of any new and useful improvement, &c., is entitled to a patent, upon complying with the conditions and making the oath thereby required. No person pretends to deny, indeed it is conceded, that if the inventor should die before obtaining his patent, his personal representatives would not be entitled to, and could not obtain a patent by virtue of the 5th and 6th sections. Now, is there not at least as much right to an original patent, vested in the inventor at the time of his death, when he has matured and completed his invention, but died before obtaining his patent, as there is to an extension of a patent already obtained, when a patentee dies before such extension is granted? Has not the right to a patent in such case, a much greater resemblance to property, which would

vest in executors or administrators, than this mere possibility of an extension of a patent under the 18th section? And is there not just as much authority, under the 5th and 6th sections, for the issuing of an original patent to the personal representatives of an inventor, as there is under the 18th section to extend a patent in favor of the personal representatives of a deceased patentee?

If an inventor complies with the 6th section of the act, he is entitled to a patent; no discretion is vested in the commissioner of patents to issue or withhold a patent; and should he refuse, in such case, to issue a patent, this court would compel him, by mandamus, to issue it. But if a patentee does all that is required of him by the 18th section, it is still discretionary with the board, to extend the patent or not, as it may be deemed compatible, or incompatible, with the public interest. Can any one deny that while the former has some resemblance to a chose in action, the latter has none whatever? And yet, while it is conceded that, in the former case, the personal representatives could not obtain a patent, were it not for the 10th section, which expressly authorizes it, it is contended that in the latter case, such personal representatives are entitled to an extension by virtue of the 18th section, when the patentee has died without making any application for a prolongation of his patent, or complying with any other requisite of that section.

2. My second proposition requires no illustration. Its truth is demonstrated by reading the 18th section. It cannot be affirmed, that that section, in terms, authorizes the renewal of a patent on the application of the executor or administrator of a patentee.

3. It cannot be legitimately inferred from the language of that section, that the lawmakers intended to authorize the renewal or extension of a patent, provided for in that section, in favor of, or upon the application of, the executor or administrator of a deceased patentee, or to give any latitude of discretion whatever to the commissioner of patents, or to the board, as to the person in favor of whom, or upon whose application, such renewal or extension might be granted. The question presented by this proposition, relates solely to the interpretation of the 18th section of the act. In the discussion of this question, I shall assume, as an undisputed and indisputable position, that, in the exposition of the act, the court will be governed by the same rules and principles which control the interpretation and construction of any other statute, upon any other subject.

The most important and most universal of those rules and principles, and the one which I most desire to impress upon the mind of the court at this stage of the argument, is, that the intention of the legislature can only be ascertained by the language it has used in the act to express that intention. As expounders of the law, we are not at liberty to presume that the legislature intended what it has not expressed, or expressed what it did not intend. Should courts indulge in any speculation of that kind, there would be, indeed there could be, no certain rule for the construction of any statute. In Pennington v. Cox, 2 Cranch [6 U. S.] 33, the court say: "That a law is the best expositor of itself, is one of those plain rules, which has been uniformly acknowledged." In Minor v. Mechanics' Bank of Alexandria, 1 Pet. [26 U. S.] 46, the court assert the principle, that a legislative act is to be interpreted according to the intention of the legislature, apparent upon its face. The rule is laid down, explicitly and emphatically, in Dwar. St. 703, and the writer sustains his position by reference to many well considered cases.

Assuming then, that the court is not at liberty, according to the well established principles of law governing the construction of statutes, to intend or suppose, that the legislature meant what it has not plainly expressed or declared, I humbly, but most confidently, submit, that the statute in question does not authorize the renewal or extension of a patent upon the application of, and in favor of, the personal representatives of a deceased patentee.

First. It is manifest from the provisions in other sections of this act, that the administrators and executors of the patentee were intentionally excluded from the provisions of the 18th section, and that congress did not intend to authorize the renewal or extension of a patent, provided for in that section, after the decease of the patentee. Wherever and whenever congress have intended to extend this exclusive right to the heirs or personal representatives of a patentee, they have provided for it in express terms. The 6th section of the act authorizes the issuing of a patent to the inventor, upon his making the oath required, and complying with the other requisites of the statute. The 10th section provides expressly that, in case of the death of the inventor, his executors or administrators may obtain the patent, and shall hold it in trust for the heirs or devisees of the inventor, and prescribes the oath to be made by such personal representatives as a substitute for the oath required of the inventor by the 6th section. The 13th section provides for the surrender of a patent by the patentee, and the obtaining of a new patent for the same invention, when the original patent is void by reason of a defective specification, without fraud or fault on the part of the patentee; the same section provides, that this privilege shall extend to the executors, administrators, and assignees of the patentee. But the 18th section, in its terms, authorizes an extension of a patent only upon the application of the patentee. Now I submit, if congress had intended that the benefit and privilege provided for by the 18th section, should extend to the heirs or personal representatives of a deceased patentee, they would have said so, as they did in the other

sections referred to. Can any legal reason be given why, in this particular solitary instance, congress should have omitted to express its intentions, as in the 10th and 13th sections, if it did intend that the provisions of the 18th section should extend to the heirs or personal representatives of the patentee? The omission, (manifestly ex industria,) of any words extending the provisions of the 18th section to the heirs or personal representatives of the patentee, is a clear indication of the intention of the law-giver, that those provisions should not be thus extended. "Where in several statutes in pari materia," (and the principle is equally applicable to several sections in the same act,) "the legislature is found sometimes inserting and sometimes omitting a clause of relation, it is to be presumed that their attention had been drawn to the point, and that the omission is designed." Moser v. Newman, 6 Bing. 556. "If," says Mr. Dwarris, "there is a material alteration in the language used in the different clauses of a statute, it is to be inferred that the legislature knew how to use terms applicable to the subject matter." "The several inditing and pruning of the different branches," said the judges in Edrich's Case, "doth argue that the maker did intend a difference of the purview and remedies, or otherwise they would have followed the same words." Dwar. St. 707; Edrich's Case, 5 Coke, 118a.

To overturn or escape all the rules which have been established by the wisdom and experience of the most learned jurists for the construction of statutes, the counsel for the plaintiff reposed, apparently with confidence, upon the position assumed by him, that no reason could be divined for denying to the heirs and personal representatives of a patentee, the benefit of obtaining an extension of a patent under the 18th section, which would not apply with equal force against the policy of the 10th and 13th sections. I call this an assumed position of the learned counsel, because, although he most confidently asserted it, he failed to prove it; indeed, he did not attempt to demonstrate its truth. And the learned counsel concluded that part of his argument, with a defiance to the most accomplished casuist, to find a reason for a difference of policy in the cases provided for in those three sections. Suppose there were so much of danger and peril in this defiance, that no wrangler could be found of sufficient intrepidity to attempt a trial of conclusions with the learned gentleman, as to the truth of his hypothesis, do the deductions which he has attempted to draw from it by any means follow? The argument of the learned counsel is simply and plainly this: The same reason and policy which induced congress to authorize the executors or administrators of an inventor to take out an original patent, where the inventor died before obtaining it, and also to surrender a patent void by reason of a defective specification, and take out a new patent upon a corrected specification, for the residue of the term

of fourteen years then unexpired, required congress to authorize the extension of a patent under the 18th section, in favor of the executors or administrators of a deceased patentee, and, therefore, it is to be presumed congress so intended. Is this so? Does it advance one step towards proving that congress has done a thing, to show it ought to have done it? Besides, the rule of law and good sense applicable to the construction of a statute is, that when the law-giver, in one section of the act, uses words which, in their terms, apply to particular persons or things, and, in another section, omits those words, the presumption is, that he did so intentionally, understanding the force and effect of the use of the words in one section, and the omission of them in another; and that he intended "a difference of the purview and remedy" by the different phraseology of the sections, otherwise he would have used the same words in the several sections. This inference is directly the opposite of that which the learned counsel supposed necessarily followed from those facts. A statute introductive of a new law, (as is the case of the 18th section of this act,) in its terms applicable to particular persons or things, cannot be extended or applied by construction to other persons or things, although standing on the same reason. Jacob v. U. S. [Case No. 7,157]; Foster's Case, 11 Coke, 64a.

But suppose congress unintentionally, and through mere inadvertence, omitted, in the 18th section, the provision in favor of executors and administrators contained in the 10th and 13th sections, would it help the plaintiff's case? Can this court, by construction, insert those provisions in the 18th section? Lord Ellenborough, in the case of Rex v. Skone, 6 East, 514, 518, has answered this question. "It is no question for us," says that learned judge, "whether it would be expedient that there should be an appeal to the sessions in the case of a conviction before two justices of the peace, for a penalty in respect of the malt duty. If there be no words of reference to any act giving such an appeal, we cannot supply the want of them. Now the clauses in the statutes of Car. II. and Geo. II. have not the word 'penalties' in those parts giving the appeal;" (the words of those statutes describing the convictions for which an appeal was given, being "forfeitures and offences,") "and when that word occurs in other clauses, in other respects facsimiles, it seems as if the omission were intentional; but if it were not intended, we can only say of the legislature, quod voluit non dixit." In Dwar. St. 790, a like rule is laid down as the result of adjudged cases on the subject. But the hypothesis of the learned counsel, of which he so confidently challenged a refutation, and from which he has attempted to draw his conclusions, has no foundation in truth. If I am not wholly in error in regard to the policy and the main object of the provision of the constitution on this subject, and of the laws framed in pursuance of that provision, they furnish a sufficient and

most satisfactory reason for the provisions of the 10th and 13th sections, which can have no application to the provisions of the 18th section. The late Mr. Chief Justice Marshall, in delivering the judgment of the court in the case of Grant v. Raymond, 6 Pet. [31 U. S.] 218, 243, says: "The great object and intention of the act is to secure to the public the advantages to be derived from the discoveries of individuals, and the means it employs are the compensation made to those individuals for the time and labor devoted to those discoveries, by the exclusive right to make and sell the things discovered for a limited time." The same doctrine is laid down by Mr. Justice Ashhurst, in Turner v. Winter, 1 Term R. 602, 605. Many other authorities might be adduced, were it necessary, to show that such is the true exposition of the principles, policy and object of the laws authorizing these monopolies. It is upon the same principle that the law declares a patent void, if it turns out that the patentee was not the first and original inventor, or if he has suffered his invention to get into public use before obtaining his patent, or if he does not describe his invention truly, and with sufficient intelligence to be understood by others. In either case the patent is void, because the consideration upon which it was granted fails.

The great object of these laws, then, being to give the public the benefit of the discoveries of individuals,. and the exclusive right granted to those individuals to use the invention for a limited period, as a compensation for the time and labor devoted to those discoveries, and the disclosure of them to the public, being the means employed to obtain this public benefit, it follows that the same policy which would induce the grant of a patent to the inventor, would dictate a similar grant to the legal representatives of an inventor, who has died before disclosing his invention. The public would derive the same benefit from the disclosure of an invention by the executors and administrators of an inventor after his death, and the government should grant the same compensation to the heirs or devisees of an inventor for such disclosure, as it would to the inventor himself. No such reason, however, can apply to the case of the extension of a patent provided for by the 18th section. In that case, the disclosure has already been made; the patent for fourteen years, (the stipulated compensation for the invention and disclosure,) has already been granted to the patentee; a further grant of seven years is entirely at the option of the government, based upon no new consideration of a new invention, or new disclosure, from which the public would or could derive a benefit; but, on the contrary, such extension takes from the public that which they are fairly in possession of, and to the benefit of which they are justly entitled. In Shaw v. Cooper, 7 Pet. [32 U. S.] 292, 320, the court say: "The patent law was designed for the public benefit as well as for the

benefit of inventors. For a valuable invention, the public, on the inventor's complying with certain conditions, give him, for a limited period, the profits arising from the sale of the thing invented. This holds out an inducement for the exercise of genius and skill, in making discoveries which may be useful to society, and profitable to the discoverer. But it was not the intention of this law to take from the public that of which they were fairly in possession." This principle applies equally to the case of a possession acquired by the public, by the disclosure upon obtaining a patent, as to a possession of a discovery acquired before a patent for it is issued, by a promulgation of it to the public by the inventor.

The conditions upon which a renewal or extension of a patent is authorized by the 18th section, furnish another reason why congress would intentionally exclude executors and administrators from the purview of that section. None but a patentee himself could have any accurate knowledge of the facts required to be shown to authorize an extension of a patent for an additional term. The patentee is required to furnish to the board a statement in writing, under oath, of the ascertained value of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of said invention. And the patent is only to be extended in case it shall be just and proper, by reason of the patentee, without neglect or fault on his part, having failed to obtain from the use and sale of his invention a reasonable remuneration for the time, ingenuity and expense bestowed upon the same, and the introduction thereof into use. How is it possible, in the nature of things, that his executor or administrator could know anything of this? Is it within the range of possibilities, that any person but the inventor himself, could have any accurate or certain knowledge of the time spent. of the study and reflection bestowed, of the mental powers exerted, in projecting and maturing the invention, or of the amount of time and money expended in experimenting upon his discovery, and the introduction of it into use, or how much he has received for or on account of the invention, or how much he might have received therefor, with proper attention, or without neglect or fault on his part? Congress undoubtedly appreciated the uncertainty that must necessarily exist in relation to the best information that could be given by an executor or administrator upon this subject, and for that reason deemed it discreet to confine the provisions of that section to the patentee alone. The 13th section proceeds upon the principle that the inventor, having in good faith complied with the policy and provisions of the law on his part, has a just right to expect that the government will secure to him and his heirs the exclusive use of his invention for fourteen years, as a re-

ward for his ingenuity, skill and science, and as a remuneration for the disclosure of his invention to the public, and that, if from any defect in the patent issued, such exclusive right is not secured to him, and no blame or fault is imputable to him, the government will, by a new and valid patent, secure to him such exclusive right. Such is the view taken of the act of 1793, in the case of Grant v. Raymond, 6 Pet. [31 U. S.] 218, 243. The same principle which would require the issuing of a new patent in such case to the patentee, would require it to be issued to his heirs or personal representatives for the unexpired portion of the fourteen years. The compensation agreed to be given by the government, is a valid patent for fourteen years, to the patentee, his heirs or assigns; and when the patent issued turns out to be void, a new and valid patent could, with no more propriety, be refused to the heirs or assigns of the patentee, than to the patentee himself. The government has received the consideration for which a valid patent should be granted, and which the government admits it is bound to grant; and the death of the person entitled to this grant does not exonerate the government from the obligation. Upon this principle, and for this reason, the 13th section of the act of 1836 was framed. But no such principle or reason exists in regard to the 18th section of the act.

Second. The 18th section of this act cannot be so construed as to authorize the renewal or extension of a patent, in favor of the personal representatives of a deceased patentee, because such representatives cannot comply with the terms and conditions required by that section to authorize the renewal of a patent. The 18th section requires the oath of the patentee to the statement in writing which is required to be made to the board. Such, I submit, is the plain import and meaning of the words used. After providing that the application for an extension of a patent shall be made by the patentee, in writing, to the commissioner of patents, prescribing the notice to be published by the commissioner, and designating the persons who shall constitute the board to hear and decide upon the application, the section proceeds in these words: "The patentee shall furnish to said board a statement in writing, under oath, of the ascertained value of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of said invention." Under whose oath is this statement to be furnished? From the nature of the facts required to be verified by this oath, facts the knowledge of which must, from their character, rest almost, if not entirely, exclusively with the patentee, can there be any doubt that the verification of these facts, required by this section, is the oath of the patentee? Besides, the terms of this section are so explicit, that nothing is left for con-

struction or criticism. The patentee shall furnish a statement under oath. Does not this language as clearly and unequivocally require the oath of the patentee, as if the word "his" had been inserted between the words "under" and "oath?" Can any one suppose that congress had the most remote idea, that this statement should or could be verified by the oath of any other person than the patentee? An executor or administrator cannot comply with this requirement of the section any more than he could with the requirement, in this respect, of the 6th section. By the 10th section, congress made a special provision, varying the oath to be made when executors or administrators apply for an original patent, but no such provision has been made in relation to the 18th section.

My learned adversary has urged with much earnestness, that the object of congress in enacting the section in question, was exclusively to reward and encourage inventors, "to foster genius and reward merit"—that this object could not (as he conceives) be sufficiently accomplished, without a provision in favor of the children of the inventor who may be and often are left destitute at his death—and that therefore it is the duty of the court to give a construction to this section, which will extend its provisions to personal representatives of the deceased patentee. If such were the object of congress, it is certainly to be regretted that it has not in some way expressed it, or given some hint of it in some of the laws which have been passed upon this subject. It was certainly a very plain and easy matter for congress to have made such a provision as the learned gentleman supposes it intended to make and ought to have made, had it deemed it expedient to do so. But I have heard no argument which tends to prove that this law owes its origin to the object supposed by the learned counsel. Certainly the argument would furnish no reason for extending a patent in favor of the personal representatives of a patentee who had no family, no children, or (as might be the case) no heirs. And suppose the patentee should die deeply in debt and leave a destitute family. This family could not be benefitted by an extension of his patent, unless its value should be more than sufficient to pay his debts. The patent, when extended in favor of his executors or administrators, would be assets in their hands to be administered as a part of his estate.

Again, the patentee may not be the inventor, he may not be the man of genius and of merit, which the government ought to foster and reward. An inventor may assign his invention before obtaining a patent, and the patent be taken out in the name of the assignee. Act March 3, 1837, § 6 [5 Stat. 193]. What benefit would the renewal of a patent in favor of the personal representatives of such a patentee, be to the family of the inventor? How would the extension of such a patent "foster genius or reward merit?"

If the object of congress had been to benefit the children of inventors, it is inconceivable how or why they would enact a law in the words of the 18th section of this act, which, according to the construction attempted to be given to it, would in most cases benefit only the creditors of the inventor, and in many cases benefit neither the inventor, nor his children, nor his creditors, and which, in its terms, applies to all patentees whether they are inventors or not, or do or do not leave any children or heirs to be benefitted. No principle in aid of the plaintiff's construction of this section, can be extracted from the proceedings of the privy council under the statute of 5 & 6 Wm. IV. In England the crown is the fountain from which all monopolies flow. Previous to the reign of James I., monopolies of every description and for unlimited periods, were created by letters patent from the crown. Such grants were simply the exercise of the royal prerogative, the original source of power, from which all such and the like privileges and franchises emanated. This portion of the royal prerogative was frequently exercised in a manner greatly to prejudice the business, commerce, and prosperity of the kingdom. To remedy such abuses the statute of 21 Jac. I. c. 3, commonly called the "Monopoly Act," was passed. The 1st section of that act declared all monopolies to be against public policy and void. The 6th section contained a proviso excluding from the operation of the first section, letters patent for a period not exceeding 14 years, for the sale, making and working of any manner of new manufacture in the kingdom. The act of 5 & 6 Wm. IV. c. 83, amended the 6th section of the monopoly act, so as to authorize the crown, if in its wisdom and discretion it should deem it proper and expedient, by and with the advice of the privy council, to enlarge or prolong the time for which such letters patent were authorized by the 6th section of the monopoly act, for a period not exceeding seven years. Although by these acts the power of the crown as to granting patents is thus limited, yet in granting or prolonging patents which are not prohibited by these acts, the crown still acts as the original source of power—possessing in that respect the same power that the congress of the United States does, and, therefore, in the exercise of that power, it prolongs patents in favor of the heirs or assignees or executors or administrators of a particular patentee. Congress may do the same by special act, or it might if it deemed proper, pass a general act, authorizing the extension of a patent by any officer or officers it might designate, in favor of the personal representatives or heirs of a deceased patentee.

But the question here is not what congress has the power to do, but what it has done. Has it, by this 18th section, granted the power to the board therein mentioned, to extend a patent, in favor of the executors or administrators of a deceased patentee? This board,

acting under this section, is not the original source of power, but a mere servant or agent of the original source of power, acting under and by virtue of a delegated limited authority; and the question is not what authority or powers the principal might have bestowed upon this agent, but with what power or authority, it has clothed this agent. Demonstrating that congress might have granted to this board the power claimed for it, is not advancing one step towards proving that it has done so.

Third. This brings me to the consideration of the third proposition under my third point, which is that the power granted to the commissioner of patents and to the board, by the 18th section of this act, is a special and limited power, and must be strictly pursued. Is the power given by this section limited and special? Of this there can be no doubt. It certainly is not a general power to extend all patents, in favor of any person, in the discretion of the board. Where a jurisdiction is limited by custom or by statute, either, 1st, as to place, as a leet or corporation, or, 2d, as to persons, or, 3d, with respect to the subject matter, it is deemed a special and limited jurisdiction; and its proceedings in a case arising out of the place, or in favor of persons not named in the statute giving the power, or upon a subject matter not mentioned in the statute, or in a mode or manner not specified in the statute, are coram non judice and void. Perkin v. Proctor, 2 Wils. 382; Case of The Marshalsea, 10 Coke, 74–76.

The power conferred on the secretary of state by the patent act of 1793, was a special and limited power; and hence it was held in Pennock v. Dialogue, 2 Pet. [27 U. S.] 1, that the patentee acquired no title to his patent, without a strict compliance with all the preliminary steps required by that statute. Clearly, under that act, the secretary of state had no power to issue a patent in favor of any other persons than those named in the act. Could he dispense with a strict compliance with any one of the provisions of that act? His whole power to act in the premises, depended upon a strict compliance by the patentee with every requirement of the act. It is contended that the board organized by the 18th section of the present act, is a judicial court, whose judgments or decisions upon the subject matter before it are conclusive. If this board were to be deemed a judicial court, the conclusions drawn from that supposition by the plaintiff's counsel would not follow. If a court at all, it is indisputably a court of limited and special jurisdiction, and all its proceedings in favor of persons not specified in the act, or upon a different application from that mentioned in the act, or without a strict compliance, by the applicant, with all the requirements of the statute conferring the power, would be coram non judice, and void. But, I insist, the board act as commissioners by virtue of the power or commission given them by this act, and not

as. a. court. It is not a judicial court recognized or authorized by the constitution of the United States. Article 3, § 1, of the constitution of the United States declares, that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance in office." By article 1, § 8, subd. 9, power is given to congress "to constitute tribunals inferior to the supreme court." It cannot be contended with the semblance of plausibility, either, that the persons composing the board constituted by the 18th section of this act, are judges within the provision of the constitution, or that the board is a tribunal inferior to the supreme court. Its decisions cannot be reviewed by the supreme court, nor can that court, by mandamus, or otherwise, interfere with its action; nor are the powers and duties of the board, within the judicial powers of the government. By article 3, § 2, of the constitution, "the judicial power shall extend to all cases in law and equity, arising under the constitution, the laws of the United States, and treaties made, or which shall be made, under their authority." This is all of the section which is applicable to the question now under consideration.

The late Mr. Justice Story, in his Commentaries on the Constitution (volume 3, § 1639), says, that the terms "law and equity," as used in this section of the constitution, mean "law and equity," according to the known legal definition of those terms, in the jurisprudence of England, at the time of the adoption of the constitution, and that by this section the constitution appeals to and adopts the common law to the extent of making it a rule in the pursuit of remedial justice in the courts of the Union. In the same volume (section 1640), this learned jurist defines the words "cases in law and equity," as used in this section of the constitution, to be cases which arise under the constitution, laws and treaties of the United States, and which can be litigated in the ordinary mode of proceeding in a court of common law, or in a court of equity. He says: "A case is a suit in law or equity, instituted according to the regular course of judicial proceedings; and when it involves any question arising under the constitution, laws or treaties, of the United States, it is within the judicial power confided to the Union." By an act of congress "to provide for the settlement of the claims of widows and orphans, and to regulate the claims to invalid pensions," approved March 23, 1792 (1 Stat. 243), it was provided that certain disabled persons therein mentioned, should be entitled to be placed on the pension list of the United States for such time, and to be entitled to such allowance, not exceeding a certain rate, for arrears of pensions, as the circuit court of the district in which they respectively resided, might think just. The act, then, prescribes certain preliminary proofs to be presented by the applicant to the court, and then the section (section 1), concludes in these words: "The circuit court, upon receipt of the proofs aforesaid, shall forthwith proceed to examine into the nature of the wound, or other cause of disability of such applicant, and having ascertained the degree thereof, shall certify the same, and transmit the result of their inquiry, in case, in their opinion, the applicant should be put on the pension list, to the secretary at war, together with their opinion in writing, what proportion of the monthly pay of such applicant will be equivalent to the degree of disability ascertained in manner aforesaid." The third section of the act required the several circuit courts to continue in session five days at the least, from the time of opening the sessions thereof, that such disabled persons might have full opportunity to make application for relief under that act.

Immediately after the passage of this act, applications for relief under it, were made to the circuit court for the district of New York. That court, then consisting of Chief Justice Jay and Mr. Justice Cushing of the supreme court, and Judge Duane, the district judge of that district, were unanimously of opinion: "That by the constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either; that neither the legislative nor the executive branches can constitutionally assign to the judiciary any duties, but such as are properly judicial, and to be performed in a judicial manner; that the duties assigned to the circuit courts by this act are not of that description. As, therefore, the business assigned to this court, by the act, is not judicial, nor directed to be performed judicially, the act can only be considered as appointing commissioners for the purposes mentioned in it, by official instead of personal description; that the judges of this court regard themselves as being the commissioners designated by the act, and therefore as being at liberty to accept or decline that office; that as the objects of this act are exceedingly benevolent, they will execute it in the capacity of commissioners." The circuit court for the district of Pennsylvania, consisting of Mr. Justice Wilson and Mr. Justice Blair of the supreme court, and Judge Peters, district judge for the district of Pennsylvania, certified their unanimous opinion to the president, that the court could not proceed under that act; and one reason assigned was, that the business directed by it was not of a judicial nature, and formed no part of the power vested by the constitution in the courts of the United States; and consequently, had the court attempted to perform the duties assign-

ed by the act, it would have proceeded without constitutional authority. The circuit court for the district of North Carolina, consisting of Mr. Justice Iredell of the supreme court, and Judge Sitgreaves, the district judge, came to a similar conclusion, which they maintained in a very elaborate argument. Hayburn's Case, 2 Dall. [2 U. S.] 410 to 414, note. The board, therefore, created by the 18th section of this act, is not a court. It is no part of: nor in any manner connected with, the judiciary. It constitutes no portion of the judicial branch or department of the government: its powers and duties are not within the judicial powers of the government.

Mr. Seward—What do you say of courts martial? Are not they courts authorized by the constitution?

Mr. Stevens—I say courts martial are part and portion of the war and navy departments, having no connection whatever with the judiciary; they are not mentioned in the constitution, and are only authorized by implication, as being necessary incidents to the power given to congress by article one, section eight, to raise and support armies, and to provide and maintain a navy. This board is a board of commissioners, with special and limited jurisdiction and powers. It is an inferior jurisdiction, not proceeding according to the common law. Such a tribunal acquires no jurisdiction, unless every preliminary step is taken in the manner, and by the person, prescribed by the statute. Jones v. Reed, 1 Johns. Cas. 20; Smith v. Bouchier, cited in 2 Wils. 385. The preliminary jurisdictional facts, required by the 18th section of this act, to authorise the board to act at all upon the application are: 1st. The patentee must make application to the commissioner of patents, for the renewal. 2d. The application must be in writing. 3rd. The sum required must be paid. 4th. The commissioner must publish notice, as required. 5th. The patentee must furnish to the board a statement in writing under oath of the ascertained value of the invention, &c. If any of these steps are omitted, the board acquires no jurisdiction to act upon the application. The power must be strictly pursued; nothing is to be taken by implication. Now, is there any more authority given by this section to the board to entertain and act upon the application of an executor or administrator of the patentee, than upon the application of the heir, or assignee, or devisee of the patentee? Can the application be made by a different person than the one designated by the statute? Can any application, except one in writing, give jurisdiction? Can the publication of notice, or the statement of the patentee in writing, under oath, of the ascertained value of the invention, as required by the statute, be dispensed with? Has the board any such dispensing power? If the board can dispense with any one of these requisites, it may dispense with the whole.

The statute securing to authors an exclusive right in their works, is authorized by the same clause of the constitution, and is very analogous in principle to the act now under consideration. In regard to that act, the supreme court held, in the case of Wheaton v. Peters, 8 Pet. [33 U. S.] 591, 664, that no requirement of the statute, whether important or unimportant, could be dispensed with; and that if any one of the provisions of the statute, however unimportant the court might deem it, were not strictly complied with, the author acquired no title to an exclusive right in his book. The same doctrine was held by Mr. Justice Washington, in the case of Ewer v. Coxe [Case No. 4,584]. The case of Grant v. Raymond, 6 Pet. [31 U. S.] 218, is relied upon as authority for the latitude of construction contended for by the plaintiff. I confess I am unable to see the least analogy between the principle decided in that case, and that contended for in this. The main question presented in that case was whether the law of 1793 authorized the secretary of state to issue a valid patent to an inventor, after he had issued a void one, in a case where no fault or blame was imputable to the inventor. The court, after much hesitation, and not without doubt, came to the conclusion that the issuing of a void patent did not exhaust the power of the secretary of state under that act, and that he could issue a valid patent for that portion of the fourteen years then unexpired. This was, doubtless, correct; all the requirements of the statute were complied with; a void patent was issued; that was no patent; so that the case, in legal effect, stood as though no patent had before been issued, although the application in due form had been made by the inventor several years before.

Fourth. The fourth proposition under my third point is, that the provision in the 18th section for the renewal of a patent is, as to patents issued before the passage of that act, a gratuity to the patentee, in derogation of the rights to which every other citizen would be entitled upon the expiration of the first patent. Such an act ought not to be extended by construction beyond its express terms. All grants from the government are construed strictly against the grantee. In this respect the rule of construction is different from that which is applied to grants between individuals. But between individuals, a grant which is a gratuity—a deed of gift—is always construed strictly against the donee. The donor is never presumed to have given, or to have intended to give anything that is not expressly mentioned, or to a person not expressly named in the deed. In relation to public grants, by act of the legislature, Mr. Chief Justice Taney, in the case of Charles River Bridge v. Warren Bridge, says—the rule is well settled, that, in grants by the public, the grantee can claim nothing that is not clearly given; nothing passes by implication. 11 Pet. [36 U. S.] 420, 544–546. This

rule should be applied with the utmost strictness to a grant that is a mere gratuity. It cannot be denied that so far as the 18th section of the act in question authorizes the extension of a patent issued before the passage of that act, it is a mere gratuity to the patentee. The patentee had, in such case, received all that the government had agreed to give, and all he had a right to expect as a reward for his invention; an act authorizing such a patent to be extended for seven years longer, is a grant of a monopoly in derogation of the rights of the public, without consideration. It is, therefore, submitted that such a gift ought not to be construed to extend beyond the party expressly named, nor should it take effect at all, but upon a strict and literal compliance with the conditions required by the act.

II. The second question presented is, whether by force and operation of the 18th section of the act of July 4th, 1836 [5 Stat. 124], entitled "An act to promote the progress of the useful arts, &c.," the extension granted to William W. Woodworth as administrator on the 16th day of November, 1842, enured to the benefit of assignees under the original patent granted to William Woodworth on the 27th day of December, 1828; or whether said extension enured to the benefit of the administrator only in his said capacity. So far as it regards the particular case now under argument, this question will be wholly out of the case if the defendants prevail on the first question; because if the court shall be of opinion, that the act does not authorize an extension of a patent in favor of the personal representatives of a patentee, then the extension of this patent is wholly void and can enure to the benefit of no person. It will be necessary, therefore, to discuss this question on the supposition that the extension of this patent in favor of the administrator of the patentee is valid; or, (which will render it still more simple,) to assume, for the purpose of the argument, that the renewal or extension of this patent was obtained upon the application of the patentee himself. If the 18th section of this act does authorize the extension of a patent in favor of the administrator of a deceased patentee, such administrator can have no greater interest in, or more extensive right to the benefits of such extension, than the patentee himself would have had, had he lived and obtained the extension or renewal himself. The simple abstract question then, (to pursue the words of the statute,) is, does "the benefit of such renewal extend to assignees and grantees" of the original patentee? It is respectfully submitted that it does. (1) Such is the plain sense and import of the last clause of the 18th section. (2) Any other construction of that section would render it unjust and invalid, as to those assignees and grantees of the original patentee, who had purchased their rights and obtained their grants or assignments prior to the passage of the act.

1. The clause of the 18th section, upon the interpretation of which this question depends, is in these words: "and the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein." The alleged obscurity of this clause does not arise from the language used by the framers of the act, but from an attempt by construction and interpretation, to give that language a meaning different from the plain import of the words used. Our adversaries contend that the word "therein," refers to the extended term, and gives the same meaning to the clause as if it read "to the extent of their respective interest" in such renewed or extended term of the patent. Therefore, if the assignment does not extend to and embrace the renewed term, or, in other words, if it is not an assignment in terms for the new term for which the patent may be extended, the assignee has not only no benefit of the renewal, but will be precluded by the renewal from using the thing patented during the renewed term. If I may be permitted to borrow a phrase from my learned adversary, I would say that "the most accomplished casuist would fail" to furnish anything like a plausible argument in favor of this construction. It is diametrically opposed to the intention of the legislature as clearly manifested by the language used to express that intention. Besides, such an interpretation would violate one of the best established rules of construction, by rendering the whole clause entirely nugatory and utterly useless. Every statute should, if possible, be so construed that every clause, sentence and word shall have full effect. Dwar. St. 763. An assignee or grantee of a renewed term, would, by virtue of his grant, be entitled to all the benefit of such renewed or extended term, without this clause in the statute.

It is, indeed, contended, that even a specific, absolute grant of the extended term, before the extension was obtained, would not vest in the grantee the legal title to such extended term, after it should be obtained, without this clause in the statute; and that without that clause, such a grantee would be obliged to resort to a court of equity to compel the patentee to convey the title to the extended term after he had obtained the extension of his patent. This position is attempted to be sustained upon an alleged principle of law, that it was not in the power of a patentee before the passage of this act, by any form of grant, assurance or covenant, to convey the legal title to an extended term of his patent which he might thereafter obtain; and that before the extension, it was not a right or property capable of being so transferred, as that the legal title to it would vest in, or enure by force of the conveyance to the benefit of the vendee. The court, I think, cannot fail to be struck with the harmony and consistency of this argument, with that urged by the learned gentleman upon the first question presented by this record, to prove that this possibility of an extension

or renewal of a patent, was such a right or property as would vest in the personal representatives of a patentee at his death. But is this argument sound, or even plausible, upon the ground assumed by the counsel? Why would not the legal title of the renewed term vest in the grantee by virtue of the grant, if it contained the necessary words to effect that object? The only reason that has been or can be urged is that from the nature of such contemplated future interest or right, any grant, or conveyance of it, must, notwithstanding any possible covenants of warranty or further assurance, necessarily be deemed an executory, and not an executed contract. Now, can it be contended that the intent, object and purpose of this clause, in the 18th section of this act, was simply to convert an executory into an executed contract? Could any object or purpose, more foreign from the sense conveyed by the words used in the clause, be imagined? This effect is attempted to be given to the statute under the name of construction. Nothing of the kind is to be found in its language. The court is asked to intend, independently, I may say with truth, in defiance of the language, that such was the subtle, metaphysical intent of congress, and that the words used express such intent.

But the proposition of the learned counsel, that no form of conveyance of such extended term, before it was obtained, could operate so as to vest the legal title thereto in the grantee after it is obtained, is wholly unsound. Suppose a patentee had, prior to 1836, granted by deed his entire right and title to his patent, and all the benefit secured thereby, and all that he might thereafter acquire in a certain specified territory, and had covenanted in the conveyance, that in case the patent should in any manner be renewed, extended or prolonged, all the right and title to such renewed, extended or prolonged term of such patent, and all the benefits thereof, should enure to, and vest in, the grantee, to the extent of his territory; after which an act should be passed similar to what the 18th section of the patent act would be, excluding the clause in question, under which the patentee should obtain an extension of his patent for seven years. Could the patentee, in direct opposition to the covenants in his grant, maintain a suit at law against his grantee, for using or vending the thing patented within his territory, after the commencement of the renewed term? Would the grantee be driven to a court of equity for relief in such a case? Could the patentee in any manner, by the judgment of any court governed by the rules of law or equity, deprive his grantee of the benefit of the renewed term? Certainly a court of equity would not sanction any such attempt. Then suppose he brings his action at law against his grantee, for a violation of the patent during the extended term, would not that covenant of the patentee be a conclusive defence to such an action? How could it be otherwise? Would such subsequent law of congress cancel or annul such a contract, or so far affect it, as to make a resort to equity by the grantee necessary for his relief? Congress has no power to pass a law that would so affect existing contracts.

At the time the act of 1836 was passed, there was no statute or law authorizing an extension, renewal or prolongation of a patent, beyond the original term of fourteen years. When, therefore, congress made the provision that the benefit of such renewal should extend to assignees and grantees, could they have meant assignees and grantees of the renewed term? Is it at all consistent with sound reasoning, to suppose that congress, by the terms "assignees" and "grantees," meant assignees and grantees of a future possible interest in the patent, after the expiration of the original term; assignees and grantees who, as the counsel claiming this construction insists, could not, from the nature of things, have any existence; and when, in fact, such an assignment or attempt at such an assignment, was extremely rare; while on the other hand, assignments and grants, and assignees and grantees of the original patent, or of some interest therein, were as common as the patents themselves? These, I submit, are insuperable objections to the construction of the clause in question, contended for on the part of the plaintiff, while the construction claimed by us, follows from the grammatical construction and meaning of the words in which the clause is expressed.

The term "therein" obviously refers to the phrase, "the thing patented," so that if all that is grammatically understood, were expressed, the clause would read thus: "and the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest" in the thing patented. The word "therein," as used in the clause, is a relative term, and is used to obviate the repetition of the phrase, "in the thing patented." This, I submit, is the plain grammatical construction of the sentence. What, then, is the thing patented? Clearly the exclusive right to make, vend and use the thing invented or discovered. If, as in this case, the invention consists in the discovery of a machine, the thing secured by the patent, and consequently the thing patented, is not the machine itself, but the exclusive right to make, vend and use that machine. An assignment or grant by the patentee of the whole of such exclusive right, for a specified territory, vests in such assignee or grantee all the right and property of the patentee, in and to such exclusive right, to the extent of such territory. The extent of the interest of such assignee or grantee is limited by the territory to which the grant or assignment is confined. Therefore, the extent of the interest of such assignee or grantee in the thing patented, to which the benefit of such renewal extends, is the extent of the territory, in and over which he has, by the terms of his assignment or grant, such exclusive right.

It is insisted, that the word "extent," used

in the clause, applies to duration of interest as well as to extent of territory. Metaphorically or poetically, the word "extent" is sometimes used to express duration; but it is never so used in a professional sense or in common parlance. The term used by property lawyers and conveyancers, to express the duration of interest in an estate, is "quantity." "The term for which the right of enjoyment is to continue, forms the quantity of the estate." 1 Prest. Est. 21. No writer on property has ever used the word "extent," or "extent of interest," to designate the time of enjoyment. In common parlance, the word "extent" is rarely, if ever, used to denote duration. Extent of one's interest or property in a town—extent of one's plantation or farm—extent of dominion—extent of a road or river—designate space and not time. If any person were to enquire as to the extent of the interest of a grantee or assignee in a patent, every one would understand the inquiry to be, whether the grant or assignment was of the whole patent, or of a part, and of what part. No one would understand such an inquiry to relate to the duration of the interest. No definition signifying duration, is given to the word "extent," by the best lexicographers. Walker defines it to mean—"space or degree to which a thing is stretched." Johnson—"space or degree to which a thing is extended." Webster, (first octavo edition,) defines it thus: "1st, space or degree to which a thing is extended; hence compass, bulk, size; as, a great extent of country, or of body; 2d, length; as, an extent of line; 3d, communication, distribution; 4th, in law; a writ of execution, or extendi facias." It is not to be presumed, at least it is not a legal presumption, that congress, in penning or framing this clause of the act, used any of the words employed for that purpose, in any other than their ordinary sense. The 18th section also declares, that upon the patent being so renewed, "the said patent shall have the same effect in law, as though it had been originally granted for the term of twenty-one years." Is there anything in this language which authorizes, or in the least degree countenances the construction given it by the counsel for the plaintiff, that the renewed patent shall only have this effect quoad the patentee? Can a sentence expressed in such clear and unequivocal terms, be thus curtailed and restricted by any known rule of interpretation? I insist, not. The patent, when renewed, is to have the same effect in law, in all respects, and to every intent and purpose, as though it had, in the first instance, been issued for twenty-one years. By the express terms of the act, the renewal, by relation, makes it a patent for twenty-one years ab origine. One of the necessary effects in law of this is, that an assignment of all the patentee's interest in the patent, in any specified territory, would vest in the assignee the whole right to the patent for that territory, for the twenty-one years.

2. The construction contended for by the counsel for the plaintiff, would, if adopted, render the law unjust and invalid as to those assignees and grantees who had purchased their rights and obtained their grants or assignments, prior to the passage of the act of 1836. Such assignees and grantees, by virtue of their grants, acquired the right, as the law then stood, to use the thing patented in the manner specified in their grants or assignments, not only during the continuance of the original patent, but for all time to come; an exclusive right, during the existence of the patent, and a right in common with other persons after the expiration of the monopoly. Such, we have a right to assume, was their just expectation, which entered into the inducement to purchase, and which constituted a portion of the consideration for the price paid for the grant. No man would give so much for a business of any kind, which he might by law be compelled to relinquish in fourteen years, as he would if it could be continued at his pleasure. True, he would have no exclusive right after the expiration of the monopoly, but he nevertheless knew that after the expiration of the patent, he would have a common right, and would have the benefit of being in the market, with every necessary material and structure, to carry on the business. This to start with, at the expiration of the monopoly, would be no inconsiderable advantage; an advantage valuable in itself, to which he would be legally entitled, from having purchased and paid a valuable consideration for the right of placing himself in that position. The bare making of the thing patented, during the existence of the patent, ready to be used, would be a violation of the patent. No person but the patentee, or those deriving the right from him, could do so, with impunity. This advantage, independent of the large sum that must necessarily be invested in the business at the expiration of the patent, is a property —a right—vested in the assignee or grantee, by virtue of his grant, which congress has no power to impair, much less to take from him and bestow upon his grantor. A law which would impair, or take from a grantee rights, thus lawfully acquired, for the benefit of the grantor, would be unjust and invalid. Wilkinson v. Leland, 2 Pet. [27 U. S.] 627, 657, 658.

The grantor, or his heirs or representatives, have no right to do, or omit to do any act, which would impair or injuriously affect any part or portion of the rights thus granted by him, and no such right could be vested in him, or his heirs or personal representatives, by any subsequent law. The fourth section of the act of 1793, under and by virtue of which the assignees and grantees of the patent in question acquired their rights, declares: "that it shall be lawful for any inventor, his executor or administrator to assign the title and interest in the said invention, at any time, and the assignee having recorded the said assignment, in the office of

the secretary of state, shall thereafter stand in the place of the original inventor, both as to right and responsibility, and so the assignees of assigns, to any degree." By what rule of construction, can the word "thereafter" be held to mean any limited period? By the plain meaning of the language used, the assignee, to the extent of the right acquired by his assignment, is to all intents and purposes, and for all time, put in the place of the inventor, both as to right and responsibility. And yet the construction contended for by our adversaries, would require the word "thereafter" to be expunged from the section, and the words "during the existence of the patent" substituted in its place.

In the case of Herbert v. Adams [Case No. 6,394], it was held that an inventor who had assigned his invention, and afterwards took out a patent for it, could not maintain an action for an infringement of the patent. Mr. Justice Story said, that the patentee was estopped from claiming any right adverse to the assignee; that, although the assignment was made before the patent was obtained, yet the assignee, by force of the 4th section of the act of 1793, stood in the place of the inventor, both as to right and responsibility; and that the patent obtained by the inventor subsequent to his assignment, enured to the benefit of his assignee. Now, I ask, could congress pass any law which could, or would, at any period of time, re-invest in the inventor any right to such invention, without the consent of, and hostile to his assignee? And more especially, if congress should pass any law on the subject which did not, in the most explicit terms, declare such to be its object, would this court, by construction, give it that effect? By the 7th section of the act of 1839, it is enacted that every person who has or shall have purchased or constructed any newly invented machine, &c., prior to the application by the inventor or discoverer for a patent, shall be held to possess the right to use and vend to others to be used, the machine, &c., so made or purchased, without liability therefor, &c., but that the patent for such invention, if obtained within two years, shall not be held to be void by reason of such prior sale or use, &c. The only alteration of the law, made by this section, is, that the prior use or sale of an invention shall not render a patent subsequently obtained void, unless such prior use, purchase or sale has continued for more than two years prior to the application for the patent. In the case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, the defendant had used the invention four months before the inventor applied for his patent; and the question was, whether the use of the invention by the defendant after the patent was obtained, rendered him liable to an action for infringing the patent. The court held that the defendants had a right to continue to use the invention, notwithstanding the patent, without liability to the patentee or his assignee. Now, suppose

this patentee should get his patent renewed or extended under the 18th section of the act of 1836, would such renewal give him any better or greater or other right, than he had by his original patent? Would persons who were not liable to him for an infringement of the patent before it was extended, be liable for the same or similar acts of infringement, after it was extended? By the 2d section of the act of the 3d of February, 1831, to amend the several acts respecting copyrights, an author may renew and continue his copy-right for fourteen years after the first term of twenty-eight years. Could an author, who had sold the original copy-right of his book to a publisher, acquire by a renewal of such copy-right, any right to prohibit such publisher from publishing or selling such book after the expiration of the first term? Suppose the work were so extensive, and the publication so expensive, that the publisher should deem it advisable to publish a very large edition in the first instance, a large portion of which (of the value of many thousands of dollars) should remain on hand at the expiration of the first term of the copyright. Would a renewal of such copy-right by the author, entitle him to prohibit the sale of the books thus published? Clearly, such an interpretation of the second section of that act, would render it most manifestly unjust, and such a construction would be still more indefensible, if we suppose (to make the case more analogous) that this second section had been enacted after the publisher had purchased and paid for the original copy-right. A retroactive effect, injurious to existing rights, is never given to a statute by construction.

The very able and conclusive opinion of Chief Justice Taney upon this very question, in the case of Wilson v. Turner [Case No. 17,845], at the Maryland circuit, in December last, divests it of all doubt. After stating the construction contended for by the plaintiff in that case, which was the same as that now insisted upon, the learned chief justice remarks: "Now, if this be the construction of the act of congress, the provision in favor of assignees and grantees would seem to the court to be useless and nugatory. No one, we think, would suppose that the grant of this new right annulled all contracts made under the old one; and that giving to the patentee an additional term of seven years, would deprive purchasers of the right which they had acquired in the original term, before the renewal was granted. If the patentee had assigned all his right in a particular district or state, for and during the whole fourteen years, or even for a shorter period, surely that contract would continue binding upon him, notwithstanding he afterwards procured an extension of his patent, and congress could hardly have deemed it necessary to make a special provision for its protection. Certainly, according to this construction, the assignees or grantees would derive no ad-

vantage from the renewal. Yet the law clearly intended that they should share in the benefit conferred on the patentee, and have some advantage from the extension of the patent for seven years. For it provides, in express terms, that the benefit of the renewal shall extend to them; thus using a word which shows that it was not the intention of the legislature merely to protect interests which previously existed in assignees and grantees, but to give them a share in the benefit conferred on the patentee by the renewal of the patent. Moreover, assignees who had purchased the title of the patentee in particular states and territories, and individuals who had paid for the right to use the invention during the original period of the monopoly, might have suffered serious injustice by the grant of a new and further term to the patentee, unless they also were embraced in it, and they would, therefore, very naturally and properly be the objects of protection. For, in cases like the present, where the patent was issued and the purchaser obtained his assignment before the passage of the act of 1836, both parties must have understood that the exclusive right of the patentee for its whole period was transferred, and that at the expiration of the fourteen years the assignee would have the right to use the invention without interruption, and without paying the inventor any further compensation. The object of the clause in question in the act of congress, is to preserve the contract in the sense in which both parties understood and intended it at the time it was made, and to secure to the purchaser the right which he intended to buy, and supposed he had bought, and which the patentee must have intended to sell, and, at the time of the contract, must have supposed he had sold. Indeed, the power of extension given by the act of 1836, would have operated most unjustly upon those who had purchased the right to use a patented machine, if it had not been accompanied by a provision for their protection. For, relying on the assurance given by the law, as it stood when the contract was made, that they had purchased for the whole period of the monopoly, and that they might lawfully continue the use of the invention after the expiration of the fourteen years, many grantees, after having obtained the assignment or grant from the patentee, had undoubtedly erected costly machinery, and encountered expenses which they would not have incurred, if they had supposed it would be in the power of the patentee to forbid the use of his invention after the term limited by his original patent; and if, with these expenses incurred and arrangements made for the continued use of the improvement, congress had passed the law of 1836 without this provision in favor of assignees and grantees, it would have enabled the patentee to deal with them most severely and oppressively, and to exact from them a far heavier sum for the extended term

of seven years, than they would have been willing, under other circumstances, to have given for the original term of fourteen." After further illustrating and demonstrating the correctness of this construction, and answering the arguments urged against it, the learned chief justice concludes: "Besides, the words of the law appear to us to admit of no other interpretation than the one we have given. It declares that the benefit of the renewal shall extend to assignees and grantees of the thing patented, to the extent of their respective interest therein. Now, what benefit have they in the renewal, if they are excluded from the use of the thing patented during the whole of the renewed term. According to that construction of the law, so far from receiving a benefit, they would be subject to loss; they would not even enjoy the right which they supposed they had bought, but would be compelled, at the expiration of the fourteen years, to stop the works they had constructed, at whatever loss it might occasion, unless the patentee gave them leave to proceed. Yet the law, in plain terms, declares that they are to derive an advantage from the extension, and that the benefit of the renewal shall extend to them according to their respective interests. In other words, it means to provide that assignees and grantees shall share with the patentee the benefit of the renewal, according to the interest which they respectively acquired in the thing patented within particular districts of country, or for their own individual use."

The learned counsel for the plaintiff has urged, as an answer to this argument, that there are many inventions which do not require the erection of costly machinery, or an encounter with great expense; and he instanced an invention for combining colors, in which case the loss of capital invested in machinery, must at most be very trifling. I will not say that such an argument is absurd, but, surely, it must derive its whole force, it must be exclusively indebted for whatever consideration it may command or receive, wholly and entirely to the source whence it emanated. What is it? The gentleman contends for a construction of this act, which will exclude from its provisions persons expressly included in its language. We resist this construction, and, as one reason against it, show to the court the gross injustice it must inevitably work in the case pointed out. To this the learned counsel answers: There may be other cases where the injustice would not be so great or so apparent. If the construction contended for by the plaintiff would inevitably work injustice in a single case, it demonstrates such construction to be wrong, notwithstanding there may be other cases and other persons that would not be injuriously affected by such a construction.

It has also been urged that any citizen, when a patent is about to expire, may erect costly structures and machinery to use the invention

after the monopoly shall have expired; and the question is asked: Why should not congress consider his case as favorably as that of the assignee? I suppose the difference between the case of an assignee who has purchased and paid the patentee for the right to make, use and vend the invention, and who has invested his capital in that business under a just and lawful expectation, which entered into the inducement to purchase, that he would have a right to continue in the business after the monopoly expired, and a person who, without such right, should invest his capital in the same business, is too obvious to require illustration.

If the interpretation of the plaintiff's counsel is adopted, it must inevitably deprive purchasers of the patented article for sale or for use, as well as assignees or grantees of the patent, of the right to vend or use the article purchased. Take the article of a stove for instance, an article of prime necessity, and for which hundreds of different patents have been obtained. Suppose a patentee, shortly before the expiration of his patent, should sell to a stove-dealer, a quantity of the patented stoves, or should sell a single stove to a person for his own use. The renewal of the patent would authorize the patentee to prohibit the sale in the one case, or the use of the stove in the other, after the expiration of the original patent. Any person who may have purchased the patented article from the patentee, his assignee or agent, the day before the expiration of the original patent, be it ever so expensive, may the next day be prohibited from using it. A mere purchaser of the patented article for any purpose, cannot, perhaps, be deemed to be an assignee or grantee of the patent, or of any interest in it, or of any right secured by it, and is, therefore, not within the words of the clause extending the benefit of the renewal to grantees and assignees. But can it be supposed that congress ever dreamed, much less intended, to give a patentee, under any circumstances, the right to prohibit the use of the patented article which had been sold by him, or by his authority? Can it be maintained for a moment, that such would be the effect of the 18th section, even if the clause in question had not been inserted in it? The term "to use" is employed in the clause in question, in its most extensive sense, as it is in common parlance. "The right to use the thing patented" means the right to make any use of the thing patented, of which it is susceptible, and which is authorized by the grant or assignment. If the grant be only to make and sell the thing patented, the only use the grantee can make of the invention, is to make and sell the article invented. If the grant be of all the patentee's right to the invention within a specified territory, then the grantee can make any use of it which the patentee himself could. The verb "to use," in its general signification means any employment or disposition of a thing. Loaning money, or purchasing property with it, is using it. Retailing goods is the use to which the shop-keeper or merchant applies that kind of property, while the consumption of it is the use to which the purchaser applies it. It has before been shown that the thing patented—the thing secured by the patent, is the exclusive right to the use of the discovery. Making and selling the article discovered, is as much an use of such exclusive right, as any employment or disposition of the article by the purchaser can be.

Another argument has been urged by the plaintiff's counsel which should not be passed unnoticed. It is contended that the constitution does not authorize any legislation on this subject, directly or indirectly, in favor of assignees, and, therefore, if the 18th section does, by its terms or effect, extend the benefit of such renewal to assignees, such provision is not authorized by the constitution, and is therefore void. To sustain this position, the counsel has cited 3 Story, Comm. § 1148. Upon this hypothesis, it is asserted that if the construction of this section is as is insisted by us, congress has undertaken to give the property of William Woodworth to his assignees, which it had no power to do. Now, it appears to me that this argument admits of a very plain answer. In the first place, although it is true that the constitution only authorizes congress to grant such exclusive right to authors and inventors, yet it is equally true that congress has power to annex any terms or conditions to the grant of such exclusive right, that it may deem proper. Wheaton v. Peters, 8 Pet. [33 U. S.] 591, 663. It was entirely competent for congress to annex any terms or conditions to the renewal of a patent that it might deem proper. The patentee can accept of the renewal on those terms or not, as he may choose, but he can only have such renewal subject to those terms and conditions whatever they may be. In the case of Wilson v. Turner before referred to, the court say: "The legislature, obviously, we think, intended to guard the party who had purchased from the patentee the right to use his invention until the expiration of his exclusive privilege, from the necessity of buying it again; and when they were giving to the patentee a new privilege, and one which he had no legal right to demand, they had undoubtedly a right to annex to it such conditions and limitations, as in their judgment, justice required."

In the next place, it is an utter misconception, if not a perversion of the facts, and of the rights of the parties, to say that if the construction contended for by us be correct, it would be giving the property of the patentee to his assignee. The patentee had no legal or equitable claim to an extension of his patent, at least before this law was passed. The law created a new right, if it be a right, which had no existence before. In creating this right, congress was bound to protect the interests of the grantees and assignees of the patentee; and the clause in question simply and only protects the assignees against any

future exaction of the patentee under the new right gratuitously bestowed upon him. Instead of giving the property of the patentee to his assignees, it only protects assignees and grantees in the enjoyment of the rights which they have purchased of the patentee. Without such a provision expressed or implied, the law would be justly obnoxious to the objection, that it deprived assignees and grantees of rights acquired by grant from the patentee, for the benefit of their grantor.

The Commentaries of the late Mr. Justice Story, in no manner favor the views of the learned counsel. The monopoly act of 21 James I. c. 3, authorizes patents to be issued to persons who shall introduce into the kingdom any new manufacture, &c., as well as to inventors. Our constitution authorizes congress to secure the exclusive right to authors and inventors only, to their respective writings and discoveries. In the commentaries referred to, Mr. Justice Story is discussing the policy of the provision in our constitution, excluding introducers of new works and discoveries. The language of the learned commentator, referred to as authority against us, is this (section 1148): "The power, in its terms, is confined to authors and inventors; and cannot be extended to the introducers of any new works or inventions;" clearly having no reference whatever, as to whether the constitution did or did not authorize congress to enact any provision for the protection or benefit of the grantees or assignees of inventors or authors. Besides, congress, upon the literal construction of the constitution insisted upon by the counsel for the plaintiff, would have no more power to authorize the issuing or renewal of a patent in favor of the executor, administrator or heirs of a patentee, than in favor of his assignees, grantees or creditors.

V. The fifth question is so intimately connected with the second, that I beg leave now to present such considerations as have occurred to me in relation to it. I assume that the discussion of the second question has demonstrated, that a renewal or extension of the patent under the 18th section, enures to the benefit of the assignees and grantees of the patentee. That section does not contemplate or authorize the renewal of a patent, unless the patentee can, to some extent, be benefitted by it, without injury to his assignees or grantees. If this be true, it necessarily follows that a patentee who has parted with his entire interest in the invention, is not within the spirit and intent of the 18th section. I have already shown that where a patentee assigns his discovery before obtaining his patent originally, he is not entitled to a patent for his own benefit, and if he do afterwards obtain a patent, it will enure to the benefit of the assignee. Suppose the case of a patentee who has, in clear and unequivocal terms, and for a valuable consideration, granted his entire interest in his invention and patent, future as well as present, so that the benefit of any extension or renewal must,

by force of the grant, enure to the grantee. Would the patentee, in such case, be within the provisions of the 18th section? Clearly not; unless that section authorizes a renewal from which the patentee can derive no benefit whatever. Clearly, such renewal could not reinvest the patentee with any right or title to the discovery, in direct violation of his grant.

III. The third question is: Whether by legal operation and effect of the assignment from Woodworth (the patentee) and Strong, to Twogood, Halstead and Tyack, on the 28th of November, 1829, and the covenants therein contained, the benefit of the renewal of said patent enures to said assignees, to the extent of the territory specified in said assignment. This question is presented on the hypothesis that the assignee is not entitled to any benefit of the renewal, or to any interest in the extended term, unless it is secured to him by the terms or legal effect of his assignment. Such, we insist, is the legal effect of the assignment in question. Upon this point I hope to establish, to the satisfaction of the court, the following propositions: (1) That all the interest which William Woodworth had in and to said invention in November, 1829, and all the right, property, and interest therein, which he contemplated thereafter acquiring, or might thereafter acquire, could be legally passed or transferred by grant or assignment, with proper granting terms therein used for that purpose. (2) By the assignment or grant in question, all the interest, right, and property, which the patentee then had, or which he might thereafter acquire, to the exclusive right to said invention, was transferred to the said assignees or grantees, to the extent of territory embraced in said grant or assignment. (3) But if the property thereafter to be acquired by the patentee in the exclusive right to said invention, by a renewal of his patent therefor, were not such a property as could legally be passed, or transferred by grant, then we submit that the covenants contained in said assignment, operate by way of estoppel, to transfer such future interest to said assignees, the moment it is acquired by the patentee or those representing him.

1. As to the first proposition, it is contended on the part of the plaintiff, that at the time of the assignment (1829) the patentee had not such a property in or right to the renewed term, as could pass by assignment; that there was nothing in esse upon which an assignment or grant could operate. Were it necessary for me to controvert this doctrine, I would refer the court to the argument of the same learned gentleman, upon the first question presented; where, it will be recollected, he labored with equal zeal to establish a diametrically opposite doctrine. It was necessary for his purpose then, and he attempted to prove that the interest of the patentee in this future contingent right of renewal, was a chose in action; such a right to property as would, by operation of law,

vest in the administrator, and might be enforced by him. I admit I could not see anything like plausibility in that argument. The possibility of obtaining a patent by a patentee, was as mere a possibility in 1839 when the patentee died, as it was in 1829 when he made the assignment. The act of 1836 did not invest the possibility of obtaining a renewal of a patent under it, with any more of the characteristics or attributes of property or right to property, than it had before. A possibility is not changed to a right, nor does it approach nearer to a right, by a change of probabilities in its favor. Nevertheless, unsound as I deem that argument to be, unless the court adopt it, there can be no pretence of authority for the renewal of the patent in favor of the administrator. It is, therefore, only upon the supposition that the court may, by possibility, hold the right of the patentee to apply for a renewal of his patent, and the possibility of such application being successful, to be a right of property, which, upon the death of the patentee before making the application, will vest in his administrator, and constitute assets in his hands, that the present question becomes at all material. Should such be the decision of the court, it would establish the proposition for which I am now contending. Surely, it cannot be denied, that every species of property which would constitute assets in the hands of an administrator, may be sold and transferred by the decedent in his life-time. Whatever the law might once have been, it is now perfectly settled, that a chose in action, or any property of whatever description, may be assigned, and the rights of the assignee will be protected at law as well as in equity. A claim of any description upon the government, which would constitute assets in the hands of the administrator, is capable of being assigned by his intestate in his life-time.

But I do not controvert the present doctrine of the learned counsel. I admit now, what I attempted, (and I hope not without success,) to prove, in my argument upon the first question, that the liberty or power of the patentee to make the proper application for a renewal of his patent, and the possibility of such application being granted, is not property or a right to property, which would go to personal representatives. It is only a possibility; and although an assignment, purporting to convey only the present interest of the assignor, would not pass any after acquired right, into which such possibility might ripen, that by no means disproves the proposition now under discussion. Every future contingent right, even a bare possibility, may be barred by estoppel, or may be transferred by deed, with proper and apt words for that purpose, although it would not descend to heirs, or pass to personal representatives. An heir, during the life of his ancestor, has only a possibility in the estate of the ancestor; yet an assignment by deed or grant, from him to a third person, of all the interest he then had, or might thereafter acquire in such estate, with covenants for further assurance, would pass to the grantee whatever estate the grantor should thereafter acquire in the premises, at the moment he acquired it.

In this case, the patentee, at the time of the assignment, had a present tangible property in his patent. The patent, securing to him the exclusive right to his invention for fourteen years, was that species of property denominated in law an incorporeal hereditament. It is classed by the *writers upon property, as a species of real estate. The patentee, at that time, also had the possibility of an extension or renewal of his patent for a further period. Congress had before renewed patents, and they might do so again, by special or general law. This was a possibility coupled with, attached to, and dependent upon, his present right and interest, and was grantable over. "A bare possibility, coupled with some present interest, is grantable over." Shepp. Prec. 252. If the grant or assignment contain either proper and apt words to transfer such possibility, as well as the present interest, or a present grant of the entire interest of the patentee in the invention, with covenants of warranty, or covenants to convey such future interest as the patentee might thereafter acquire, the grantee or assignee would, by force of the deed, become vested with such future interest as the patentee might thereafter acquire, the moment he acquired it. An heir, entitled to an estate for years, the remainder in fee in his ancestor—the interest of the heir in the remainder is a mere possibility, not a right. Yet, if the heir should convey the whole estate with covenants of warranty, and for further assurance, or should convey his estate for years, together with his possibility in the remainder, or with covenants that his vendee should have the remainder, or so much thereof as he should thereafter acquire, his grantee, by force of the grant and the covenants, would be vested with the remainder the moment it became vested in the grantor. An inventor has no exclusive right to his invention before he obtains a patent for it. Yet if he assign his discovery, and afterwards acquires such exclusive right by obtaining a patent, such exclusive right immediately vests in his assignee, by force of the previous assignment. The same principle would vest any extension of such exclusive right in the assignee. In short, the simple question is: Has a patentee the power of transferring to another any possible future extension of his exclusive right? That he has such power, there is no ground for a reasonable doubt.

2. The assignment is by deed. It contains apt and appropriate words to convey and transfer all the interest which the patentee then had in his invention, or which he might thereafter acquire by a renewal of his patent. The assignment is of all the right and interest of the patentee in the patent, in the territory

therein specified, (the county of Albany being a part of such territory,) to have and to hold the rights and privileges granted for and during the term of fourteen years from the date of the patent. The assignors then . covenant that any improvement in the machinery, or alteration or renewal of the patent, shall enure to the benefit of the assignees, and may be applied and used by the assignees, within their territory thereinbefore designated. It is clear, from the words used, that the patentee intended to grant, and supposed he was granting, and the assignees supposed they were receiving, a conveyance, not only of the right of the patentee to the original term, but also to any renewed term of the patent, should such renewed term be obtained. · The intention of the parties must govern in this as well as in any other case of contract, unless, indeed, the whole law of contracts, as well as every rule for the construction of statutes, is to be overturned for the benefit of the plaintiff in this cause. Woodworth's interest in the patent, in the territory embraced in the assignment, was his entire interest, to the extent of that territory, in the invention patented. The term "patent," as used in this assignment, includes the invention, or thing patented. Webst. Pat. 1. The patent was his title to the exclusive right to his invention; the whole of that right is conveyed to the assignees, with an express covenant, that if the patent, securing that exclusive right, should be renewed, such renewal should enure to the benefit of the assignees, and that they might apply and use such renewed patent within the territory specified in their assignment.

3. If the court should be of opinion that the right to the renewed term could not, from its nature, pass with the then present right of the patentee, still there can be no doubt that the covenants in the assignment operate by way of estoppel to transfer the after acquired interest, by such renewal, to the assignee, the moment such renewal was obtained by the assignor or his representatives, without any other or further conveyance. Mr. Sheppard, in the Touchstone (volume 1, p. 182), says that the effect of such covenants is to transfer all the present and future rights of the covenantor at once to the covenantee. Mr. Preston, in his edition of the same work, says, that such covenants operate, by way of estoppel, to transfer any after acquired right, to the grantee. The grantor and his heirs being estopped, by his covenants, to assert any after acquired right, such right necessarily enures to the benefit of the grantee. No subsequent conveyance is necessary; the covenants operate as a conveyance. The doctrine must be familiar to the court. Where a grantor, without title, or with a title for years or for life, conveys in fee, with covenants of warranty and further assurance, and afterwards acquires the fee, the after acquired right enures, by force of the covenants, to the grantee, without any further or other assurance. This doctrine is not peculiar to real estate. Where the

mere bailee of a chattel, without title, sells it absolutely, and afterwards acquires the title to it from the owner, he cannot assert this after acquired title against his vendee. Mr. Sheppard, in the Touchstone (volume 1, p. 161), says: "A covenant doth sometimes, also, make a transmutation of property and possession of things, as in case of a covenant to stand seized of land to uses; and in case where one doth covenant that another shall have a piece of land for five years, this is a good lease for five years. And in law, where one doth covenant with another, that if he pay him ten pounds such a day, he shall have all his cattle in Dale, or his lease for years he hath of of the manor of Dale; in this case, if he pay the money at the time, he shall have the property of the goods, and of the lease for years."

It is urged that the covenants in this assignment are executory, and therefore a subsequent conveyance is necessary to transfer the title to the assignee. In all the cases I have referred to, the covenants were executory. A covenant of warranty, a covenant for further assurance, and the covenants in the several cases just referred to in Sheppard's Touchstone, are all executory covenants, and yet they all operate either as a conveyance or by way of estoppel, to transfer the title to the property, without any other or further assurance. The doctrine contended for by the plaintiff would work the greatest injustice, and be productive of the greatest mischief, in the most common affairs of life. Suppose a person entitled to a chattel for fourteen years, sells his interest in it, with a covenant that all the right he should thereafter acquire to it, should enure to the vendee, and the vendor should afterwards acquire a further right for fourteen years; could he, after the expiration of the first fourteen years, reclaim the chattel from his vendee, or maintain any action at law against him for it? Would not the covenant be a complete defence to any such claim? Would it be any answer to such defence, that no further conveyance had been made by the vendor? In the case of Cartwright v. Amatt, 2 Bos. & P. 43, this doctrine was applied to a covenant contained in an assignment of a patent. In that case, A., by indenture, (reciting that a suit was pending between him and B. respecting certain patents, and that the same could not be assigned without hazard of defeating the suit,) granted absolutely the said patents, with others, to C., excepting, however, from the grant, until the determination of said suit, such patents as should be necessary to support his, (A.'s), title. Then followed a covenant that A., upon the determination of the suit, should assign the excepted patents to C., and that, until such assignment, A. should stand legally possessed of such excepted patents. It was held that the legal interest in the excepted patents, vested in C., upon the determination of the suit, without any other or further assignment.

A grantor in fee with covenants of warranty, or for further assurance, who at the time

of the grant has no title, but afterwards acquires one, is deemed in law, quoad his grantee, to have had the title at the time of his grant or conveyance. Hence, no other or future conveyance is necessary to vest his after acquired interest in his grantee. This is precisely the position in which the 18th section of this act places the patentee, upon obtaining a renewal of his patent. "And, thereupon," (upon the renewal,) "the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years." Does it not necessarily follow, from the terms of this section, as well as from the principles of law applicable to such covenants, that the assignment in this case has the same effect, as though the patent had originally been issued for twenty-one years instead of fourteen years?

It has, however, been urged with great earnestness, that the habendum clause in this assignment restricts the grant and the covenants, to the period of fourteen years. "No matter," says the learned counsel, "what the parties may be supposed to have stipulated for, and even though a right to an extension might have passed under the general words, yet those words are controlled by the habendum, and restricted to fourteen years." It seems that the legal effect of the habendum clause in grants must be directly reversed for the benefit of this meritorious plaintiff. The habendum may sometimes enlarge, but it never restricts a grant. Mr. Preston says, the habendum is a formal and not an essential part of a deed. Where the habendum is inconsistent with the grant, the grant and not the habendum will operate. As a grant to A. and his heirs, habendum to A. for life, or for years, the grant will operate, and the habendum be rejected as repugnant to it. So, if a man grant rent, or common, &c., out of his land, by the premises of the deed to one and his heirs, habendum to the grantee for years, or for life, the habendum is repugnant, for a fee passeth by the premises, by the delivery of the deed; and, therefore, the habendum for years or life is void. 3 Prest. Abst. 43, 45; Baldwin's Case, 2 Coke, 22b. Whatever interest, therefore, the patentee had in his invention and patent, beyond the term thus secured by the patent, whether contingent or merely possible, being coupled with and incident to his then present interest as patentee, passed by the assignment, notwithstanding the habendum. Besides, the covenants expressly assure to the assignees any future interest that the patentee may acquire by a renewal of his patent. Whatever effect the habendum may have on the granting clause, it can have none whatever upon those covenants.

But it is contended, that inasmuch as there was no general law for the renewal of patents at the time of this assignment, the parties cannot be supposed to have provided, or intended to provide, for an extension of the patent; that the term "renewal" does not mean an extension of the patent, and is, therefore, inappropriately used in the 18th section; and that it must be deemed in law to have reference to a new patent being issued in consequence of the original patent being void for some cause which would, as the law was then understood to be, authorize the issuing of a new patent for the same invention, for the residue of the term then unexpired, for which the original patent was issued. Such a construction of the covenants in this assignment, would not only render the covenant giving to the assignees the benefit of any renewal of the patent, wholly nugatory and inoperative, but would pervert and change the known and well established effect and signification of the word "renew." At the time this assignment was made there was no statute authorizing a new patent to issue, in case the first should turn out to be void from mistake, nor any general statute authorizing the renewal of a patent. But in the case of Morris v. Huntington [Case No. 9,831], tried at New York, in April, 1824, where the patentee had taken out two patents for the same invention, the specification in the first patent not having sufficiently described the improvement, but still the first not having been vacated, it was objected that the second patent was void for that reason, and Mr. Justice Thompson held the second patent, (for the violation of which the suit was brought,) to be void for that reason. But he remarked, in making that decision, that he saw no insuperable objection to entering a vacatur of the first patent, of record in the department of state, if taken out inadvertently, and that upon such surrender or vacatur of the first patent, the secretary of state might issue a new one (not renew the old one) for the residue of the term of fourteen years from the date of the first patent; but expressed some doubts, whether this could be done solely at the instance of the patentee. In January term, 1832, (nearly three years after this assignment,) the case of Grant v. Raymond, came before the supreme court, on a certificate of division upon this very point, and the court held (6 Pet. [31 U. S.] 218, 240–244) that the secretary of state might receive a surrender of the first patent, and cancel the record thereof, and issue a new patent with a corrected specification, for the same invention, for the residue of the term of fourteen years. where the first patent was void in consequence of a defective specification arising from inadvertence or mistake, and without any fraud or misconduct on the part of the patentee; that such issuing of a new and valid patent, was only a due execution of the power conferred by the first section of the act of 1793; and that an abortive attempt to execute that power by inadvertently issuing a void patent, whether such inadvertence was imputable to the patentee or to the secretary, was no impediment to a due and valid execution of it subsequently. At the time, therefore, that the assignment in question was made, it was very doubtful whether a new

patent could be issued, where the first patent was void for a defective specification.

But suppose that principle of law had been well settled, it would require no covenant in an assignment, to give the assignee the benefit of such new patent. If a patentee should assign his exclusive right to use the invention in a specified territory, without any covenants, or should sell one of his patented machines, and his patent should afterwards turn out to be void, in consequence of his own mistake or inadvertence in framing the specification, and he should, for that reason, obtain a new and valid patent for the same invention; will any one contend, that he could deprive his assignee of the right to use the invention according to the assignment, or prevent the individual to whom he had sold one of the patented machines from using it? Certainly, no such doctrine can find a place in the law or equity of this or any other civilized country. The patentee sells his exclusive right to his invention, as a valid exclusive right. If it be invalid for a defect, arising from his own inadvertence, which he can supply and does supply, and he obtains a new patent, effectually securing the same exclusive right to the same invention, and for the same term for which the invalid patent was issued; can it be pretended that that exonerates him from his assignment of the exclusive right to use the same invention for the same term? Could he maintain an action against his assignee, for using such exclusive right, after the valid patent had issued? Surely, such a principle could not be gravely insisted upon. It cannot, therefore, be determined as matter of law, upon the face of this assignment, that the covenant in question was not intended to secure to the assignee the benefit of a new patent issued under such circumstances, unless the court determine as matter of law that the parties intended to make a covenant entirely useless, nugatory and inoperative; and that, the law never does presume or intend.

The proper philological signification as well as legal meaning of the term "renewal of the patent," as used in this assignment, is, to "continue"—to "prolong"—to "extend." Renewal of a lease, of a contract, of a policy of insurance, of a note, of a bond, &c., means to prolong—to extend. The term "renew" is not applicable to the making of a new thing, as a substitute for a void thing. The renewal of a thing ex vi termini presupposes the prior existence of the thing renewed. It is renovating a thing which has expired, or is about to expire; while a new thing is a thing which did not exist before. Making a new thing is making a thing which did not exist before. Issuing a new patent in the place of a prior void patent, is in no sense a renewal of the void patent. It would be absurd to call the giving of a new lease, as a substitute for a prior void lease, a renewal of the prior lease. The terms "renew" and "renewal" are, therefore, appropriately used in the 18th section,

to designate the extending and extension of a patent. In section two of the act of July 3d, 1832 [4 Stat. 559], concerning patents for useful inventions, the word "renew" is used as synonymous with "prolong." The 3d section of the act of 1832, and the 13th section of the act of 1836 [5 Stat. 122], provide for the issuing of a new patent in the place of an invalid patent. The word "renew" is not used; nor is the word "renew," or the terms "renewal of the patent," used in a single instance by the supreme court in [Grant v. Raymond], 6 Pet. [31 U. S.], or by the circuit court in Morris v. Huntington [Case No. 9,-831], when discussing the legality of issuing a patent in the place of a prior invalid patent. It is called, as it is, a new patent for the same invention and for the same term, as a substitute for and not a renewal of the former invalid patent.

It is useless to pursue this philological discussion further. It must be obvious, that the definition and meaning now attempted to be given to the word "renew," are forced and arbitrary, and contrary to the intention of the parties, and to the import of the word as understood by them, when this contract of assignment was entered into. If it can be supposed that there is anything ambiguous or equivocal, as to the sense in which the parties to this assignment used the term "renewal," the covenantor, or those who represent him, cannot be benefitted by it." "A covenant is always taken most strong against the covenantor, and most in advantage of the covenantee." Shepp. Touch. (1st Am. Ed., 1808) 166.

IV. The fourth question is, whether the plaintiff, claiming under the extension from the administrator, can maintain an action for an infringement of the patent-right within the territory specified in the contract of assignment to Twogood, Halstead and Tyack, against any person not claiming under said assignment; or whether said assignment be, of itself, a perfect bar to the plaintiff's suit. If I have been successful in the attempt to maintain my proposition in regard to the second and third questions, or either of them, nothing further need be said upon this question. If I have been unsuccessful in that attempt, nothing further can be said. If my construction of the 18th section of the patent act, or of the assignment to Twogood, Halstead and Tyack, be correct, it necessarily follows: 1st. That the plaintiff has no right or title to the exclusive use of the invention in question, in the county of Albany. That right is vested in others. 2d. Without such title, the plaintiff cannot maintain an action for an infringement of that right. The defendants are in the possession and enjoyment of the patented machine, in the county of Albany. This action is brought against them because they are in such possession and enjoyment. If the plaintiff has no title to the exclusive use of the patented machines in that county, it is idle to contend that he can

maintain the action, because the defendants have no title. The defendants have a right to say, we are answerable to no one but him who has the title to the exclusive right.

VI. The sixth question is, whether the plaintiff, if he be an assignee of an exclusive right to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to maintain an action for an infringement of the patent within said town, or whether, to maintain such action, the plaintiff must be possessed, as to that territory, of all the rights of the original patentee?

Prior to the act of 1836, an action at law could not be maintained by and in the name of such an assignee. Whittemore v. Cutter [Case No. 17,600]; Tyler v. Tuel, 6 Cranch [10 U. S.] 329. The only provision of the law of 1836, which authorizes an assignee to maintain an action, is contained in the 14th section, and is in these words: "and such damages" (damages for the infringement of the patent) "may be recovered by action on the case, in any court of competent jurisdiction, to be brought in the name or names of the person or persons interested, whether as patentee, assignees, or as grantees of the exclusive right within and throughout a specified part of the United States." To entitle an assignee or grantee to maintain an action in his own name, for an infringement of the patent, he must, by the express terms of this section, be the assignee or grantee "of the exclusive right within and throughout a specified part of the United States." Is an assignee or grantee of a part only of the exclusive right within a specified territory, an assignee or grantee of the exclusive right? What exclusive right must the assignee have, to enable him to sue in his own name? Clearly the exclusive right secured by the patent, to the extent of the specified territory. The exclusive right cannot mean a part of the exclusive right.

The patentee, in this case, has an equal interest with the assignee or licensee, that no more than the two machines should be used in the town of Watervliet. For, although the patentee, after he had granted to another the exclusive right of using two machines in the town of Watervliet, could not lawfully use or authorize the use of any other machines in that town; yet the unauthorized use of more than two machines in that town, would prejudice the sale and lessen the value of the exclusive right to use the machine in other places. If such an assignee can be deemed to have any interest in the patent, it is a joint interest with the patentee; in which case, a suit might perhaps be maintained in the name of both, but clearly it could not be in the name of such assignee alone. He is not an assignee of the exclusive right; that is, of the whole of the exclusive right for that town, or any other specified part of the United States.

But I submit that a grant of the exclusive right to use two machines in a specified town

or territory, is only an exclusive license to use such machines, and gives the licensee no right in the patent itself. In such case, the suit must always be brought in the name of the patentee, as the title to the whole patent is in him. A grant of the exclusive right to use two or more machines, in whatever form it may be made, is in legal effect only an exclusive license, and gives no title whatever to the patent, even if such exclusive license should be co-extensive with the patent. Protheroe v. May, 5 Mees. & W. 675. It necessarily follows, that a suit for an infringement of the patent under such circumstances, must be brought in the name of the patentee.

VII. The seventh question is: Whether the letters patent issued to William Woodworth, as administrator, on the 8th of July, 1845, upon the amended specification and explanatory drawings then filed, be good and valid in law; or whether the same be void for uncertainty, ambiguity or multiplicity of claim, or for any other cause. As to this question, it is submitted that the new patent issued to William W. Woodworth, as administrator, on the 8th of July, 1845, is void on the following grounds: (1) The said letters patent are not countersigned by the commissioner of the patent office, and there was no vacancy in the office of the commissioner, when said patent was issued. Vide sections 2, 4, 5, 13, of the patent act of 1836. (2) The said patent of July 8th, 1845, is for an improvement in machines for planing boards, and the specification[2] does not describe the machine upon which the invention patented is claimed to be an improvement, nor in any other manner specify in what the alleged improvement consists. Turner v. Winter. 1 Term R. 602, 605; Campion v. Benyon, 3 Brod. & B. 5; MacFarlane v. Price, 1 Starkie, 199; Evans v. Eaton, 3 Wheat. [16 U. S.] 454, and 7 Wheat. [20 U. S.] 356; Lowell v. Lewis [Case No. 8,568]; Barrett v. Hall [Id. 1,047]; Sullivan v. Redfield [Id. 13,597]; Dixon v. Moyer [Id. 3,931]. (3) The specification claims the invention to be of the machine or machines therein described, and not of an improvement upon any existing machine, while the patent is for an improvement in machines, which presupposes the existence of a machine upon which an improvement has been invented. The specification is, therefore, broader than the patent, does not support it, and the patent is therefore void. Sullivan v. Redfield [supra]; section 5 of patent act of 1836; Webst. Pat. 65, note b. (4) The specification describes and claims several distinct and separate combinations of tools or implements, each of which combinations is claimed as a separate machine, that may be operated separately; and also a combination of those several combinations into one machine. This multiplicity of claim renders the patent void. (5) The said new patent of July 8th, 1845 [6 Stat. 936].

—————
[2] See the letters patent and specification set forth at length in 4 How. [45 U. S.] 662–668.

is·not for the same invention for which the original patent was granted. (6) The patent is issued for a longer time than is authorized by law, and is also issued in trust for third persons, which is not authorized by law.

1. In regard to the first point, I submit, that unless a patent is issued, signed and countersigned by the officers designated by the statute, it is void. If it be not signed or countersigned by the proper authority, it is not a patent. The 5th section of the act of 1836, requires all patents to be signed by the secretary of state, and countersigned by the commissioner of the patent office. The 2nd execution of that act authorizes the chief clerk of the patent office to perform the duties of the commissioner during a vacancy in the office of commissioner. The same section also gives the chief clerk the custody of the seal, books, records and models of the office during the necessary absence of the commissioner, but only authorizes him to discharge the duties of commissioner, when that office is vacant. This patent is countersigned by the chief clerk, acting as commissioner, when the office of commissioner was not vacant. This, I submit, was wholly unauthorized, and the patent, not having been countersigned as required by the act, has no validity.

2. The objection to the validity of the patent, raised by the second point, it seems to me, is a matter of settled and positive law, if any question, which has been settled by repeated adjudications, can be deemed so. The patent shows upon its face, that it was granted for a "new and useful improvement in machines for planing, tonguing, and grooving, and dressing boards." It appears, also, upon the face of the patent, that that was the invention for which the patent was claimed. It will be seen, by reading the specification, that the improvement is in no manner whatever described. It describes how the machines are constructed and the manner in which they are to operate, but it does not describe the machine upon which the invention patented is claimed to be an improvement, nor in any other manner specify in what the alleged improvement consists. Sullivan v. Redfield; Dixon v. Moyer; Lowell v. Lewis; Barrett v. Hall.

The doctrine which I maintain, was. to its full extent. confirmed by the supreme court in the cases of Evans v. Eaton, 3 Wheat. [16 U. S.] 454, and 7 Wheat. [20 U. S.] 356. In the last case, at page 366, Mr. Justice Washington says: "The patent is for an improved hopper-boy, as described in the specification, which is referred to and made part of the patent." In the case at bar, the patent is for "a new and useful improvement in machines for planing, tonguing and grooving, and dressing boards. &c.."—"a description whereof," (that is, of the improvement in the machines,) "is given in the words of the said William W. Woodworth in the schedule" (specification) "hereunto annexed, and is made part of these presents." Thus far the

patent in this case is the same as in the case cited, a patent for an improved thing and for an improvement in a thing being the same; and, by pursuing the opinion of Mr. Justice Washington, and comparing the specification in this case, with that in the case cited, it will be seen, so far as it regards the question now under consideration, that the specifications in the two cases are identical, and that the same principle of law must govern both. After stating that the patent was for an improved hopper-boy, Mr. Justice Washington proceeds: "Now, does the specification express in what his improvement consists? It states all and each of the parts of the entire machine, its use, and mode of operation, and claims, as his invention, the machine, the peculiar properties or principles of it, viz: the spreading, turning, and gathering of the meal, and the rising and lowering of its arm, by its motion, to accommodate itself to the·meal under it. But does this description designate the improvement, or in what it consists? Where shall we find the original hopper-boy described, either as to its construction, operation, or use; or by reference to anything, by which a knowledge of it may be obtained? Where are the improvements on such original stated?" In the case at bar the specification states all and each of the parts of the several machines, and the mode of their operation separately, and jointly when combined as one machine. The summary or claim is then stated in the specification as follows: "Having thus fully described the parts and combination of parts, and operation of the machine for planing, tonguing, and grooving boards or plank. and shown various modes in which the same may be constructed and made to operate, without changing the principle or mode of operation of the machine, what is claimed therein as the invention of William Woodworth, deceased, is the employment of rotating planes, substantially as herein described, in combination with rollers, or any analogous device. to prevent the boards from being drawn up by the planes when cutting upwards. or from the reduced or planed to the unplaned surface. as described. And also the combination of the rotating planes with the cutter-wheels for tonguing and grooving, for the purpose of planing, tonguing and grooving boards, &c., at one operation, as described. And also the combination of the tonguing and grooving cutter-wheels, for tonguing and grooving boards, and at one operation, as described. And finally, the combination of either the tonguing or the grooving cutter-wheel, for tonguing or grooving boards, &c., with the pressure rollers, as described, the effect of the pressure rollers in these operations being such as keep the boards. &c., steady, and prevent the cutters from drawing the board towards the centre of the cutter-wheels, whilst it is moved through by machinery. In the planing operation. the tendency of the plane is to lift the board directly up against the

rollers; but in the tonguing and grooving, the tendency is to overcome the friction occasioned by the pressure of the rollers."

Now I invite the learned counsel for the plaintiff to point out, and the court to ascertain and designate if it can, in what the improvement of the patentee in the machines for planing, tonguing and grooving and dressing boards, consists. What was the machine before it was improved? How did it operate? Of what cutter-wheels, or other tools or implements, was it composed? What has been added by the improvement? Where does the old stop, and the new begin? What was the previous combination, and how does the improved machine differ from it? To all these enquiries the same answer must be given, which was given by Mr. Justice Washington to similar questions put by himself, in the case of Evans v. Eaton. "The undoubted truth is, that the specification communicates no information whatever upon any of these facts." At pages 434, 435, of the case of Evans v. Eaton, in 7 Wheat. [20 U. S.], the supreme court fully agree with and confirm the doctrine of Mr. Justice Washington. Unless these and the other authorities cited in support of this point are overruled, this patent cannot be sustained. I need not, I trust, remind the court, that if the invention consists of a machine constituted by the combination of known implements, or by the combination of known machinery, the patent must be for the machine itself so constituted, and if taken out for an improvement upon or in machines, it cannot be sustained.

3. The third objection to the validity of this patent, rests upon a different, though somewhat analogous principle. It is a well established principle of law, in regard to patents, that the specification must not be broader than the patent; it must support the patent; if it fail to do so, the patent is void. If the patent be for an improvement in a machine, and the schedule or specification claims the machine which it describes, as the invention, or if the patent be for a machine, and the specification claim an improvement as the invention, in neither case does the specification support the patent, and it is, therefore, void. This principle is clearly deducible from the patent act, as well as from the adjudications on that subject. The 5th section of the patent act of 1836 provides, that "every patent shall contain a short description or title of the invention or discovery, correctly indicating its matter and design." In Webst. Pat. p. 65, note b, it is stated, that great accuracy is necessary in stating the description or title of the invention for which the patent is issued, in the letters patent; because if the invention, which is particularly described in the specification, varies from the description or title in the patent, the patent cannot be considered as having issued for the invention described in the specification, and will, therefore, be void. In Cochrane v. Smethurst, 1 Starkie, 205, the patent was for

an improved mode of lighting cities; the specification described the invention to consist of an improved street lamp. It was held that the specification did not support the patent; that the invention described in the specification was not truly indicated by the description or title in the patent; and that the patent was therefore void. The description or title of the invention, as contained in the patent in this case, and for which the patent is issued, is, "a new and useful improvement in machines for planing," &c. This description necessarily presupposes the existence of a machine upon which an improvement has been invented, and that the invention for which the patent was issued, consists of such improvement. But the specification claims the invention to be of the machines therein described, and not of an improvement upon any existing machine. In the case of Sullivan v. Redfield, before referred to, Mr. Justice Thompson says: "This specification is obviously broader than the patent. The latter is for an improvement of the steam tow-boat, and the former contains a description of the steam tow-boat itself, of which the patentee claims to be the inventor, according to his specification. The patent and specification are connected together, and dependent on each other for support. The specification should maintain the title of the patent. The latter should not indicate one thing and the former another, as the subject of the grant."

But it is said by the learned counsel for the plaintiff, that the liberality of construction for which he contends, would authorize the court to hold, that this patent is for the machines described in the specification, and not for an improvement in machines. That is most undoubtedly true. His construction of statutes and of language, would not only authorize but require the court to hold, that this patent, although it is declared in express terms to be for an improvement in machines, is, nevertheless, not for an improvement, but for the machines themselves. There is, however, a slight objection to this liberality, or, to use a more appropriate phrase, to this liberty of construction. It is entirely at variance with all principle and every adjudged case on the subject.

4. The fourth objection to the validity of the patent is founded upon the multiplicity of claim. It has already been shown, by reading the specification, that it claims a separate and distinct combination of tools and implements, constituting a machine for planing; another combination of implements constituting a machine for grooving boards and plank; another combination for tonguing boards and plank; a combination of the two last machines, constituting another and a different machine, for both tonguing and grooving plank at one operation; and a combination of all these machines, constituting another and different machine, for planing, tonguing and grooving boards at one operation. These five separate

and distinct machines, it is claimed, and, as appears by the specification, may be operated separately, producing separate and distinct results; not different parts of one complete manufacture at which the work must arrive before it can be used, but producing separate and distinct manufactures, each of which not only may be, but very frequently is used without the other. Many boards and plank are required to· be planed only, the use to which they are to be applied not requiring them to be tongued and grooved; and many are required to be tongued and grooved which are not required, for the uses to which they are to be put, to be planed.

In the case of Evans v. Eaton, 3 Wheat. [16 U. S.] 454, 506, the supreme court manifested a very serious doubt—Mr. Justice Story said, a very significant doubt, which he was persuaded could not be removed—that several distinct inventions could not be embraced and secured in one and the same patent. When the question afterwards came before him in the case of Barrett v. Hall, he held, that if the patentee embraced several distinct improvements or inventions in the same patent, it would· be void. In that case the patent was for "a new and useful improvement, being a mode of dyeing and finishing all kinds of silk goods." The invention, as described in the specification, consisted of an improved reel and an improved silk-frame. The reel was used to wind and secure the silk and put it in the dye. The frame was for the purpose of extending and finishing the silk after it was dyed. The learned judge held, that if the specification claimed the reel and also the frame as the invention, the patent was void for multiplicity of claim, as containing two distinct machines, each of which might be operated separately and independent of the other. "A patent," said he, "cannot embrace various distinct improvements or inventions; but in such case, the party must take out separate patents. If the patentee has invented certain improved machines, which are capable of a distinct operation, and has also invented a combination of those machines to produce a connected result, the same patent cannot at once be for the combination and for each of the improved machines; for the inventions are as distinct as if the subject were entirely different." Unless the doctrine promulgated in this opinion of the circuit court is held to be unsound, the patent in the case at bar is void. Most certainly, planing boards, and tonguing and grooving boards, are much more separate and distinct operations, than those of dyeing and finishing silk. The latter are, to some extent, connected, and necessary to be performed upon the article before it can be used. Silk must at least be dried after it is dyed, before it can be used, and, in most instances, it is required to be finished before it is used, though it is sometimes used in its raw state, without receiving its gloss ·by being dressed. But a much greater portion of boards and plank are required to be planed without

being tongued and grooved, and to be tongued and grooved without being planed, than are required to be planed, tongued and grooved. The operations of planing, tonguing and grooving boards and plank, are no more necessarily connected, or different parts of one and the same general operation, than the operations of making a garment, and of coloring and dressing the cloth of which it is made.

But it is said that this is but one invention, and that it was necessary for the patentee to claim the several machines as well as the combination of the whole, to prevent piracies of any part of the combination of the whole, because if the patentee had only taken out his patent for the combination constituting the machine to plane, tongue and groove at one operation, any person might, with impunity, use the planing, or tonguing, or grooving machine separately. If the objection to the patent, presented by this point, be correct in principle, this argument sustains, instead of disproving it. It shows that the operations of the several machines are separate and distinct, and are not the performance of parts of one and the same general connected operation. The patentee might have obtained a patent for each of the machines, and also a patent for a combination of the whole. In the case of Treadwell v. Bladen [Case No. 14,154], the patentee took out a patent for a combination of five parts, and afterwards took out a patent for a combination of two of them, which produced a part of the result obtained by the combination of the whole. It was objected that the first patent embraced the whole and all its parts, and therefore the last patent was void, because a patentee could not have two patents for the same invention. But the court held the two patents were not for the same invention—that a combination of the whole did not embrace each part, or a combination of two or any number of parts less than the whole, unless such combination would produce the same result, in the same manner, accomplished by the combination of the whole.

5. In discussing the fifth objection to the validity of the patent, I shall assume that the new patent, of July 8th, 1845, issued upon the surrender of the original patent, is not for the same invention for which the original patent was issued, as that proposition is embraced in and will be debated under the eighth question. If I am right in the assumption that the new patent is not for the same invention for which the original patent was issued, it is clearly unauthorized and void. The only authority for issuing the new patent is contained in the thirteenth section of the patent act of 1836. That section only authorizes a new patent to issue for the same invention for which the original patent was issued, in case the original patent is invalid by reason of a defective or insufficient description or specification, and shall be for that reason surrendered and cancelled. If, therefore, an original patent is invalid for the reason mentioned in the act, and is for that cause surrendered and cancelled, a

new patent can only issue for the same invention. If the new patent is not upon its face for the same invention, or if the corrected specification describes an invention different from that for which the original patent was issued, the patent would be unauthorized by the act and consequently void.

6. As to the sixth point: The new patent appears upon its face to have been issued to the administrator of the patentee, in trust for his heirs at law, for the term of twenty-eight years from the date of the original patent. This is wholly without authority. The thirteenth section of the act only authorizes the new patent to issue for the unexpired term for which the original patent was issued. If the patentee be dead at the time such new patent is issued, it may be issued to his executors or administrators; but it contains no authority for the issuing of such patent in trust for the heirs at law of the original patentee. The tenth section authorizes an original patent to be issued to the executors or administrators of an inventor in trust for his heirs at law or devisees, in case the inventor dies after having made the discovery and before obtaining a patent. But in no other case is a patent authorized to be issued in trust for the heirs at law of the inventor. Nor is there any authority for issuing a patent in any case for twenty-eight years. It is said the original patent was extended under the eighteenth section for seven years, and by the act of 1845 for seven years longer, making a period of twenty-eight years from the date of the original patent. But this is no answer to the objection. The exclusive right secured by the original patent, may, by law, continue for twenty-eight years, and still, the commissioner of patents has no authority to issue a patent for that period. That depends entirely upon the fact, whether any such authority is given by the statute. The act of 1845, although it extends the original patent of 1828 for seven years from December, 1849, yet gives no authority whatever to the commissioner of patents or to any other person to issue a new patent for any period. Nor, is the extension granted by that act, in trust for, or for the benefit of, the heirs of the patentee. In both these respects, therefore, the commissioner of patents has exceeded his power, and the patent is for that reason void.

VIII. The eighth question is: Whether the court can determine, as matter of law, upon an inspection of the said two patents, and their respective specifications, that the said new patent of the 8th of July, 1845, is not for the same invention for which the said patent of 1828 was granted. Whether the specifications of the two patents describe two distinct inventions materially different from each other, cannot perhaps be decided as a matter of law upon an inspection of those specifications. The testimony of experts might prove them to be different or the same. I do not, therefore, propose in this stage of the cause to raise any question as to the dissimilarity of the two inventions as described in the two specifications. But I insist, it appears upon the face of the two patents, that the new patent is not for the same invention for which the original patent was issued. The original patent states the invention for which it is issued, to be, "a new and useful improvement in the method of planing, tonguing and grooving plank and boards." The new patent states the invention for which it is issued, to be, "a new and useful improvement in machines for planing, tonguing and grooving boards, &c." These are manifestly different things. A method of planing, is not a machine for planing. The method of doing a thing is the manner, the modus operandi of doing it, and not the instrument by which it is done. It is the mode of operating with the machine, and not the instrument iself. There may be an improvement in the method of planing boards, without any improvement in the implements or machine with which that work is performed. So there may be an improvement in a machine for planing, without any improvement in the mode of its operation. They are not the same improvement or invention. A patent for the one will not embrace the other.

In the case of Cochrane v. Smethurst, 1 Starkie, 205, it was held that a patent for an improved method of lighting cities, was not supported by a specification describing an improved street lamp. The patent should have been for an improved street lamp; yet if an invention of an improved mode or method of lighting cities, and an invention of an improved street lamp, were the same thing, clearly the specification would have supported the patent. Two patents, one for an improved method of lighting streets, and the other for an improved street lamp, would not be for the same invention. A specification which would support the one, would not support the other. So in this case, a patent for an improved method of planing, and a patent for an improvement in a machine for planing, are entirely different. A specification which would support the one would not support the other. In the case of Barrett v. Hall, Mr. Justice Story says: "If the invention consist in a new combination of machinery, or in improvements upon an old machine to produce an old effect; the patent should be for the combined machinery, or improvements on the old machine, and not for a mere mode or device for producing such effects, detached from machinery." In Boulton v. Bull, 2 H. Bl. 463, Chief Justice Eyre, said that method was not a machine, but was the mode of operating, either with a machine or the hand of man; that it was a principle detached from all physical existence whatever; and that if it were new and useful and reduced to practice, it was patentable. In Barrett v. Hall, before cited, Mr. Justice Story concurs in this doctrine of Chief Justice Eyre. The authority and reasoning of these cases are decisive of the question.

IX. The ninth question is: 'Whether the decision of the board of commissioners, who are to determine upon the application for the extension of a patent under the eighteenth section of the act of 1836, is conclusive upon the question of their jurisdiction to act in the given case. It has already been shown, first, that this board is a tribunal of special and limited jurisdiction; and, secondly, that all acts and proceedings of such a tribunal, beyond the power specially given it, or in a manner different from that specially prescribed, are coram non judice and void. It necessarily follows, that the decision of such a board, that it has jurisdiction, cannot give it jurisdiction. An adjudication, whether upon the question of jurisdiction, or any other question, which is void for the want of jurisdiction, is a mere nullity. There is no judge, and, therefore, no judgment; and so far from being conclusive upon the question of jurisdiction, it can have no effect whatever upon any question.

X. The tenth and last question is: Whether the commissioner of patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and pending the existence of an extended term of seven years; or whether such surrender and renewal may be made at any time during such extended term. The only authority for issuing the new patent of 8th July, 1845, is given by the 13th section of the patent act of 1836. Whatever may have been the power of the secretary of state, prior to the law of 1836, by that law the authority to issue a new patent for the same invention, in a case where the original patent is void, is limited to, and can be exercised only in strict accordance with the power given by the 13th section of that act. The part of that section applicable to the present question, is in these words: "Whenever any patent which has heretofore been granted, or which shall hereafter be granted, shall be inoperative, or invalid, by reason of a defective or insufficient description or specification, or by reason of the patentee claiming in his specification as his own invention, more than he had or shall have a right to claim as new; if the error has, or shall have arisen by inadvertency, accident, or mistake, and without any fraudulent or deceptive intention, it shall be lawful for the commissioner, upon the surrender to him of such patent, and the payment of the further duty of fifteen dollars, to cause a new patent to be issued to the said inventor, for the same invention, for the residue of the period then unexpired for which the original patent was granted, in accordance with the patentee's corrected description and specification." This is a limited special authority, and must be strictly pursued. In exercising the authority conferred by this act, the commissioner is confined strictly to the power given him. "He can take nothing by implication, but must show the power to be expressly given in every instance." Jones v. Reed, 1 Johns. Cas. 20. The very authority to the commissioner to issue such new patent declares, in express terms, that such new patent shall be issued only "for the residue of the period then unexpired, for which the original patent was granted." This phraseology is an unequivocal exclusion of the period unexpired, for which the original patent may have been extended; or the unexpired period or term of a renewed patent.

Congress undoubtedly intended, that it ought to be and necessarily would be ascertained within the fourteen years for which the original patent was granted, whether it was or was not void, for any of the reasons specified in that section. This part of the section is an exact transcript of the third section of the act of 1832. It can mean no more or less now, than it meant then. Prior to 1836, a renewal or extension of the term for which the original patent was issued, was only granted by a special act of congress. The 3d section of the act of 1832 confines the power of the secretary of state to the issuing of a new patent for the unexpired term for which the original patent was issued, in case such original patent were void for any of the reasons specified in that section. Should congress, by act, renew a patent, without making any provision in the act for remedying defects in the specification, the secretary of state would have no authority, by virtue of the 3d section of the act of 1832, to supply such omission. In short, if congress, by the 13th section of the act of 1836, intended to provide for the issuing of a new patent for the unexpired term for which any original patent might have been or might be extended, it is clearly a casus omissus, and cannot be supplied by interpretation or construction. Dwar. St. 711.

I have now submitted to the court all the observations which have occurred to me as pertinent to the various questions presented; and although I am perfectly aware that the law has no respect to persons, yet so much has been said in the course of the argument, of a disparaging and somewhat vituperative character against assignees of patents, and laudatory of patentees, that I hope I may be pardoned, if, before I take leave of the subject, I remind the court that the plaintiff in this cause, as well as the defendants, is an assignee of the invention in question. The only difference in their characters or positions, as litigants, is, that the plaintiff is a subsequent assignee, with a full knowledge of the prior assignment, and the right claimed under it—certainly, therefore, in no sense, a bona fide assignee without notice—an assignee, too, who, we are at liberty to assume, has purchased the rights which he now claims, at a reduced price, in consequence of the claims of others under the prior assignment. It is in favor of rights thus acquired that this court is invoked to disregard the plain words, as well as the established rules for the interpretation of statutes—to put a limited, forced, and unnatural construction, against the covenantee, upon the words of the covenant contained in the prior assignment, under the specious,

though, I insist, unfounded and illegal pretence. that this extraordinary departure from all law and all principle, is invoked "to foster genius and reward merit." Is inventive genuis, however meritorious, to be fostered and rewarded at such an expense—at such a sacrifice?

The answers of the supreme court to the several questions certified will be found in 4 How. [45 U. S.] 687, 688.

[For other cases involving this patent, see note to Bicknell v. Todd, Case No. 1,389.]